1  ROBERT E. KREBS, CA BAR NO. 57526
   rkrebs@thelen.com
2  CHRISTOPHER L. OGDEN, CA BAR NO. 235517
   cogden@thelen.com
3  PAPOOL S. CHAUDHARI, CA BAR NO. 241346
   pchaudhari@thelen.com
4  THELEN REID BROWN RAYSMAN & STEINER LLP
   225 West Santa Clara Street, Suite 1200
5  San Jose, CA  95113–1723
   Tel. 408.292.5800
6  Fax 408.287.8040

7  RONALD F. LOPEZ, CA BAR NO. 111756
   rflopez@thelen.com
8  THELEN REID BROWN RAYSMAN & STEINER LLP
   101 Second Street, Suite 1800
9  San Francisco, CA 94105–3606
   Tel. 415.371.1200
10 Fax. 415.371.1211

11 Attorneys for Defendants TECHNOLOGY PROPERTIES LIMITED, MCM PORTFOLIO LLC,
   and ALLIACENSE LIMITED.
12
   CHARLES T. HOGE, CA BAR NO. 110696
13 choge@knlh.com
   KIRBY NOONAN LANCE & HOGE, LLP
14 350 Tenth Avenue, Suite 1300
   San Diego, CA 92101
15 Tel. 619.231.8666
   Fax. 619.231.9593
16
   Attorney for Defendant PATRIOT SCIENTIFIC CORPORATION.
17
                    **UNITED STATES DISTRICT COURT**
18               **NORTHERN DISTRICT OF CALIFORNIA**
                     **SAN FRANCISCO DIVISION**
19

20
   ASUSTEK COMPUTER, INC. and ASUS          CASE NO. 08-CV-00884 EMC
21 COMPUTER INTERNATIONAL,
                                            **DECLARATION OF RONALD F.**
22             Plaintiffs,                  **LOPEZ IN SUPPORT OF**
        v.                                  **DEFENDANTS' MOTION**
23
   TECHNOLOGY PROPERTIES LIMITED,           Date:    June 11, 2008
24 PATRIOT SCIENTIFIC CORPORATION,          Time:    10:30 a.m.
   MCM PORTFOLIO LLC, AND                   Place:   Courtroom C, 15th Floor
25 ALLIACENSE LIMITED,                      Judge:   Hon. Edward M. Chen

26             Defendants.

27

28

SV #341272 v1

1    I, Ronald F. Lopez, declare and state as follows:

2        1.        I am an attorney with the law firm of Thelen Reid Brown Raysman & Steiner LLP,

3    counsel of record to Technology Properties Limited.  I have personal knowledge of the matters set

4    forth in this declaration, and if called as a witness, I could and would testify competently thereto.

5    This declaration is submitted in support of the concurrently-filed Motion to Dismiss on Grounds

6    of Lack of Subject Matter Jurisdiction (the "Motion").

7        2.        I searched the U.S. Patent and Trademark Website, http://patft.uspto.gov/netahtml/

8    PTO/search-bool.html,  for all patents assigned to "Asustek." A total of 170 patents were located. I

9    reviewed the first page of the most recent 50 patents, and every inventor on all 50 patents was

10   based in Taiwan.

11       3.        I searched the U.S. Patent and Trademark Website, http://patft.uspto.gov/netahtml/

12   PTO/search-bool.html, for all patents assigned to "High Tech Computer." A total of 90 patents

13   were located. I reviewed the first page of the most recent 50 patents, and every inventor on all 50

14   patents was based in Taiwan.

15       4.        Attached as Exhibit A is a true and correct copy of the website

16   http://www.referenceforbusiness.com/history2/44/High-Tech-Computer-Corporation.html. While

17   not authoritative, it states that "HTC operates manufacturing subsidiaries in mainland China."

18       5.        Attached as Exhibit B is a true and correct copy of the website

19   http://en.wikipedia.org/wiki/Asustek.  While not authoritative, it states that "As of January 2006,

20   Asus has manufacturing facilities in Taiwan (Taipei, Lujhu, Nankan, Kweishan) and in mainland

21   China (Suzhou), Juarez, Mexico and Czech Republic with a monthly production capacity of two

22   million motherboards and 150,000 notebook computers."

23       6.        Attached as Exhibit C are true and correct copies of three print-outs of web pages

24   that I accessed, starting with http://www.htcamerica.com.

SV #341272 v1

7.      Attached as Exhibit D are true and correct copies of four print-outs of web pages that I accessed, starting with usa.asus.com.

8.      Attached as Exhibit E are true and correct copies of a web page that I accessed from the website www.bestbuy.com.

9.      Attached as Exhibit F is a true and correct copy of the *Defendant Mosaid Technologies Inc.'s Notice of Motion and Motion to Transfer for Consolidation with Broader Action Approaching Trial*, N.D. Cal. Case, Doc. No. 43.

10.     Attached as Exhibit G is a true and correct copy of the opinion in *Ambat v. City and Cty of San Francisco*, No. C 07-3622 SI, 2007 WL 3101323 (N.D.Cal. Oct. 22, 2007).

11.     Attached as Exhibit H is a true and correct copy of the opinion in *Arete Power, Inc., v. Beacon Power Corp.*, No. 07-CV-5167 WDB, 2008 WL 508477 (N.D. Cal. Feb. 22, 2008).

12.     Attached as Exhibit I is a true and correct copy of the opinion in *Carus Corp. v. Greater Texas Finishing Corp.*, No. 91 C 2560, 1992 WL 22691 at (N.D. Ill. January 31, 1992).

13.     Attached as Exhibit J is a true and correct copy of the opinion in *CoxCom, Inc. v. Hybrid Patents, Inc.*, 2007 WL 2500982 (N.D. Cal. 2007).

14.     Attached as Exhibit K is a true and correct copy of the opinion in *Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, v. Gibson Guitar Corp.*, No. 91 C 6718, 1991 WL 273800 (N.D. Ill. Dec. 12, 1991).

15.     Attached as Exhibit L is a true and correct copy of the opinion in *Royal Queentex Enterprises v. Sara-Lee Corp.*, No. C-99-4787 MJJ, 2000 WL 246599 (N.D. Cal. 2000).

16.     Attached as Exhibit M is a true and correct copy of the opinion in *Singleton v. Volkswagen of America*, 2006 WL 2634768 (E.D. Tex. 2006).

17.     Attached as Exhibit N is a true and correct copy of the opinion in *Vishay Dale Electronics, Inc. v. KOA Corp.*, No. 04-CV-247-A, 2004 WL 1908244 (N.D. Tex. 2004).

1    18.    Attached as Exhibit O is a true and correct copy of the opinion in *Vitria Tech. Inc.*

2  *v. Cincinnati Ins. Co.*, No. C 05-01951 JW, 2005 WL 2431192 (N.D. Cal.2005).

3    I declare under penalty of perjury under the laws of the United States of America the

4  foregoing statements are true and correct; and all statements of belief are believe to be true and

5  correct.

6    EXECUTED this 25th day of April 2008 in San Francisco, California.

7

8

9                                        _____/s/_____

10                                        Ronald F. Lopez

Exhibit A

Business forum
Company History Index
Manufacturing

# High Tech Computer Corporation - Company Profile, Information, Business Description, History, Background Information on High Tech Computer Corporation

*23 Hsin Hua Road*
*Taoyuan 330*
*Taipei*
*Taiwan*

**MAS 90 for Manufacturers**
MAS 90 modules designed for the Manufacturing Industry. Free quote
sagemas90.isformy.biz

**Inventory Management**
Integrated Solution with Inventory Management, Accounting and More.
www.NetSuite.com

**Warehouse Distribution**
Smooth Info Sharing With Suppliers & Improve Margins. Learn How Today!
SageMas.com

**Management Training**
Sign up for free weekly business tips and advice from Dale Carnegie.
DaleCarnegie.com

## Company Perspectives

Mission Statement: "Our mission is to become the leading supplier of mobile information and communication devices by providing value-added design, world-class manufacturing, and logistic and service capabilities," Peter Chou, President HTC Corporation, said. He continued, "HTC is working hard to establish a high volume manufacturing facility, and it is focusing on wireless capability, strengthening its R & D team, and developing a software team capable of creating world-class consumer and business applications that will enhance the value of our hardware. It is investing in growing engineering capability in GSM, GPRS and CDMA wireless technologies, investing in sophisticated wireless equipment for both manufacturing and engineering, and investing in protocol software and technology licensing."

## History of High Tech Computer Corporation

High Tech Computer Corporation (HTC) is the hidden force behind most of the world's Windows Mobile-based clamshell "smartphones" and personal digital assistants (PDAs). The Taiwan-based company operates primarily as an original design manufacturer (ODM) but also as an original equipment manufacturer (OEM) for many of the world's largest telecommunications companies, including Orange, NTT DoCoMo, AT&T Wireless, and T-Mobile, among others. HTC also produces smartphones and PDAs under its own brand, Qtek, to limited markets. In June 2006, however, the company announced its acquisition of Dopod, a major manufacturer and distributor of HTC-based smartphones and PDAs in the Asian region, a move that placed HTC in direct competition with many of its customers.

Founded only in 1997, HTC grew quickly through its close partnership with Microsoft Corporation, helping the

software giant impose its operating system on an initially reluctant mobile telecommunications sector. HTC operates manufacturing subsidiaries in mainland China, and sales support subsidiaries in the United States and the United Kingdom, for its North American and European operations, respectively. HTC is led by founder and Chairman Cher Wang, who is also behind chip maker Via Technologies and is the daughter of Y. C. Wang, Taiwan's wealthiest person. Peter Chou serves as the group's president, and H. T. Cho is company CEO. The company is listed on the Taiwan Stock Exchange and produced revenues of TWD 72 billion ($2.23 billion) in 2005.

## Smartphone Start in 1997

High Tech Corporation was founded in 1997 to develop a new generation of personal digital assistants and so-called "smartphones," which combined mobile telephone technology with miniaturized computer and other functions. The development of the smartphones became an important step in what many technology market observers viewed as an inevitable drive toward the convergence of various technologies--ranging from telecommunications to music to video and photography to a variety of computer applications--into single, all-encompassing, handheld units. As company founder Cher Wang told *China Daily:*
"We started HTC with the vision of offering end-users an easy to use product. We have never believed consumers want to have to carry separate laptops, mobile phones and digital cameras."

HTC was not Wang's first venture into the technology sector. Wang was the daughter of Y. C. Wang, head of Taiwan's largest corporation, Formosa, and recognized as Taiwan's wealthiest person. The Wang family had entered the technology sector during the late 1970s, through Formosa Plastic's semiconductor division, headed by Winston Wang, and through First International Computer, established by Charlene Wang and her husband in 1979. The fourth of five children born to Y. C. Wang's second marriage, Cher Wang started out by working for older sister Charlene at First International Computer. Wang then joined with husband Wenchi Chen to found chip maker Via Technologies in 1992. After the Wang family acquired struggling computer manufacturer Everex Systems, based in the United States, in 1993, Cher Wang was placed in charge of the company, and led its turnaround by mid-decade. Despite the wealth of her family, however, Wang was determined to build her career on her own. As she told *China Daily:* "In my career, I have never got a cent from my father."

By the mid-1990s, Wang had become one of the first to recognize the potential for converging technologies. The proliferation of new handheld technologies, especially mobile telephones and PDAs, as well as the rising popularity of portable computers, had given people, especially professionals, a lot to carry. Wang recognized the need for a new generation of handheld device that could combine most, if not all, of the functionality of the various technologies. This led Wang and Wenchi Chen to found a new company, based around a team of engineers from Digital Equipment, a major customer of First International Computer from when Wang worked there. HTC's research and development team gradually increased to a team of more than 1,000 engineers by the mid-2000s.

HTC at first focused on the laptop computer market, specifically on the newly emerging Pocket PC format. This effort brought the company into its first contact with Microsoft, as HTC received its Windows CE OEM certification at the end of 1997. The company set out to develop the first Pocket PC models for the OEM market and by the end of the decade, its models had captured the industry's attention. In 1998, for example, the company was a finalist in *Byte Magazine's* Best of CeBIT awards. By the following year, the company had captured the first prize from *PC Week Magazine's* Best of Comdex Spring awards. Supporting the group's development through this early phase was its early initial public offering, in 1998. The company also became the first in the industry to produce a Pocket PC with a full-color screen.

Yet the company's first years were difficult ones. Within two years, the company was facing mounting losses, and its products failed to capture consumer attention. As Wang told *Business Week:* "The market just wasn't ready for a PDA phone that behaved like a minicomputer." At the same time, the company's products were beset with technical problems, both in their design and operating software. In order to survive, Wang was forced to pump millions of her own money into the company, notably in stepping up the group's engineering and design capacity.

HTC's breakthrough came in 2000, when it was awarded the contract to develop and manufacture a new breed of still smaller handheld technologies, known as the personal digital assistant (PDA), for Compaq Corporation. The Ipaq, as the new device was called, became an instant sensation. The success of the Ipaq was a lasting one, too, as the company continued to develop new models through the middle of the decade. Of importance, the Ipaq featured an expandable design, with slots for both the CompaqFlash Expansion Pack and a PC Card Expansion Pack, pointing the way to the

future convergence of the computing and telecommunications markets.

As Peter Chou pointed out in a company press release in 2000: "We are at the beginning of a 2nd wireless revolution; one that will see wireless and Internet integration as the most important technology of this decade."

**Keeping the Lead in the New Century**

HTC set out to play the role of leader for the new market. In 2001, the company reached a new agreement with Microsoft to develop a new generation of mobile telephones based on the extension of Microsoft's latest handheld operating system, Windows CE 3.0. By March of that year, the company had debuted its first fully functional prototype of the new "smartphone." The fact that Microsoft CEO Steve Ballmer himself made the demonstration helped dramatically raise HTC's profile among the global telecommunications industry. In support of the new product line, HTC reached a processor supply agreement with Texas Instruments in May 2001.

By 2002, HTC had released its first commercially available smartphone, which was picked up by fast-growing British telecoms group Orange, later part of France Telecom. In that year as well, HTC launched its first wireless Pocket PC. The company quickly signed up new customers, including Germany's T-Mobile, the Philippines Smart Communications, and the United States' AT&T Wireless, which added smartphones in 2003. The successful launch of the new technology also transformed HTC's revenue picture. Whereas the group's Ipaq sales had dominated its turnover, accounting for some 85 percent of total company sales in 2001, HTC had successfully reduced its reliance on that single device, back to just one-third of sales, by 2003.

By 2003, HTC faced a growing number of new entrants in the smartphone market, including competing Windows versions, and the rival operating system, Symbian, used by Nokia and Motorola, among others. In response, HTC moved to lower its cost by shifting parts of its production to mainland China, incorporating a subsidiary in Suzhou in 2003. The company also focused on new product development, driving its smartphones toward still smaller, sleeker designs. The company also counted its focus on the handheld market as part of its strength against the newly emerging competitors, which entered the smartphone market with a background in personal computers (PCs). A far different sector, the PC market demanded high volumes, with little need for product innovation. The smartphone market, on the other hand, was especially driven by research and development capable of extending functionality.

HTC's sales rose quickly, as more and more of the world's major telecommunications providers adopted the company's smartphones. By the end of 2004, HTC's revenues had neared $1 billion. In that year, the company boosted its software development wing with the acquisition of IA Style, a noted developer of software applications for the Windows Mobile operating system. Following the acquisition, IA Style, which had previously operated in the retail sector, shifted its operations entirely to supporting HTC's own product development. In the meantime, HTC had begun expanding its global operations, launching a subsidiary in the United States in 2003, and a subsidiary in the United Kingdom in 2005. In this way, the company positioned itself closer to its major customers, which included European giants such as O2, Orange, Vodaphone, T-Mobile, and Telefonica. Also in 2005, HTC became the first to release a smartphone based on the new Windows Mobile 5.0 operating system. By the end of that year, the company's sales had doubled, topping $2.2 billion.

In 2006, HTC moved to boost its operations in the Asian markets as well, announcing its agreement to acquire Dopod in June of that year. Dopod was then a major player in the Asian regions with sales of its own HTC-based smartphones. The acquisition raised eyebrows, particularly among HTC's customers, as the addition of Dopod operations placed HTC in direct competition with the company's own customers. The move signaled the company's possible interest in moving out of the shadows in order to achieve recognition as the world leader in smartphone technology.

**Principal Subsidiaries**

Exedea Inc.; H.T.C. (B.V.I.) Corporation; High Tech Computer Corporation (Suzhou) (China); HTC EUROPE Co., Ltd. (U.K.); HTC USA Inc.; HTEK.

**Principal Competitors**

Siemens AG; Sony Corporation; Thomson Multimedia Inc.; Fujitsu Ltd.; AT&T Inc.; Nokia Corporation; Motorola Inc.; Mitsubishi Electric Corporation; Cisco Systems Inc.; BellSouth Corporation; Louis Dreyfus S.A.S.; Tyco

Electronics Corporation.

# Chronology

- **Key Dates**
- **1997** The company is founded.
- **2000** HTC is awarded the contract to develop and manufacture a PDA, the Ipaq, for Compaq Corporation.
- **2001** HTC reaches an agreement with Microsoft Corporation to develop a new generation of mobile telephones.
- **2002** HTC releases its first commercially available smartphone and its first wireless Pocket PC.
- **2004** HTC's revenues near $1 billion; IA Style is acquired.
- **2005**
  HTC becomes the first to release a smartphone based on the new Windows Mobile 5.0 operating system; company sales top $2.2 billion.
- **2006** HTC agrees to acquire Dopod.

# Additional Details

- **Public Company**
- **Incorporated:** 1997
- **Employees:** 4,664
- **Sales:** TWD 72.45 billion ($2.23 billion) (2005)
- **Stock Exchanges:** Taiwan
- **Ticker Symbol:** 2498
- **NAIC:**
  334210 Telephone Apparatus Manufacturing; 334220 Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing

# Further Reference

- Dano, Mike, "HTC Finds Niche in High-End Devices," *RCR Wireless News,* September 12, 2005, p. 3.
- Dean, Jason, "Smart Call," *Far Eastern Economic Review,* September 3, 2004.
- Einhorn, Bruce, "The Hottest Tech Outfit You Never Heard Of," *Business Week,* April 24, 2006, p. 42.
- ------, "Meet the Latest Tech All-Star from Taiwan," *Business Week,* March 24, 2003, p. 76D.
- "HTC Opens European Branch to Better Serve Customers," *Taiwan Economic News,* December 5, 2005.
- "HTC to Acquire Dopod with USD150mn," *Alestron,* June 7, 2006.
- Kovac, Matt, "Priestess of the PDA," *Business Week,* July 11, 2005, p. 64.
- Li Weitao, "Inspired Vision," *China Daily,* December 19, 2005, p. 5.
- Weidenbaum, Murray, and Samuel Hughes, "Asia's Bamboo Network," *Fixing America's Schools,* September/October 1996.
- Yeung, Frederick, "Taiwan Smart-Phone Supplier Eyes HK Listing," *South China Morning Post,* June 6, 2006.

Search Company History

powered by
JRank    [            ]  Go

This web site and associated pages are not associated with, endorsed by, or sponsored by High Tech Computer Corporation and has no official or unofficial affiliation with High Tech Computer Corporation.

Copyright © 2007 - NetIndustries, LLC.

Exhibit B

# Asus

From Wikipedia, the free encyclopedia
(Redirected from Asustek)

| ASUSTeK Computer Incorporated | |
|---|---|
|  | |
| **Type** | Public (LSE:ASKD (http://www.londonstockexchange.com/en-gb/pricesnews/prices/Trigger/genericsearch.htm?bsg=true&ns=ASKD) ; TSEC:2357 (http://finance.yahoo.com/q?s=2357.TW) ) |
| **Founded** | 1989 |
| **eadquarters** | Taipei, Taiwan |
| **Key people** | Jonney Shih, CEO and Chairman; TH Tung, VP and founder; Ted Hsu, VP and founder |
| **Industry** | Computer hardware Electronics |
| **Products** | Motherboards, graphics cards, notebooks, PDAs and others (see complete list of categories) |
| **Revenue** | ▲ NT$541.8 Billion (2006) (US$16.5 Billion)[1] |
| **Employees** | 97,000 |
| **Website** | www.asus.com (http://www.asus.com/) |

**ASUSTeK Computer Incorporated (Asus)** (TSE: 2357 (http://finance.yahoo.com/q?s=2357.TW&m=TW) ) (traditional Chinese: 華碩電腦股份有限公司) is a Taiwan-based company that produces motherboards, graphics cards, optical drives, PDAs, notebook computers, servers, networking products, mobile phones, computer cases, computer components and computer cooling systems. Commonly called by its brand name **Asus** (pronounced ah-soo-ss (http://gizmodo.com/gadgets/eee-pc/how-to-pronounce-eee-pc-320007.php?autoplay=true) or [a'sus] in IPA), it is listed on both the London Stock Exchange and the Taiwan Stock Exchange.

## Contents

- 1 History
  - 1.1 Relationship with Intel
  - 1.2 Corporate restructuring
  - 1.3 Timeline
- 2 Manufacturing facilities
- 3 Asus original features
- 4 See also
- 5 References
- 6 External links

# History

Asus was founded in 1989 in Taipei, Taiwan

by TH Tung, Ted Hsu, Wayne Hsieh and MT Liao - all four were computer engineers from Acer. The name *Asus* originated from *Pegasus*, the winged horse of Greek mythology.[2] The first three letters of the word were dropped to give the resulting name a high position in alphabetical listings.

In 2005, shipments from Asus, ECS, Gigabyte, and MSI totaled 104.86 million units. Asus led with 52 million units, followed by ECS with 20 million, MSI with 18 million, and Gigabyte with 16.6 million.

Asus also produces components for other corporations, including Sony (PlayStation 2), Apple Inc. (iPod, iPod Shuffle, MacBook), Alienware, Falcon Northwest, Palm, Inc., HP and Compaq.

## Relationship with Intel

In the early 1990s, Taiwanese motherboard manufacturers had not yet established their leading positions in the computer hardware business. Any new Intel processors would have been supplied to better established companies like IBM first, and the Taiwanese companies would be forced to wait for approximately six months after IBM received their engineering prototypes. [3]

When the Intel 486 was released as engineering samples, Asus decided to design its own 486 motherboard without having a 486 processor engineering sample on site, using only the technical details published by Intel and the experience they gained while making the 386 compatible motherboards. When Asus finalized its 486 motherboard prototype, they took it to Intel's base in Taiwan for testing. Unsurprisingly, they were not formally greeted when they arrived. It turned out that Intel's own 486 motherboard prototype had encountered design flaws, and Intel's engineers were rectifying it. The Asus founders exercised their experience with the 486 and had a look at Intel's malfunctioning motherboard. Their solution worked, to the Intel engineers' surprise. Intel then tested the Asus prototype, which functioned perfectly. This marked the beginning of an informal relationship between the two companies – Asus now receives Intel engineering samples ahead of its competitors.[4]

Asus is one of the main supporters of Intel's Common Building Block initiatives.

## Corporate restructuring

As of 3 January 2008, Asus has been in the process of restructuring its operations. The company will be split into three distinct operational units: ASUS, Pegatron, and Unihan. The Asus brand will be used solely for first party branded computers. Pegatron will handle motherboard and component OEM manufacturing. Unihan will focus on non-PC manufacturing such as cases and molding. In the process of restructuring, the highly criticized pension plan restructuring effectively zeroed out the current pension balances. Previous employee contributions were returned. [5]

## Timeline

- September/October 2003: debuts in the cellphone market with the J100 model.[6]
- September 2005: releases their first PhysX accelerator card[7]
- December 2005: enters the LCD TV market with the TLW32001 model, initially only available on the Taiwan market.[8]
- March 9, 2006: Asus is announced to be one of the producers of the first Microsoft Origami models, together with Samsung and Founder. Samsung and Asus devices expected by April 2006.[9]
- August 8, 2006: announced joint venture with Gigabyte Technology[10]
- June 5, 2007: Asus announced the Eee PC at COMPUTEX Taipei 2007

- **September 9, 2007**
  Asus started to support Blu-ray by announcing the release of BD-ROM/DVD writer PC drive, BC-1205PT.[11] It has been followed by the release of several Blu-ray based notebooks.
- **October 31, 2007**: launched their PDA/smartphone range to the UK market
- **January 3, 2008**: Asus formally splits into three companies: ASUStek, Pegatron and Unihan [12]

# Manufacturing facilities

As of January 2006, Asus has manufacturing facilities in Taiwan (Taipei, Lujhu, Nankan, Kweishan) and in mainland China (Suzhou), Juarez, Mexico and Czech Republic with a monthly production capacity of two million motherboards and 150,000 notebook computers.[13]

# Asus original features

Asus has introduced a number of original features and tools that complemented its products, especially motherboards. The table below lists them, together with some third-party technologies, rebranded under Asus-specific names (note: the acronym *AI*, which prefixes many of the feature names, stands for *Asus Intelligence*).

| Name | Year of Introduction | Product | Description | Patented |
|---|---|---|---|---|
| **AI NET** | 2002 | Motherboards | Diagnoses LAN connection problems before starting the OS | ✓ |
| **AI NOS** | 2005 | Motherboards | Non-delay Overclocking System. A dynamic overclocking technology | ✓ |
| **AI Proactive** | 2004 | Motherboards | a blanket term for all AI enhancements | ✓ |
| **AI Quiet/Q-Fan** | 2003 | Motherboards | Controls fan-speed to requirement for noise management | ✗ |
| **Audio DJ** | 2005 | Motherboards and notebooks | Allows playing Audio CDs without turning the computer on. Notebooks supporting this feature normally have play/pause, stop and other control buttons on the front, where they are accessible even when the notebook is closed. | ✗ |
| **Express Gate /Lite** | 2008 | Motherboards | On boot-up, the user is given the option to boot a version of Linux stored on a bit of Flash memory on the motherboard. Users can surf the internet and use Skype, IM, YouTube, webmail and internet file downloads without booting Windows. | ✓ |
| **Asus EZ Flash** | 2004 | Motherboards | Allows update of the BIOS through a non-boot floppy which just contains the new BIOS image. Built-in with the BIOS firmware and can be accessed by pressing ALT+F2 during the power-on self-test | ✗ |
| **C.P.R. (CPU Parameter Recall)** | 2004 | Motherboards | Automatically restore default CPU settings at reboot when the system fails due to overclocking. | ✓ |
| **Asus CrashFree BIOS** | 2004 | Motherboards | If the BIOS becomes corrupted, CrashFree BIOS 2 allows the user to perform a recovery using the motherboard support CD. | ✓ |
| **Color Shine** (or **Colour Shine**), **Crystal Shine** | 2006 | Laptop LCDs | Asus marketing names for the anti-reflective LCD technology. | ✗ |

| | | | | |
|---|---|---|---|---|
| **GameFace Live** | 2004 | Graphics Cards | A multi-player audio and video chat solution allowing online gamers to see and talk to each other while playing. As of 2006, it is limited to DirectX games and allows up to eight simultaneous players. | ❌ |
| **GameLiveShow** | 2004 | Graphics Cards | Allows gamers to broadcast | ❌ |
| **WiFi-AP** | 2005 | Motherboards | WiFi AccessPoint module bundled with some motherboards, Notably the P5E3 Deluxe/WiFi-AP@n that includes 802.11n. | ❌ |
| **Music Alarm** | 2007 | Motherboards | BIOS feature makes the computer play music from a CD at a user-defined date. | ✅ |
| **Q-Connector** | 2006 | Motherboards | Front-panel connectors plug into this block. The block is then plugged into the motherboard for easy removal and installation. | ✅ |
| **Stack Cool** | 2006 | Motherboards | The back of the motherboard is designed for optimal heat dissipation of onboard components. | ✅ |
| **AI Gear** | 2007 | Motherboards | Uses adjustable profiles to change CPU frequency and Core voltage to minimize noise and power consumption. | ✅ |
| **O.C. Profile** | 2006 | Motherboards | Allows users to store multiple BIOS settings for distribution or sharing. Settings can be stored in CMOS or as a separate file. | ✅ |
| **GreenASUS** | 2006 | All | Products with this badge comply with the RoHS initiative. | ❌ |

# See also

- ASUS Eee PC
- Asus Media Bus
- Asus Routers

# References

1. **^** retrieved 25 May 2007, using 25 May 2007 NWT-USD coversion rate (http://zh.wikipedia.org/wiki/%E8%8F%AF%E7%A2%A9,)
2. **^** Russian-language interview with Alexander Kim, October 2003 (http://www.hw.by/events/asus.html)
3. **^** 巨獅傳奇：華碩成長為世界500強的故事 (http://big5.huaxia.com/sw/qycf/2007/00563271.html)
4. **^** 巨獅傳奇：華碩成長為世界500強的故事 (http://big5.huaxia.com/sw/qycf/2007/00563271.html)
5. **^** [http://www.dailytech.com/New+ASUS+Corporate+Structure+Zeroes+Employee+Pensions/article10206.htm "New ASUS Corporate Structure Zeroes Employee Pensions", DailyTech, 3 January 20080
6. **^** J100 Phone from Asus (http://www.apoxi.com/phones_asus.html)
7. **^** Asus PhysX Card Ready (http://www.vr-zone.com/?i=2724&s=1)
8. **^** Asus enters LCD TV market with TLW32001 32" LCD TV (http://www.newlaunches.com/archives/asus_enters_lcd_tv_market_with_tlw32001_32_lcd_tv.php)
9. **^** Microsoft Unfolds Origami (http://www.informationweek.com/hardware/showArticle.jhtml?articleID=181502222) at the 2006 CeBIT expo
10. **^** Asustek and Gigabyte form joint venture (http://www.digitimes.com/mobos/a20060808PR203.html)
11. **^** Asus BD-ROM/DVD writer drive (http://www.psu.com/Blu-ray-scores-major-new-supporter--a0001253-p0.php) (2007). Retrieved on 2007-09-09.
12. **^** New ASUS Corporate Structure Zeroes Employee Pensions (http://www.dailytech.com/New+ASUS+Corporate+Structure+Zeroes+Employee+Pensions/article10206.htm)
13. **^** Data retrieved from Asus' official website. (http://www.asus.com/)

# External links

- Official Site (http://www.asus.com/)
- Linux on Asus Laptops (user experiences) (http://www.linux-on-laptops.com/asus.html)
- Asus Wl 500 premium Open WRT Howto (http://wiki.openwrt.org/OpenWrtDocs/Hardware/Asus/WL500GP?highlight=%28tftp%29%7C%28asus%29) : WiFi router for the Huawei E220
- Asus FTP in Taiwan - for the most up-to-date drivers. (Asus is very slow to update their subsidiary-sites (e.g. Germany), so check here) (ftp://ftp.asus.com.tw/pub/)
- Asus Forum Troubleshooting and Reviews (http://asusreviews.com/forum/)

Retrieved from "http://en.wikipedia.org/wiki/Asus"
Categories: Companies listed on the London Stock Exchange | Companies listed on the Taiwan Stock Exchange | Companies established in 1989 | Computer enclosure companies | Computer hardware companies | Graphics hardware companies | Motherboard companies | Electronics companies of Taiwan | Taiwan brands | Asus
Hidden categories: Cleanup from November 2007 | All pages needing cleanup

- This page was last modified on 21 April 2008, at 17:15.
- All text is available under the terms of the GNU Free Documentation License. (See **Copyrights** for details.) Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a U.S. registered 501(c)(3) tax-deductible nonprofit charity.

Exhibit C



**htc**
smart mobility

Home | Products | Work + Play | Shop | Support | Partners | About HTC

Choose the form factor that fits your life:

- Bar
- Flip
- Slide
- Qwerty



live easy. live smart.

The Cingular 3125 is stylish, fun and smart... all at the same time!

Learn more ▶▶

Cingular 3125

**New Products**

**HTC Advantage**
The essential tool for mobile professionals.

**Cingular 3125**

**Cingular 3125**
The Smartphone everyone is talking about.

NOW ONLY $99.00*

*$199.00 with $100.00 mail-in rebate

**Products by Carrier**

**"What products does my carrier offer?"**

Verizon 6700

Select a Carrier ▾



hTC

United States | Select Country     ORDER BY PHONE

Home | Products | Where to Buy | Support | HTC e-Club

View Cart | Order Status

**Shop**

Phones

Service Plans

Accessories

Phone + Plan Deals

powered by LetsTalk

## Enter Your Zip Code

### You're One Step Away From Great Deals on Cell Phones!

AT&T, T-Mobile, Verizon and more. All we need is your ZIP code to find the phones and plans available in your area

Find phones & plans in your area.

**Enter Your Zip Code** (or City & State)

[        ] GO

Example: 94107 or San Francisco, CA

ORDER TOLL FREE

Return to HTC Americas  |  About LetsTalk  |  Contact LetsTalk  |  Ordering + Policies  |  Privacy + Security  |  Cart + Checkout

Copyright © 2003-2007 LetsTalk.com Inc. All Rights Reserved.

*Orders for products and services placed on this site will be billed and fulfilled by LetsTalk.com, an authorized wireless agent.





Compare ☐

**HTC Touch™ (Alltel)**
- TouchFLO™ technology
- 2 MP camera with video
- Windows Mobile 6.0 Professional
- Bluetooth® Wireless Technology
- Small and light-weight

See 3-D Image

$199.99*    FREE*

**CONTINUE ▶**
to choose a plan

---

Compare ☐

**HTC PPC6800 (Alltel)**
- Windows Mobile 5.0 OS
- Windows Mobile 6 update now available
- 2 MP camera with video
- Wi-Fi capable
- Bluetooth® Wireless Technology

See 3-D Image

$199.99*    FREE*

**CONTINUE ▶**
to choose a plan

---

Compare ☐

**HTC Mogul (Sprint)**
- 2 megapixel camera with video capture
- Touch screen
- Speakerphone
- The full suite of Windows Mobile software
- miniSD card slot

$249.99*    $99.99*

**CONTINUE ▶**
to choose a plan

---

Compare ☐

**HTC Touch (Sprint)**
- 2 megapixel camera with video capture
- Windows Mobile 6 with integrated TouchFLO Technology
- Speakerphone
- Stereo Bluetooth Wireless technology
- MicroSD card slot

**Receive an Exclusive Power Pack with the purchase of a Sprint HTC Touch!**

$249.99*    $99.99*

**CONTINUE ▶**
to choose a plan

---

Compare ☐

**HTC Shift (Unlocked)**
- Microsoft Windows Vista Business
- Color CMOS VGA Web camera for video conferencing
- Built in microphone and dual speakers
- 1.8 inch 40-gigabyte hard drive
- High speed global connectivity with 3G and Wifi

$1,499.99*    $1,499.99*

**CONTINUE ▶**
to choose a plan

---

*Reflects price after available promotions or rebates. Mail-in rebates available for eligible rate plans only. Mail-in rebates may require customer to submit rebate form with proof of purchase to carrier, manufacturer, or other sponsor. May require a one or two year service term agreement with featured wireless carrier. One-time wireless activation fee and early termination fees may apply. Please check specific rebate instructions and carrier terms and conditions for details and to confirm eligibility.

Return to HTC Americas  |  About LetsTalk  |  Contact LetsTalk  |  Ordering + Policies  |  Privacy + Security  |  Cart + Checkout

Copyright © 2003-2007 LetsTalk.com Inc. All Rights Reserved.
.
*Orders for products and services placed on this site will be billed and fulfilled by LetsTalk.com, an authorized wireless agent.

Exhibit D



Products    Awards    Support    Download    About ASUS    Where to Buy

Select Country / Area

**Product Comparison**

**News**

**Events**

**Contact ASUS**

**Promotion Center**

**ASUS Advantage**

**GreenASUS & SERASUS**

⊙ Products  ○ News  ○ Awards
Keyword [          ] GO

Go Advance Search

Member Site

Easy to Learn

ASUS 360
Notebook Service Program
24 hr Phone Support

ASUS ADW
Get covered in the event
of accidental drops, fire,
spills, and surge.

**Spotlight**



**Audiophile Class Sound**
Your movies, music and games
deserve the best sound possible.
New Xonar DX now available!
▸More



**Win A Rampage Formula
Motherboard**
Free Enthusiast Edge Magazine
subscription for all entrants included.
Today through April 30.
▸More



**ASUS Motherboards With
FSB1600 Support**
20% improvement over FSB1333
▸More



**Discover The Exceptional
ASUS U6 Series**
Find out why this 12" ultraportable
was awarded Laptop Editors' Choice
and Hothardware Recommended
Award.
▸More



**P5E3 Deluxe Motherboard**
58.6% CPU power savings with
exclusive EPU technology
▸More



**R300 Portable Navigation
Device**
Automatic light sensor, Bluetooth,
and multimedia enjoyment in a slim
and compact design.
▸More



**View Your Favorite Products
On YouTube**
Now featuring EeePC, U6 luxury
notebook, P5K3 Deluxe



**Get Up To $200 In Mail-in Rebates**
Select from our best selling gaming notebooks,
thin-and light stylebooks, or desktop replacements!

**News**

◉ 04/22/2008
ASUS Previews Industry's Most Energy-Efficient
Motherboards

◉ 04/14/2008
With the 0dB ASUS EN9600GT SILENT, "Noiseless
Gaming" Never Sounded so Good

◉ 03/20/2008
ASUS Launches Stylish Ultra-light Leather-Bound
Notebook

◉ 03/19/2008
ASUS Striker II Extreme: The Ultimate Republic of
Gamers Overclocking Platform

◉ 03/19/2008
ASUS Launches the World's Fastest Graphics
Solution: The ASUS EN9800GX2/G/2DI/1G

◉ 03/18/2008
ASUS Announces World's First 24" LCD Monitor
with Integrated Video Conferencing Capabilities

◉ 03/18/2008
Enjoy Lightweight Portable Navigation On-the-Go

◉ 03/18/2008
Crystal Clear Audio for Gaming and Home
Entertainment

▸More


motherboard.

▸ More

Home    Legal Information    Privacy Policy    Investor Relations
© ASUSTeK Computer Inc. All Rights Reserved.



ASUSTeK Computer Inc.



Products    Awards    Support    Download    About ASUS    Where to Buy

Select Country / Area

**ASUS Club**

**News**

**Events**

**Contact ASUS**

**Reseller**

● Products  ○ News  ○ Awards

Keyword [          ] GO









## Where To Buy

### USA Resellers

### Canadian Resellers





Home    Legal Information    Privacy Policy    Investor Relations
© ASUSTeK Computer Inc. All Rights Reserved.

1 of 1

4/24/2008 11:10 AM



Products   Awards   Support   Download   About ASUS   Where to Buy

Select Country / Area

**ASUS Club**

**News**

**Events**

**Contact ASUS**

**Reseller**

○ Products ○ News ○ Awards
Keyword [        ] GO

Go Advance Search

Member Site

ASUS Advantage
The Reseller's Insider Resource

## US Resellers



Motherboards          Graphics Cards          Optical Storage

Barebone Notebook     Notebooks               Pocket PCs

PC Components         Networking and Wireless  Servers

Desktop System Integrators  LCD Monitors       Distributors

Eee PC

Home | Legal Information | Privacy Policy | Investor Relations
© ASUSTeK Computer Inc. All Rights Reserved.



Products   Awards   Support   Download   About ASUS   Where to Buy

Select Country / Area

**ASUS Club**

**News**

**Events**

**Contact ASUS**

**Reseller**

○ Products ○ News ○ Awards

Keyword [                ] GO

Go Advance Search

Member Site


ASUS Advantage
The Reseller's Insider Resource

ASUS notebooks feature dramatic styling that turns heads. All come from ASUS fully built and configured with the unwavering attention to quality that ASUS is known for. **Built On ASUS** notebooks are custom tailored to your exact needs. Choose the processor, hard drive size, memory, and operating system that fits your needs and build the notebook of your dreams.

## US Resellers - Notebooks

| | | | |
|---|---|---|---|
| **AGear Notebooks** | AGear Notebooks.com | www.agearnotebooks.com | 866.863.4784 |
| **All Asus** | ALLASUS.COM | www.allasus.com | 866.939.2787 |
| **Alice Computer** | ALICE | www.alicecomputer.com | 626.451.0288 |
| **Bass Computers** | bc | www.basscomputers.com | 281.776.6700 |
| **Best Buy** | BEST BUY | www.bestbuy.com | 888.237.8289 |
| **BTOtech** | BTOTECH.com | 888.580.2951 |
| **Buy** | Buy.com | www.buy.com | 800.800.0800 |
| **CDW** | CDW | www.cdw.com | 800.750.4239 |
| **Central Computer** | CENTRAL COMPUTERS | www.centralcomputers.com | 510.793.5555 |
| **ClubIt.com** | ClubIT | www.clubit.com | 877.625.8248 |
| **ContactPC** | ContactPC | store.contactpc.com | 720.348.0398 |
| **Datavision** | DATAVISION | www.datavis.com | 888.888.2087 |
| **eCost** | eCOST | www.ecost.com | 877.888.2678 |
| **EXcaliberPC** | EXCALIBERPC | www.excaliberpc.com | 877.289.3972 |
| **GenTech** | GenTech Computers | 1toppc.com | 626.915.5008 |
| **Infotech Systems, Inc.** | INFOTECHNOW | infotechnow.com | 253.839.3540 |
| **J&R** | J&R | www.jandr.com | 212.238.9001 |
| **Laptop Authority** | LAPTOP | www.laptopauthority.com | 877.777.8123 |
| **Lynnbay** | LynnBay | www.lynnbay.com/index.cfm | 800.449.2055 |
| **Micro League Inc.** | Micro League Inc. Computer Solutions | www.microleague.com | 800.677.9637 |
| **MilestonePC** | MilestonePC.com | www.milestonepc.com | 888.899.5009 |
| **Mwave** | mwave.com | www.mwave.com | 800.234.3358 |
| **Newegg** | newegg | www.newegg.com | 800.390.1119 |
| **PC Club** | PC CLUB | www.pcclub.com | 626.839.8088 |
| **PC Connection** | PC Connection | www.pcconnection.com | 888.800.0323 |
| **PC Mall, Inc.** | PCMall | www.pcmall.com | 800.555.6255 |
| **Portable One** | P1 | www.laptopsinc.com | 800.650.4006 |
| **ProPortable** | PROPortable | www.proportable.com | 800.474.2296 |
| **Provantage** | PROVANTAGE | www.provantage.com | 877.827.4283 |





Exhibit E



 

Gift Cards    Credit Cards    Reward Zone®    Customer Service    Wish List    Order Status    My Acco

**0** Items

SEARCH FOR [Keyword or Item #]      IN  [All Categories ▾]  [GO]        **Welcome.** Please <u>create an</u>

   | **LOOK FOR THE LOGOS:** Be sure to look for the GEEK SQUAD, Magnolia Home Th
for Business logos. These logos will display when these services are available at your chose

**STORE LOCATOR**

# Find a Best Buy Store

We have found several Best Buy stores near **75670**. Please see the store listings in the search results below.

## Modify Your Search



**ENTER** *Required fields

***ZIP Code**
[               ]

**SELECT STORE SERVICES:**
Refine your search by selecting these additional services:

☐ Mobile electronic installation

☐ Large appliances on display

☐ Professional appliance installation

**AND/OR**
Street Address
[               ]

City
[               ]

***State**
[Select a State... ▾]      [FIND STORES]

## Preferred Stores

**Find stores easier with Preferred Stores**
By adding up to 3 Preferred Stores to Your Account, you'll save yourself time and avoid shipping and handling when you can pick up in-store. If you already have Preferred Stores, view them by signing in. If you do not have an account, it takes only a few moments to create one.

**What are Preferred Stores?**
Preferred Stores are a great way to quickly check in-store merchandise availability. Plus, you eliminate all shipping and handling costs when you can pick up your purchase at one of our stores. During checkout, you can easily make your final

S
qu
Ca
at
(1

Pi

Pe
Se



## Search Results

<u>See Map of All Listed Stores</u>

**Longview TX (Store 594)**       WEEKLY AD
422 W Loop 281
Ste 100
Longview, TX  75601
**Phone:** 903-757-9212
**Hours:** Mon-Sat 10:00am-9:00pm
Sun 11:00am-7:00pm

**This store also features:**
- Mobile electronics installation
- Large appliances on display
- Professional appliances installation

<u>Map & Directions</u> | <u>Add to Preferred Stores</u>

**Also available at this store**

 

**Bossier City LA (Store 1462)**      WEEKLY AD
2641 Beene Blvd
Bossier City, LA  71111
**Phone:** 318-741-1033
**Hours:** Mon-Sat 10:00am-9:00pm
Sun 11:00am-7:00pm

store choices for pickup or delivery.

Featuring Microsoft MapPoint Technology. Review Terms of Use and Privacy Statement.

**This store also features:**
- Mobile electronics installation
- Large appliances on display
- Professional appliances installation

Map & Directions | Add to Preferred Stores

**Also available at this store**



---

**Shreveport LA (Store 363)**     WEEKLY AD
7080 Youree Dr
Shreveport, LA  71105-5109
**Phone:** 318-524-2876
**Hours:** Mon-Sat 10:00am-9:00pm
Sun 11:00am-7:00pm

**This store also features:**
- Mobile electronics installation
- Large appliances on display
- Professional appliances installation

Map & Directions | Add to Preferred Stores

**Also available at this store**



---

**Tyler TX (Store 246)**    WEEKLY AD
5514 S Broadway Ave
Tyler, TX  75703
**Phone:** 903-509-0690
**Hours:** Mon-Sat 10:00am-9:00pm
Sun 11:00am-7:00pm

**This store also features:**
- Mobile electronics installation
- Large appliances on display
- Professional appliances installation

Map & Directions | Add to Preferred Stores

**Also available at this store**



NEXT 4 CLOSEST ▶



**Gift Cards**
• Buy a Gift Card
• Check your balance



**Credit Cards**
• Learn more
• Apply now
• Make a payment



**Rew**
**Pro**
• Lea
• Ch

**Your Order**
Order Status
Shipping &
Delivery
Store Pickup

**Product
Support**
Installation
&
Repairs

**Safe
&
Secure
Shopping**

**More**

Select a Site
Buy
Sites

Store Pickup
Find a Rebate
Returns

Repairs
Warranties
&
Performance
Plans
Order
Product
Recalls
Trade
-
in
Center
Tech
Support
–
by
Fixya

Conditions
of
Use
Legal
Policies
Privacy
Policy
California
Privacy
Rights
Low
Price
Guarantee

Select a Site

About Best Buy  |  News Center  |  Careers  |  For Our Investors  |  Responsibility  |  Community Relations  |  Affiliate Program  |  Site

RSS -
(What's
this?)

**Need help? We're available 24/7 at 1-888-BEST BUY (1-888-237-8289)**

We'll call you now
click to talk ›

Online prices and selection generally match our retail stores, but may vary. Prices and offers are subject to change. © 2003-
2008 Best Buy. All rights reserved. Best Buy, BestBuy.com and the tag design are trademarks of Best Buy. For personal,
noncommercial use only.

Exhibit F

Henry C. Bunsow (060707)
K.T. Cherian (133967)
Scott Wales (179804)
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, CA  94105
Telephone:  (415) 848-4900
Facsimile:  (415) 848-4999
Email:  bunsowh@howrey.com;
cheriank@howrey.com;
waless@howrey.com

Jeannine Yoo Sano (174190)
Andrew Y. Piatnicia (174691)
Anthony S. Kim (225703)
HOWREY LLP
1950 University Avenue, 4th Floor
East Palo Alto, CA  94303
Telephone:  (650) 798-3636
Facsimile:  (650) 798-3600
Email:  sanoj@howrey.com;
piatniciaa@howrey.com;
kimt@howrey.com

Attorneys for Defendant
MOSAID TECHNOLOGIES INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MICRON TECHNOLOGY, INC., | ) Case No. C 06-4496 JF |
| | ) |
| Plaintiff, | ) **DEFENDANT MOSAID TECHNOLOGIES** |
| | ) **INC.'S NOTICE OF MOTION AND** |
| v. | ) **MOTION TO TRANSFER FOR** |
| | ) **CONSOLIDATION WITH BROADER** |
| MOSAID TECHNOLOGIES INC., | ) **ACTION APPROACHING TRIAL** |
| | ) |
| Defendant. | ) Date:   June 13, 2008[1] |
| | ) Time:   9:00 a.m. |
| | Courtroom 3, 5th Floor |
| | Hon. Jeremy Fogel |

---

[1]     MOSAID plans to submit a stipulation or motion shortening time for the hearing to May 16, 2008.  (*See* Kim Decl. ¶ 18.)

# TABLE OF CONTENTS

I.      STATEMENT OF ISSUE TO BE DECIDED ............................................................. 2

II.     STATEMENT OF RELEVANT FACTS ................................................................... 3

III.    ARGUMENT ............................................................................................................. 5

        A.    The Federal Circuit's Opinion Was Based Upon Facts As They
              Existed in October 2006. ................................................................................. 5

        B.    This Action Should Be Transferred to the Eastern District of Texas
              Under 28 U.S.C. § 1404(a). ............................................................................. 6

IV.     CONCLUSION ......................................................................................................... 9

# TABLE OF AUTHORITIES

## CASES

*Arete Power, Inc. v. Beacon Power Corp.*,
  2008 WL 508477, at *2-*14 (N.D. Cal. Feb. 22, 2008)................................................6

*Commodity Futures Trading Comm'n v. Savage*,
  611 F.2d 270 (9th Cir. 1979) ........................................................................................9

*CoxCom, Inc. v. Hybrid Patents, Inc.*,
  2007 WL 2500982, at *2 (N.D. Cal. Aug. 30, 2007) .................................................6, 8

*Flexible Funding, LLC v. Iron Mountain Info. Mgmt.*,
  2005 WL 2431241, at *2 (N.D. Cal. Sept. 30, 2005)....................................................7

*Gulf Oil Co. v. Gilbert*,
  330 U.S. 501 (1947) .......................................................................................................7

*Inherent.com v. Martindale-Hubbell*,
  420 F. Supp. 2d 1093 (N.D. Cal 2006)..........................................................................7

*Jones v. GNC Franchising, Inc.*,
  211 F.3d 495 (9th Cir.), *cert. denied*, 531 U.S. 928 (2000) ........................................7

*MedImmune, Inc. v. Genentech, Inc.*,
  127 S. Ct. 764 (2007) .....................................................................................................2

*Mediostream, Inc. v. Priddis Music, Inc.*,
  2007 WL 2790688, at *4 (N.D. Cal. Sept. 24, 2007).....................................................8

*Micron Tech. Inc., v. MOSAID Techs. Inc.*,
  2006 WL 3050865, at *1 (N.D. Cal. Oct. 23, 2006) ......................................................2

*Micron Tech., Inc. v. MOSAID Techs., Inc.*,
  518 F.3d 897 (Fed. Cir. 2008) .......................................................................................5

*Minnesota Mining & Mfg. Co. v. Norton Co.*,
  929 F.2d 670 (Fed. Cir. 1991) .......................................................................................5

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
  329 F.3d 823 (Fed. Cir. 2003) .......................................................................................6

*Z-Line Designs, Inc. v. Bell'O Intern., LLC*,
  218 F.R.D. 663 (N.D. Cal. 2003) ..................................................................................7

## STATUTES

28 U.S.C. § 1404(a) ...........................................................................................1, 2, 5, 6

Case No.  C 06-4496 JF
MOSAID's Motion To Transfer

HOWREY LLP

DM_US:21143231_4

**RULES**

Civil L.R. 16 ...........................................................................................................................4

Civil L.R. 7-2 ..........................................................................................................................1

Fed. R. Civ. P. 12(b)(3) ..........................................................................................................1

Fed. R. Civ. P. 16(b) ...............................................................................................................4

Case No.  C 06-4496 JF
MOSAID's Motion To Transfer

HOWREY LLP

DM_US:21143231_4

1    TO PLAINTIFF MICRON TECHNOLOGY, INC. AND ITS COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that on June 13, 2008 at 9:00 a.m., or as soon thereafter as the matter

3    may be heard, at 280 South 1st Street, Courtroom 3, San Jose, California, Defendant MOSAID

4    Technologies Inc. will move for an order to transfer this action to the Eastern District of Texas, where

5    *MOSAID Techs. Inc. v. Micron Tech., Inc. et al.*, Case No. 2:06cv-302 DF, is currently pending with a

6    scheduled trial date of October 2008.

7    This Motion is made pursuant to 28 U.S.C. § 1404(a), Rule 12(b)(3) of the Federal Rules of

8    Civil Procedure, and Civil Local Rule 7-2, on the grounds that judicial economy and the interest of

9    justice favor transferring this case for consolidation with the broader action pending in the Eastern

10   District of Texas, in which substantial litigation activity has taken place in the past year and a half and

11   the court has invested significant time and resources in becoming familiar with the patents and issues

12   in dispute, progressing toward a trial date in six months.  To avoid a delay of the October 2008 trial

13   date and for judicial efficiency, MOSAID respectfully requests that this case be transferred to the

14   Eastern District of Texas, where the patents involved in this case, as well as additional patents and

15   another party accused of infringing those patents, are at issue.

16   This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and

17   Authorities and the Declaration of Anthony Kim filed herewith, all pleadings and records on file in this

18   action, any other matter of which the Court may take judicial notice, and any other written and oral

19   argument and authorities as may be presented to the Court on this matter.

20   Dated:  April 23, 2008                    HOWREY LLP

21

22                                            By:  /s/ Jeannine Sano

23                                            Attorneys for Defendant
24                                            MOSAID TECHNOLOGIES INC.

25

26

27

28

## I.      STATEMENT OF ISSUE TO BE DECIDED

Defendant MOSAID Technologies Inc. ("MOSAID") seeks a transfer of this action to the Eastern District of Texas, where an overlapping action that has progressed significantly toward trial is concurrently pending.  The present action was dismissed by this Court on or about October 23, 2006 for lack of subject matter jurisdiction.  *See Micron Tech. Inc., v. MOSAID Techs. Inc.*, 2006 WL 3050865, at *1 (N.D. Cal. Oct. 23, 2006).  In dismissing the action, the Court expressly did "not reach Mosaid's alternative motion to transfer the instant action to the Eastern District of Texas." *Id.* Following the appeal of the Court's ruling by Plaintiff Micron Technology, Inc. ("Micron"), the United States Court of Appeals for the Federal Circuit issued an opinion on or about February 29, 2008, reversing and remanding the case in view of the new declaratory judgment jurisdiction test in *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007).  The mandate issued on or about April 14, 2008, and MOSAID now requests that the Court consider this Motion to Transfer to the Eastern District of Texas.

During the pendency of Micron's appeal of this Court's ruling, a significant amount of litigation activity has taken place in the Texas action in the past year and a half.  MOSAID has served its preliminary infringement contentions, Micron (together with a second defendant not involved in this action) has served preliminary and amended invalidity contentions, the parties have completed claim construction discovery and briefing, undertaken substantial written discovery as well as numerous depositions per side, and have had numerous motions filed and heard by the Eastern District of Texas. At present, the parties have several additional procedural and discovery motions pending hearing in the Eastern District of Texas.  In view of the substantial investment of judicial resources by the Eastern District of Texas into the parties' patent dispute during the past eighteen months and to avoid a delay of the upcoming trial currently scheduled in the Texas action, MOSAID hereby requests the Court to exercise its discretion pursuant to 28 U.S.C. § 1404(a), to transfer this case to the Eastern District of Texas to proceed to trial in October 2008.

Case No.  C 06-4496 JF
MOSAID's Motion To Transfer

HOWREY LLP

DM_US:21143231_4

## II.    STATEMENT OF RELEVANT FACTS

Micron filed its declaratory judgment complaint against MOSAID on or about July 24, 2006. (*See* Compl., Doc. No. 1.)  On July 25, 2006, MOSAID filed a patent infringement action in the Eastern District of Texas against Micron and several other defendants.[2]  (*See* Kim Decl. Ex. 1.)

The patents identified in Micron's declaratory judgment complaint are the following MOSAID patents:  U.S. Patent No. 5,214,602, U.S. Patent No. 5,751,643, U.S. Patent No. 5,822,253, U.S. Patent No. 6,278,640, U.S. Patent No. 6,603,703, U.S. Patent No. 5,828,620, U.S. Patent No. 6,055,201, U.S. Patent No. 6,236,581, U.S. Patent No. 6,580,654, U.S. Patent No. 6,067,272, U.S. Patent No. 6,657,919, U.S. Patent No. 6,992,950, U.S. Patent No. 6,057,676 and U.S. Patent No. RE37,651.

Eight of these fourteen patents (U.S. Patent No. 5,751,643, U.S. Patent No. 5,822,253, U.S. Patent No. 6,278,640, U.S. Patent No. 6,603,703, U.S. Patent No. 5,828,620, U.S. Patent No. 6,236,581, U.S. Patent No. 6,657,919, U.S. Patent No. 6,992,950) are at issue in the Texas action pending between MOSAID, Micron, and Powerchip Semiconductor Corporation ("Powerchip"). Powerchip, a Taiwan corporation, is not a party to the present action and only involved in the Texas action.  MOSAID has asserted four additional patents against Micron in the Eastern District of Texas: U.S. Patent No. 5,406,523, U.S. Patent No. 6,980,448, U.S. Patent No. 7,038,937, and U.S. Patent No. 6,847,573.  These additional patents, with the exception of U.S. Patent No. 6,847,573, are also asserted against the second defendant, Powerchip, in the Texas action.  (*See* Kim Decl. Ex. 4.)

As of the Court's dismissal of the present action in October 2006 for lack of subject matter jurisdiction, this case had not reached the stage of a case management conference under Fed. R. Civ. P. 16(b) and Civil L.R. 16.  In contrast, the Texas action has since progressed to the point where a pretrial conference date of October 6, 2008 and a jury selection date of October 7, 2008 have been set in the

---

[2]    MOSAID amended its complaint in the Eastern District of Texas in August of 2006 and filed its second amended complaint in November of 2006.  (*See* Kim Decl. Exs. 2-4.)  One of the defendants named in the Texas action, ProMOS Technologies, Inc. ("ProMOS") had filed a related action in the Northern District of California, *ProMOS Techs. Inc. v. MOSAID Techs. Inc.*, Case No. C 06-5788 JF. (*See* Doc. No. 31.)  MOSAID has since settled the dispute with ProMOS and also with Mosel Vitelic, Inc., another defendant in the Texas action.  (*See* Kim Decl. Ex. 10.)  The remaining defendants in the co-pending Texas action are Micron and Powerchip.

Case No.  C 06-4496 JF
MOSAID's Motion To Transfer

DM_US:21143231_4

1    case schedule. (*See* Docket Control Order of July 24, 2007, attached as Kim Decl. Ex. 6 at 6; *see also*

2    Kim Decl. Ex. 8.) The parties in the Texas action have also exchanged preliminary infringement and

3    invalidity contentions, identified claims for trial, completed claim construction briefing – submitting

4    over two hundred pages of claim construction briefing plus over a hundred exhibits – taken over

5    twenty depositions, propounded and responded to over three hundred document requests and nearly

6    forty interrogatories, in addition to having filed numerous discovery and procedural motions, many of

7    which have already been heard by the Texas court and several of which are scheduled to be heard on

8    May 1, 2008. (*See* Kim Decl. Exs. 6-9, 13-15, 20-21.) Claim construction discovery has closed, and

9    the Texas court has also appointed a technical advisor. (*See* Kim Decl. ¶ 15, Exs. 16-18.)

10          Following the Federal Circuit's denial of MOSAID's petition for rehearing, the Texas court has

11   continued the claim construction tutorial and hearing which had previously been set for April 14 and

12   15, 2008. (*See* Kim Decl. Ex. 19.) The docket control order scheduling trial for October 2008 in the

13   Texas action, however, has not otherwise been modified. (*See* Kim Decl. ¶ 16.) MOSAID therefore

14   presents this Motion To Transfer in order to conserve judicial resources and continue toward a trial

15   schedule which has been in place since last year, in a jurisdiction where the court has invested

16   considerable time and effort in hearing various motions, resolving disputes, and familiarizing itself

17   with the parties, technology, and patents at issue since the dismissal of this action in October 2006.

18   (*See* Kim Decl. Exs. 8, 9, 22-23, 25-26.)

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

DM_US:21143231_4

III.   **ARGUMENT**

   A.   **The Federal Circuit's Opinion Was Based Upon Facts As They Existed in October 2006.**

In deciding Micron's appeal of the Court's October 23, 2006 jurisdiction order, the Federal Circuit reviewed the Court's dismissal order *de novo* and reversed the Court's ruling based on a subsequent Supreme Court decision, *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007), which created a more lenient standard for declaratory judgment jurisdiction in patent cases. *See Micron Tech., Inc. v. MOSAID Techs., Inc.*, 518 F.3d 897, 900, 902 (Fed. Cir. 2008) ("A district court's grant of a motion to dismiss for lack of subject matter jurisdiction presents a question of law that this court reviews without deference…. Because satisfaction of the reasonable apprehension of suit test is no longer a necessary criterion for declaratory judgment jurisdiction, the district court did not weigh the facts of this case under the correct standard."). Thus, the Federal Circuit's finding of abuse of discretion should necessarily be limited to an evaluation of the Court's exercise of discretion to decline to entertain Micron's declaratory judgment complaint. *See Minnesota Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672 (Fed. Cir. 1991) (declaratory judgment statute specifically entrusts courts with discretion to hear declaratory suits); *accord Micron*, 518 F.3d at 903 ("The word 'may' within the language of the Declaratory Judgment Act means that a court has discretion to accept a declaratory judgment action in the first place….").

Since this Court never reached the motion to transfer, it had not weighed the convenience factors of 28 U.S.C. § 1404(a) in its October 23, 2006 Order. Nonetheless, the Federal Circuit viewed the Court's decision to dismiss the case for lack of declaratory judgment jurisdiction to be essentially the same as a ruling on a motion to transfer, without the requisite analysis of the applicable 28 U.S.C. § 1404(a) factors.[3] *See Micron*, 518 F.3d at 904, 905 ("In sum, the trial court must weigh the factors

---

[3]   Despite acknowledging that this Court did not reach the motion to transfer that accompanied the motion to dismiss, the Federal Circuit proceeded to evaluate whether the Court abused its discretion in dismissing the case. *See Micron*, 518 F.3d at 905. MOSAID's petition for rehearing to clarify this potential inconsistency was denied on or about April 7, 2008. (*See* Kim Decl. Exs. 19-20.)

HOWREY LLP

DM_US:21143231_4

1   used in a transfer analysis as for any other transfer motion…. [T]he trial court needed to evaluate the

2   'convenience factors' before effectively transferring the case to another jurisdiction.").  The Federal

3   Circuit then proceeded to evaluate the convenience factors, sua sponte, and reached the conclusion that

4   it would be an abuse of discretion to transfer the action, based on the timeframe of the dismissal order

5   in October 2006 when neither court was "more invested in the case" than the other.  *See Micron* at 903,

6   905.

7     Accordingly, MOSAID renews its Motion to Transfer and requests that the Court weigh the

8   convenience factors of 28 U.S.C. § 1404(a) now, to take into consideration the current circumstances

9   of the case, including the fact that the broader Texas action has been active for over a year and a half,

10  progressing toward trial in six months.  *See Electronics for Imaging, Inc. v. Tesseron, Ltd.*, 2008 WL

11  276567, at *1 (N.D. Cal. Jan. 29, 2008) ("With respect to the second factor, the interest of justice is the

12  most important consideration."); *see also Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 836

13  (Fed. Cir. 2003) ("In reviewing a district court's decision regarding a motion to transfer under 28

14  U.S.C. § 1404(a), this court applies the law of the appropriate regional circuit….").

15    **B.**  **This Action Should Be Transferred to the Eastern District of Texas Under 28 U.S.C. § 1404(a).**

16

17    Based on a weighing of the applicable 28 U.S.C. § 1404(a) convenience factors, this action

18  should be transferred to the Eastern District of Texas to proceed to trial in October 2008 with the

19  broader and significantly more advanced action pending in the Eastern District of Texas.  *See Arete*

20  *Power, Inc. v. Beacon Power Corp.*, 2008 WL 508477, at *2-*14 (N.D. Cal. Feb. 22, 2008)

21  (considering relative dockets and length of case pendency among balance of factors in granting motion

22  to transfer); *CoxCom, Inc. v. Hybrid Patents, Inc.*, 2007 WL 2500982, at *2 (N.D. Cal. Aug. 30, 2007)

23  (finding feasibility of consolidation with action pending in Eastern District of Texas to weigh heavily

24  in favor of transfer, outweighing the deference due plaintiff's choice of forum, because of the positive

25  effects it might have in possible consolidation of discovery and convenience to witnesses and parties).

26    "A motion to transfer venue lies within the broad discretion of the district court, and must be

27  determined on an individualized basis."  *Inherent.com v. Martindale-Hubbell*, 420 F. Supp. 2d 1093,

28  1098 (N.D. Cal 2006) (citing *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir.), *cert.*

HOWREY LLP

DM_US:21143231_4

*denied*, 531 U.S. 928 (2000)).  Among the factors that may be considered to determine whether transfer is appropriate in a particular case are: (1) the plaintiff's choice of forum; (2) the convenience of witnesses and the parties; (3) the familiarity of the forum with the applicable law; (4) the ease of access to evidence; and (5) the relative court congestion and time to trial in each forum.  *See, e.g.*, *Flexible Funding, LLC v. Iron Mountain Info. Mgmt.*, 2005 WL 2431241, at *2 (N.D. Cal. Sept. 30, 2005) (citing *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508-09 (1947), and *Jones*, 211 F.3d at 498-99).  The existence of a substantially overlapping case pending in another jurisdiction also weighs heavily in favor of transfer.  *CoxCom*, 2007 WL 2500982, at *2.

In this case, factors (2)-(4) above do not favor either the Northern District of California or the Eastern District of Texas.[4]  Powerchip, the other defendant in the Texas action, is based in Taiwan and is not a party to Micron's declaratory judgment action that was recently remanded here.  (*See* Compl., Doc. No. 1; Kim Decl. Ex. 4.)  With respect to factor (1), although Micron is the first-to-file plaintiff with respect to eight of the patents MOSAID has asserted against Micron, MOSAID is the first-to-file plaintiff with respect to the additional four patents asserted against Micron in the Eastern District of Texas.  *Cf. Z-Line Designs, Inc. v. Bell'O Intern., LLC*, 218 F.R.D. 663, 667 (N.D. Cal. 2003) ("A court may relax the 'first to file' rule if the balance of convenience weights in favor of the later-filed action.").  Factor (5) and the existence of the overlapping broader case that has been pending in the Eastern District of Texas for 21 months, on the other hand, heavily favor transfer to the Eastern District of Texas.

A review of the 69-page docket report in the Texas action, (Kim Decl. Ex. 8), demonstrates the amount of litigation activity that has taken place in the broader, concurrently pending Texas action in the intervening eighteen months since Micron appealed this Court's dismissal ruling.  The Texas action

---

[4]     The depositions in the Texas action have taken place all over the country and in Taiwan, with Micron requesting that they take place more often than not in New York or Boise, Idaho.  Neither Micron nor MOSAID are headquartered in the Northern District of California, MOSAID has no facilities or offices in California, and both parties, as well as Powerchip who is the additional party involved in the Texas action (and also located outside of California), are all subject to jurisdiction in the Eastern District of Texas.

Case No.  C 06-4496 JF
MOSAID's Motion To Transfer

currently has a trial date of October 2008, as well as a hearing date of May 1, 2008 on several motions relating to patent local rule required document productions, contempt and fees, and protective order designations of infringement contentions. (*See* Kim Decl. Exs. 22, 23.) The only matter currently on hold is the rescheduling of the claim construction hearing. (*See* Kim Decl. Exs. 6, 21.) The parties have completed all claim construction discovery and all claim construction briefing, and the Texas court has appointed a technical advisor. (*See* Kim Decl. ¶ 15, Exs. 16-18.)

In contrast, when MOSAID contacted the Clerk of the Court to schedule a hearing date for this Motion following the issuance of the mandate by the Federal Circuit, in accordance with the Northern District of California San Jose Division Standing Order, MOSAID was provided with June 13, 2008 as the first available date on the Court's calendar. (*See* Kim Decl. ¶ 18.) The 2007 caseload profile for the Northern District of California indicates a median time from filing to trial of 24.9 months, and a caseload of 643 pending cases per judgeship. (*See* Kim Decl. Ex. 27.) During the same period, the median time from filing to trial in the Eastern District of Texas was 18 months, with 419 pending cases per judgeship. (*Id.*) The comparatively heavier caseload of this Court, particularly in light of the existing trial schedule in the Texas action, favors transfer to avoid delay of adjudicating the parties' dispute as part of the more comprehensive and further advanced case pending in the Eastern District of Texas. *See Mediostream, Inc. v. Priddis Music, Inc.*, 2007 WL 2790688, at *4 (N.D. Cal. Sept. 24, 2007) (finding convenience factors to favor transfer where parallel action in transferee court has proceeded much further, involves additional parties, and transferee court is more familiar with the action even though plaintiff was based in Northern District of California).

Thus, judicial efficiency and the interest of justice tip substantially in favor of transferring this nascent action to be resolved as part of the broader action in the Eastern District of Texas. *See CoxCom*, 2007 WL 2500982, at *2 ("feasibility of consolidation with action in transferee court is significant factor in transfer decision"); *cf. Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979) (affirming denial of transfer where transferor court was more familiar with the case and transfer may have led to delay).

Case No. C 06-4496 JF
MOSAID's Motion To Transfer

**IV. CONCLUSION**

Based on the foregoing and the comparative progress of the pending actions in the Northern District of California and the Eastern District of Texas, Defendant MOSAID Technologies Inc. respectfully requests that the Court transfer this action to the Eastern District of Texas to continue toward trial along with the additional patents and party involved in the Texas action. In the alternative, MOSAID respectfully requests that the Court stay this case pending completion of that further progressed litigation to prevent any delay of the trial date in October 2008.

Dated: April 23, 2008                HOWREY LLP


By: /s/ Jeannine Sano

Attorneys for Defendant
MOSAID TECHNOLOGIES INC.

HOWREY LLP

DM_US:21143231_4

Exhibit G

Westlaw.

Slip Copy                                                                                                      Page 1
Slip Copy, 2007 WL 3101323 (N.D.Cal.)
**(Cite as: Slip Copy, 2007 WL 3101323)**

Ambat v. City and County of San Francisco
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Mercy AMBAT, et al., Plaintiffs,
v.
CITY AND COUNTY OF SAN FRANCISCO, et al.,
Defendants.
**No. C 07-3622 SI.**

Oct. 22, 2007.

Lawrence Dale Murray, Noah W. Kanter, John J. Henning, Murray & Associates, San Francisco, CA, for Plaintiffs.
Margaret W. Baumgartner, Deputy City Attorneys, Jill Joan Figg, San Francisco City Attorney's Office, San Francisco, CA, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTION TO STAY PENDING RESOLUTION OF STATE COURT PROCEEDING**

SUSAN ILLSTON, United States District Judge.
**\*1** On October 19, 2007, the Court heard argument on defendants' motion to dismiss or stay pending resolution of an overlapping state court proceeding. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS defendants' motion to STAY pending the resolution of the state court action.

**BACKGROUND**

On February 20, 2007, seven deputy sheriffs of the County of San Francisco, along with the San Francisco Deputy Sheriff's Association ("SFDSA"), filed a putative class-action complaint in San Francisco Superior Court alleging gender discrimination against the City, Sheriff Michael Hennessey, and Undersheriff Jan Dempsey. The complaint asserted two causes of action, one alleging violations of the California Fair Employment and Housing Act ("FEHA") and the second alleging violations of California Penal Code § 4021.[FN1] The class action suit arose from defendants' reorganization of the San Francisco County Jail

system, which involved reassigning all female inmates from various county jails to one central location housed in County Jail # 8. Along with this reorganization, defendants instituted a new staffing policy that permits only female deputies to work in the female pods of County Jail # 8. The new policy also creates a gender-based two-tiered process for selecting days off by which a female deputy with less seniority than a male deputy may receive preference in selecting days off because her seniority is only compared to that of other female deputies.

> FN1.California Penal Code § 4021 provides in relevant part:
>
> > (b) It shall be unlawful for any officer, station officer, jailer, or custodial personnel to search the person of any prisoner of the opposite sex, or to enter into the room or cell occupied by any prisoner of the opposite sex, except in the company of an employee of the same sex as the prisoner. *Except as provided herein, the provisions of this subdivision shall not be applied to discriminate against any employee by prohibiting appointment or work assignment on the basis of the sex of the employee.* (Emphasis added).

The state plaintiffs alleged the policy discriminates against female deputies because it prevents them from gaining the training and experience necessary to receive promotions and further their careers in law enforcement, as well as forces them to work overtime. The policy allegedly discriminates against male deputies because it prevents them from gaining the training and experience that comes with working in female pods and it also prevents them from signing up for working overtime in the female pods. The plaintiffs also alleged that the policy discriminates against both genders because they must work less desirable shifts and schedules since the gender-based two-tiered system limits deputies' right to choose regular days off. The complaint seeks compensatory damages, punitive damages, attorney fees, injunctive relief, and costs of suit.

The plaintiffs in the state case filed a First Amended

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complaint on or about March 15, 2007. Subsequently, the City filed a demurrer, the parties began discovery, and they participated in a Case Management Conference. On October 4, 2007, the City's demurrer was sustained and the Superior Court granted leave to amend the FEHA cause of action. On October 16, 2007, the plaintiffs filed a Second Amended Complaint that folded their allegations regarding violations of California Penal Code § 4021 into one cause of action under the FEHA. [FN2]

> FN2. The Court grants defendants' supplemental request for judicial notice in support of their motion.

Five months after the filing of the state complaint, on July 13, 2007, the thirty-five plaintiffs here, seven of whom were originally named as plaintiffs in the state action, filed this federal action. Plaintiffs, both male and female deputy sheriffs, bring nine causes of action arising under Title VII, FEHA, the California Labor Code, and the California Peace Officer Bill of Rights. Similar to the state case, plaintiffs allege suffering general damages and emotional distress due to the new staffing policy. Unlike the state complaint, however, plaintiffs here allege three individual complaints of retaliation. Plaintiffs seek similar relief as sought by the plaintiffs in the state complaint.

**\*2** Originally, the law firm of Mastagni, Holstedt, Amick, Miller, Johnsen & Uhrhammer represented all plaintiffs in the state action, both the seven named plaintiffs and the SFDSA. On June 22, 2007, however, Lawrence D. Murry substituted in as counsel to represent the seven individual plaintiffs in the state action. He then filed this federal action where he represents the thirty-five individual plaintiffs. On September 14, 2007, two months after filing this federal action and two weeks after defendants brought this motion to dismiss or stay pending resolution of the state court proceeding, plaintiffs' counsel filed, and was granted, a request with the state court to dismiss without prejudice the seven named plaintiffs in the state action, leaving only the SFDSA as the named plaintiff in the state court class action.

### LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction may either "attack the allegations of the complaint or may be made as a 'speaking motion' attacking the existence of subject matter jurisdiction in fact." *Thornhill Publ'g Co. v. Gen. Tel. and Elec ., 594 F.2d 730, 733 (9th Cir.1979)* (citing *Land v. Dollars, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209. (1947)*). Where the jurisdictional issue is separable from the merits of the case, the Court need only consider evidence related to the jurisdiction issue, and rule on that issue, resolving factual disputes as necessary. *Id.* (citing *Berardinelli v. Castle & Cooke, Inc., 587 F.2d 37 (9th Cir.1978)*).

In deciding a Rule 12(b)(1) motion that mounts a factual attack on jurisdiction, "no presumption of truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir.1977).*

The Supreme Court has stated that *Younger* abstention "represents the sort of 'threshold question' [that] may be resolved before addressing jurisdiction." *Tenet v. Doe, 544 U.S. 1, 6 n. 4, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005).* However, numerous courts have also considered abstention arguments within the framework of a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).*See D.L. v. Unified Sch. Dist. No. 497, 392 F.3d 1223, 1228 (10th Cir.2004)* (declaring "*Younger* abstention is jurisdictional"); *Miller Brewing Co. v. Ace U.S. Holdings, Inc., 391 F.Supp.2d 735, 739 (E.D.Wisc.2005)* ("[A] motion to dismiss or stay based on an abstention doctrine raises the question of whether a court should exercise subject matter jurisdiction."); *Beres v. Village of Huntley, 824 F.Supp. 763, 766 (N.D.Ill.1992)* (a motion to dismiss for lack of subject matter jurisdiction "appears to be an appropriate method for raising the issue of abstention").

### DISCUSSION

**\*3** Defendants have requested that this Court abstain pursuant to the doctrine set out in *Younger v. Harris, 401 U.S. 37 (1971)*, and its progeny. Under the *Younger* doctrine, absent extraordinary

Slip Copy                                                                                          Page 3
Slip Copy, 2007 WL 3101323 (N.D.Cal.)
**(Cite as: Slip Copy, 2007 WL 3101323)**

circumstances, a federal court should abstain from proceeding with a case if: (1) there is an on-going state court proceeding; (2) there is an important state interest at issue; and (3) there is an adequate opportunity for plaintiffs to litigate the federal claims in the state court proceeding. *See Younger,* 401 U.S. at 40 (criminal proceedings only); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (outlining the three *Younger* criteria); *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (extending *Younger* doctrine to civil proceedings). Defendants argue that abstention pursuant to *Younger* is appropriate because a similar complaint raising similar issues is ongoing in state court and the other two elements of *Younger* are met as well.

The circumstances here satisfy all three prongs of the *Younger* doctrine. As to the first *Younger* element, plaintiffs argue that there is no ongoing state court proceeding because the parties in the state court action are no longer the same parties involved in this action. When the state court action was first filed on February 20, 2007, it named seven individuals and the SFDSA as plaintiffs. Those seven individuals were also included as part of the thirty-five plaintiffs named in the federal complaint, filed five months after the initiation of the state court proceeding. However, two weeks after defendants moved this court to abstain on *Younger* grounds, those seven individual plaintiffs withdrew as named plaintiffs from the state court proceeding, leaving the SFDSA as the only plaintiff in state court. Although plaintiffs correctly observe that the named parties in state court no longer contain any named parties here, that observation does not alter the fact that those seven individuals, as deputies and members of the SFDSA, remain members of the putative class in the pending state court class action being brought by the SFDSA, its members, and others similarly situated. Thus, plaintiffs' contention that the state court proceeding has been resolved as to those seven individuals because of their successful request for dismissal is not wholly accurate.

The question becomes, then, whether the first *Younger* prong is satisfied where individual members of a trade association seek to proceed in federal court when their organization is currently litigating the matter on their behalf in state court. The Supreme

Court has discussed this issue in the broader context of whether the *Younger* doctrine applies to instances where a party in a federal action shares similar interests as a different party in a state action. In *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), two men distributing pamphlets at a shopping center received warning that if they continued distribution, they would be charged with trespassing. One of the men continued distributing the handbills and was arrested and prosecuted. The other left the area, avoided arrest, and filed suit in federal court seeking both declaratory and injunctive relief. Although the two men shared similar interests, the Supreme Court held that the federal court erred by abstaining under *Younger* because the federal plaintiff was not a party in the state court adjudication. *Id.* at 455-60. The Supreme Court narrowed this holding, however, in *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), where the state seized from a theater owner four copies of a film that a state court had declared obscene. Around the same time, the state initiated criminal proceedings against two employees of the theater, but not against the theater owner. The owner filed suit in federal court seeking the return of the seized films and a declaration that the state obscenity statute was unconstitutional. The Court held that the ongoing state court proceedings against his employees provided the owner the opportunity to adjudicate his constitutional issues such that the lower court erred by not abstaining, despite the fact that the theater owner was not a party in any state court action. *Id.* at 349. Later, in *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), the Court reached a similar conclusion as in *Steffel,* but stated that "there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them." *Id.* at 928.

**\*4** While the above cases discuss scenarios involving related parties, they do not directly confront the situation in the present case where an organization is the plaintiff in the state court action and members of that organization are the plaintiffs in the federal action. *See Cornwell v. Cal. Bd. of Barbering and Cosmetology,* 962 F.Supp. 1260, 1269-70 (S.D.Cal.1997) ("No courts appear to have directly confronted this issue."). However, Chief Justice Burger discussed this issue in a concurring and dissenting opinion. *See Allee v. Medrano,* 416 U.S.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                 Page 4
Slip Copy, 2007 WL 3101323 (N.D.Cal.)
**(Cite as: Slip Copy, 2007 WL 3101323)**

802, 830-31, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974)
(Burger, C.J., concurring in part and dissenting in
part). In *Allee,* state officials in Texas arrested and
prosecuted union members for violating state statutes
while picketing. The union and several of its
members brought suit in federal court seeking
injunctive relief and judgment that declared the state
statutes unconstitutional. A three judge district court
panel, having heard the case before the Supreme
Court's decision in *Steffel* came down, ruled in favor
of the plaintiffs, declaring the statutes
unconstitutional. The case reached the Supreme
Court after its decision in *Steffel* and, consistent with
that opinion, the Court vacated and remanded the
district court's ruling based in part on abstention
issues. Chief Justice Burger advised the lower court
on the manner by which it should apply *Younger*
when it heard the case on remand:

The union, to the extent that it has standing, will be
seeking interference with state court prosecutions of
its members. There is an identity of interest between
the union and its prosecuted members; the union may
seek relief only because of the prosecutions of its
members, and only by ensuring that such
prosecutions cease may the union vindicate the
constitutional interests which it claims are violated.
The union stands in the place of its prosecuted
members even as it asserts its own constitutional
rights. The same comity considerations apply
whether the action is brought in the name of the
individual arrested union members or in the name of
the union ...

*Allee,* 416 U.S. at 830-31 (Burger, C.J., concurring in
part and dissenting in part).

The Southern District of California applied Chief
Justice Burger's rationale to a similar scenario
involving two pending actions, one involving an
organization in federal court and the other involving
two members of that organization in state court. *See*
*Cornwell,* 962 F.Supp. at 1270. In *Cornwell,* Dr.
Cornwell, an African-American hair stylist, and the
American Hairbraiders and Natural Hair Care
Association ("AHNHCA") brought suit in federal
court alleging various violations of both the federal
and California constitutions. Meanwhile, a hair salon
and its owner, both belonging to the AHNHCA, were
involved in state court proceedings as a result of
being cited and fined by the California Board of

Barbering and Cosmetology. After applying *Younger*
to the facts, the court allowed Dr. Cornwell to
proceed with her action in federal court. However,
guided by Chief Justice Burger's analysis in *Allee,* the
court abstained under *Younger* in regard to
AHNHCA. The court reasoned that:

**\*5** [t]he problem with the current complaint is that
the relief sought is really sought on behalf of all
AHNHCA's members, not on behalf of AHNHCA
itself ... AHNHCA does not operate an African hair
styling business; rather it is a trade association of
African hair styling businesses. AHNHCA is actually
seeking an injunction prohibiting enforcement of
the [Barbering and Cosmetology Act] as applied to its
members ... As currently framed, the Court cannot
grant plaintiffs the relief they seek because it would
act to enjoin a pending state proceeding.

*Id.* at 1271.The court allowed plaintiffs forty-five
days to file an amended complaint.

Although *Cornwell* is not authoritative, the Court
finds its analysis persuasive and instructive. Much
like the trade association in *Cornwell,* the SFDSA
only has standing to bring an action in state court
because of the alleged injuries to its members.[FN8]It
seeks relief in state court on behalf of all its
members, which includes the thirty-five plaintiffs in
this federal action, and not relief for the SFDSA
itself. Five months after the SFDSA began its state
court action, thirty-five individual members of the
SFDSA brought this action in federal court seeking
damages as a result of the same new staffing policy
that forms the factual basis of the SFDSA's state
complaint. Thus, although the thirty-five plaintiffs
here are not named parties in the state court action,
the SFDSA is currently litigating their interests in the
pending state action and plaintiffs here stand ready to
recover monetary awards from that action if the
SFDSA is successful. A decision by this Court on the
matter could interfere with the pending state court
proceeding. *See* New Orleans Pub. Serv., Inc. v.
Council of City of New Orleans (NOPSI), 491 U.S.
350, 373, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)
("It is true, of course, that a federal court's disposition
of such a case may well affect, or for practical
purposes preempt, a future-or, as in the present
circumstances, even a pending state court action.").
Therefore, as to the first *Younger* element, there is an
ongoing state court proceeding and the Court should

Slip Copy                                                                                              Page 5
Slip Copy, 2007 WL 3101323 (N.D.Cal.)
**(Cite as: Slip Copy, 2007 WL 3101323)**

abstain if the other two *Younger* requirements are met as well. *See Beltran v. California,* 871 F.2d 777, 782 (9th Cir.1988)(*"Younger* abstention requires that the federal courts abstain when state court proceedings were ongoing at the time the federal action was filed.").

> FN3. The SFDSA has standing in state court to bring an action on behalf of its members challenging the staffing policy and seeking damages if: (1) the individual members would otherwise have standing to sue in their own right; (2) the interests being protected are relevant to the organization's purpose; and (3) the individual members are not required to participate in the lawsuit. *See Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles,* 136 Cal.App.4th 119, 129, 38 Cal.Rptr.3d 575 (Cal.Ct.App.2006).

The second and third prongs of *Younger* are also satisfied here. As to the second *Younger* element, the Supreme Court has held that administration of state criminal facilities and the protection of employees from sexual discrimination are both important issues of state interest. *See Preiser v. Rodriguez,* 411 U.S. 475, 491-92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) ("Since these internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems."); *Ohio Civil Rights Comm. v. Dayton Christian Sch., Inc.,* 477 U.S. 619, 628, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) ("We have no doubt that the elimination of prohibited sex discrimination is a sufficiently important state interest ..."). As to the third prong of *Younger,* the court finds no reason that plaintiffs cannot pursue all of the claims included in this lawsuit in state court. State courts are courts of general jurisdiction and are able to adjudicate questions of federal law. *See Nevada v. Hicks,* 533 U.S. 353, 366-67, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Thus, because the state court action began five months before this action, plaintiffs had the opportunity to bring any issues of federal law, such as their claims under Title VII, in the state court proceeding, and plaintiffs have failed to show otherwise. *See Hicks,* 422 U.S. at 349 (finding that the state court proceeding against a related party provided the federal plaintiff the opportunity to raise his constitutional claims); *see also Pennzoil Co. v.*

*Texaco, Inc.,* 481 U.S. 1, 14-17, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (finding that the burden rests on the federal plaintiff to show that state procedural law prevents presentation of claims).

**\*6** Having found that the *Younger* doctrine applies to the facts here, the Court must decide whether to dismiss the action or stay the proceeding pending the outcome of the state court action. When *Younger* applies and the federal party seeks injunctive relief, federal courts should dismiss the action in its entirety. *See Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973)(*"Younger v. Harris* contemplates the outright dismissal of the federal suit, and the presentation of all claims, both state and federal, to the state courts."); *Colorado River Water Conserv. Dist. v. U.S.,* 424 U.S. 800, 816 n. 22, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ("Where a case is properly within [the *Younger* ] category of cases, there is no discretion to grant injunctive relief.")."But when damages are sought and *Younger* principles apply, it makes sense for the federal court to refrain from exercising jurisdiction *temporarily* by staying its hand until such time as the state proceeding is no longer pending."*Gilbertson v. Albright,* 381 F.3d 965, 981 (9th Cir.2004) (emphasis in original). Here, because *Younger* applies and plaintiffs seek damages along with injunctive relief, the Court stays the proceeding pending resolution of the state court action.[FN4]

> FN4. Defendants also move this Court to abstain based on *Colorado River* principles. Because the Court must abstain under *Younger,* it does not reach the matter of whether to also abstain under *Colorado River.*

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion and STAYS plaintiffs' claims pending the resolution of the state court action. ***The parties are ordered to file joint reports on the status of the state court proceedings every 90 days until its resolution.***

**IT IS SO ORDERED.**

N.D.Cal.,2007.
Ambat v. City and County of San Francisco

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                         Page 6
Slip Copy, 2007 WL 3101323 (N.D.Cal.)
**(Cite as: Slip Copy, 2007 WL 3101323)**


Slip Copy, 2007 WL 3101323 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit H



Arete Power, Inc. v. Beacon Power Corp.
N.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
ARETE POWER, INC., Plaintiff,
v.
BEACON POWER CORPORATION, Defendant.
**No. C 07-5167 WDB.**

Feb. 22, 2008.

Michael E. Dergosits, Teddy Kite Joe, Dergosits & Noah, LLP, San Francisco, CA, Edward W. Goldstein, Michael James Collins, Goldstein & Faucett, LLP, Houston, TX, for Plaintiff.
David G. Conlin, Elizabeth Anderson Spinney, Gail Elise Abbey, Edwards, Angell, Palmer & Dodge, LLP, Steven M. Cowley, Boston, MA, Nathaniel Bruno, Neil Arthur Smith, Sheppard, Mullin, Richter & Hampton, LLP, San Francisco, CA, for Defendant.

ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER VENUE

WAYNE D. BRAZIL, United States Magistrate Judge.
**\*1** Now before the Court is the motion of Defendant Beacon Power Corporation to transfer this action to the United States District Court for the District of Massachusetts, pursuant to 28 U.S.C. section 1404. On February 6, 2008, the Court held a hearing on the motion to transfer. Michael Collins, Esq., and Michael Dergosits, Esq., appeared on behalf of Plaintiff Arete Power, Inc.; Steven Cowley, Esq., David Conlin, Esq. and Neil Smith, Esq., appeared on behalf of Defendant. Having considered the papers, the relevant legal authority, and the arguments of counsel, the Court GRANTS the motion for the reasons discussed below.

### *FACTUAL BACKGROUND*

Plaintiff Arete Power, Inc. ("Arete") alleges that it is "a corporation organized and existing under the laws of the State of Nevada, with its principal place of business at [Reno, Nevada]." Compl. ¶ 1. Arete further alleges, on information and belief, that

Defendant Beacon Power ("Beacon") is "a Delaware corporation with its principal place of business at [Wilmington, Massachusetts]." Compl. ¶ 2. Beacon's registered agent for service of process is The Corporation Trust Company in Wilmington, Delaware. *Id.* Neither party has a place of business in the Northern District of California.

Arete alleges that it is the owner of United States Patent No. 6,710,489 (the "'489 Patent"), issued on March 23, 2004, which pertains to flywheel energy storage systems ("FESS's") that employ mechanical rolling element bearings for radial support of a vertical axis flywheel, and magnetic bearings to carry the flywheel weight axially. Compl. ¶¶ 5-7. Arete alleges that Beacon manufactures and sells products that infringe the '489 patent, including the BHE-6, Smart Energy 25 flywheel energy storage systems, and Smart Energy Matrix multi-flywheel energy storage system (the "Accused Products"). Compl. ¶ 8.

Beacon contends that in September 1998, Beacon began shipping FESS units to various locations for use in the telecommunications industry (the "TelCom Units"). Beacon asserts that it shipped all of these TelCom Units before the ' 489 Patent issued, and that the technology in the Accused Products was embodied in these TelCom Units before the application for the '489 Patent was filed. Hockney Decl. ¶ 5.

In opposition to the motion to transfer, Arete asserts that Beacon shipped a system incorporating an array of infringing FESS's to San Ramon, California, for use in a frequency regulation demonstration project for the California Energy Commission ("CEC"). Gabrys Decl. ¶¶ 11, 12. *See* Def's Notice of Errata (Docket No. 42) correcting reference to CEC as Commission for Environmental Cooperation. Arete Power also contends that Beacon shipped a similar system of infringing FESS's to Amsterdam, New York, sometime after the shipment to San Ramon. Gabrys Decl. ¶¶ 13, 14.

Beacon acknowledges that in September 2005, it shipped to the CEC in San Ramon a system using an array of Accused Products (the "CEC Array") to demonstrate the system's use in frequency regulation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hockney Decl. ¶ 6. The CEC Array was shut down on December 22, 2006, and returned to Beacon on May 10, 2007. *Id.*

**\*2** In March 2006, Beacon shipped a similar system using an array of Accused Products for demonstrating frequency regulation to the New York State Energy Research and Development Authority in Amsterdam, New York (the "NYSERDA Array"). The NYSERDA Array was shut down on March 6, 2007. *Id.* ¶ 7.

### DISCUSSION

### I. LEGAL STANDARD

Beacon seeks a transfer of venue pursuant to 28 U.S.C. § 1404. Section 1404(a) provides as follows:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). As the moving party, Beacon has the burden to establish by particular circumstances that the action should be transferred to the proposed transferee district. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 279 (9th Cir.1979). A motion to transfer venue is committed to the discretion of the trial court, which must weigh several case-specific factors affecting convenience and fairness. *Stewart Org. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). A motion to transfer venue should be denied where the transfer would merely shift an equivalent inconvenience from one party to another. *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1985).

On a motion to transfer venue, the Court must first determine whether the action "might have been brought" in the proposed transferee district. 28 U.S.C. § 1404(a). The proposed transferee court must have subject matter jurisdiction and proper venue, and the defendant must be amenable to service of process issued by that court. *See Cambridge Filter Corp. v. Internat'l Filter Co., Inc.,* 548 F.Supp. 1308, 1310 (D.Nev.1982).*See also* Schwarzer, et al., *Rutter Group Practice Guide: Federal Civil Proc. Before*

*Trial* ¶ 4:713 (2007).

Second, the Court must determine whether transfer would allow the case to proceed more conveniently and better serve the interests of justice. *Los Angeles Memorial Coliseum Commission v. National Football League,* 89 F.R.D. 497, 499 (C.D.Cal.1981), *aff'd,*726 F.2d 1381 (9th Cir.1984).

The Federal Circuit applies the law of the appropriate regional circuit governing a motion to transfer. *Storage Technology Corp. v. Cisco Systems, Inc.,* 329 F.3d 823, 836 (Fed.Cir.2003). In *Los Angeles Memorial Coliseum Commission,* the Central District of California summarized the statutory factors set forth in § 1404(a), as well as considerations under the doctrine of *forum non conveniens:*

> In ruling on a transfer motion, a district court must consider each of the issues listed in section 1404(a): (1) the convenience of parties; (2) the convenience of witnesses; and (3) the interests of justice. *Kasey v. Molybdenum Corp.,* 408 U.S. 16, 20 (9th Cir.1969). Moreover, since section 1404(a) was "designed as an attempt to statutorily embody and modify the doctrine of forum non conveniens,"*A.J. Industries, Inc. v. United States District Court,* 503 F.2d 384, 386 (9th Cir.1974), the factors weighed by courts under the old common law doctrine of forum non conveniens should also be considered. This remains true even though the court's discretion under section 1404(a) is broader than it was under the doctrine of forum non conveniens. *Norwood v. Kirkpatrick,* 349 U.S. 29, 32, 75 S.Ct. 544, 99 L.Ed. 789 (1955). Some of those factors, discussed by the Court in *Gulf Oil Corporation v. Gilbert,* 330 U.S. 501, 508-09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), are as follows:

> **\*3** the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive....[The Court will weigh] relative advantages and obstacles to fair trial.

*Los Angeles Memorial Coliseum Commission,* 89

F.R.D. at 499. *See also Decker Coal,* 805 F.2d at 843 (reasoning that although § 1404(a) partially displaces the common law doctrine of *forum non conveniens,* factors affecting the convenience of the forum are helpful in deciding a § 1404 transfer motion). Because section 1404(a) contemplates transfer rather than dismissal, transfer is available "upon a lesser showing of inconvenience" than required for a non-statutory *forum non conveniens* dismissal, giving the Court broader discretion in deciding a section 1404(a) motion to transfer.*Reiffin v. Microsoft Corp.,* 104 F.Supp.2d 48, 50-51 (D.D.C.2000), *pet. for writ of mandamus denied,*243 F.3d 557, 2000 WL 1229009 (Fed.Cir.2000).

The Ninth Circuit instructs that on a motion to transfer, the district court also should weigh any relevant public policy in either the forum or the transferee state, as well as other " 'public interest factors of systemic integrity and fairness.' "*Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 499 n. 21 (9th Cir.2000) (citing *Stewart Org.,* 487 U.S. at 30). In an earlier opinion, the Ninth Circuit recognized other public factors that could be weighed in determining a transfer motion: " 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.' "*Decker Coal,* 805 F.2d at 843 (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (internal quotation marks omitted)).

## II. Venue Proper in Transferee District

The parties do not dispute that this patent infringement action "might have been brought" in the District of Massachusetts. The venue statute for patent cases provides as follows:

> Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.

28 U.S.C. § 1400(b). The Federal Circuit has held

that the general venue statutes extend venue in a patent infringement case to include any district where there would be personal jurisdiction over the corporate defendant at the time the action is commenced. *VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574, 1583 (Fed.Cir.1990) (applying 28 U.S.C. § 1391(c) as amended in 1988). It is undisputed that Beacon's principal place of business is in the District of Massachusetts, and that venue in that district would be proper.

## III. Application of Convenience Factors

### A. The Plaintiff's Choice of Forum

**\*4** In the weighing of convenience factors, when the forum plaintiff has chosen is also the plaintiff's residence, plaintiff's choice is given considerable weight and will not be disturbed unless other factors weigh substantially in favor of transfer. *Royal Queentex Enterprises v. Sara-Lee Corp.,* 2000 WL 246599 at \*3 (N.D.Cal.2000) (citing *Decker Coal,* 805 F.2d at 843, which requires a "strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum"); *Los Angeles Memorial Coliseum Comm'n,* 89 F.R.D. at 499. *See also Reiffen,* 104 F.Supp.2d at 52. Plaintiff's choice of forum is entitled to appreciably less weight, however, when plaintiff does not reside there, or where the forum chosen lacks a significant connection to the activities alleged in the complaint. *See Piper Aircraft,* 454 U.S. 235, 255-56, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) ("Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference."); *Pacific Car & Foundry Co. v. Pence,* 403 F.2d 949, 954-55 (9th Cir.1968); *Fabus Corp. v. Asiana Express Corp.,* 2001 U.S.Dist LEXIS 2568 at \*4, 2001 WL 253185 at \*1 (N.D.Cal. March 5, 2001).

### 1. Nonresident

Arete admits that it does not have a place of business in the Northern District of California. Opp. at 1. Arete is not incorporated in California, but in Nevada, and its principal place of business is in Reno, Nevada. As this Court is not Arete's home forum, the degree of deference to Arete's choice of venue is reduced. *See Piper Aircraft,* 454 U.S. at 255-56.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                       Page 4
Slip Copy, 2008 WL 508477 (N.D.Cal.)
**(Cite as: Slip Copy, 2008 WL 508477)**

Arete stated during oral argument that it did not file its complaint in its home forum, the District of Nevada, because it was not clear that there was a sufficient basis for that court to exercise personal jurisdiction over Beacon. On this record, we cannot find that Arete's choice of this Court was primarily a product of forum shopping. Rather, it appears that Arete chose this forum because it is relatively close to its principal place of business and is well served by means of transportation. Given these circumstances, we decline to strip plaintiff's choice of forum of any deference at all.

**2. Connection with Forum**

Under Ninth Circuit law, Arete's choice of venue is entitled to less deference if this district does not have a significant connection with the cause of action. *Pacific Car,* 403 F.2d at 954. Arete contends that its choice of forum should be entitled to deference because "many if not most of the operative facts giving rise to Arete's claim of patent infringement occurred in the Northern District of California."Opp. at 5-6. Arete apparently bases this contention on the fact that Beacon installed an accused product in San Ramon, California, and operated it there for some sixteen months.

In reply, Beacon acknowledges that it had some contacts with California by shipping and operating the CEC Array to San Ramon, but contends that it was only shipped for demonstration purposes and was not sold to the CEC.2d Hockney Decl. ¶ 5. The FESS units were vacuum-sealed in steel containers before they were shipped from Massachusetts, and remained sealed in California. *Id.* ¶ 4. The CEC Array was operated in San Ramon from about September 2005 to December 2006, and has since been returned to Beacon. Hockney Decl. ¶ 6. This was about the extent of use of the Accused Products in Amsterdam, New York, where Beacon demonstrated the potential value of its Array for the NYSERDA from March 2006 to March 2007. *Id.* ¶ 7.

**\*5** Arete counters by contending that one of the only two alleged infringing uses of the Accused Products occurred in California, and that the shipment of the CEC Array to San Ramon is the earlier known act of patent infringement, and gives rise to Arete's infringement claim.

Arete certainly has established that there is a connection between this forum and allegedly infringing activity by Beacon. But that fact misses the primary point of our inquiry at this juncture. The law asks us, here, to identify the principal location of the legally operative facts-and in patent cases that location generally is where the allegedly infringing product was designed, developed and produced. *See Neil Bros. Limited v. World Wide Lines, Inc.,* 425 F.Supp.2d 325, 327-28 (E.D.N.Y.2006). This makes sense because in determining whether infringement has been established, the principal target of inquiry is the design and construction of the accused product. The trier of fact will be asked to compare the claims in the patent with the accused product-examining its development, its components, its construction, and how it functions. All of these issues will be best addressed through evidence that is in Massachusetts-where witnesses, documents, and the accused products themselves will be used to explore the purposes for which and the manner in which the products were designed and manufactured. Significantly, the accused products are sizeable-and the only place any exemplars are now located is Massachusetts (Beacon's home). So Massachusetts is, by far, the best place for examining their evolution, construction and operation with the requisite detail and reliability.

Moreover, the central issues in this case are not how extensively the accused products were marketed, or how well they operated in the field, or how deeply they penetrated any market, or how much economic harm they caused plaintiff to suffer. Apparently Beacon has never sold an accused product-and has been able to demonstrate its operation only to two entities. The litigation of this dispute will revolve around two issues: (1) as a matter of design and construction, does the accused product infringe, and (2) was Arete's '489 patent anticipated by Beacon's design, manufacture, and marketing of products in the same field in the late 1990's. Thus, the evidentiary and behavioral center of the case is in Massachusetts-which, therefore, is the situs of the operative facts.

It follows that while there is some connection between this litigation and California, the locus of the most legally relevant connection clearly is Massachusetts.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                           Page 5
Slip Copy, 2008 WL 508477 (N.D.Cal.)
(Cite as: Slip Copy, 2008 WL 508477)

## B. Convenience of the Parties

Section 1404(a) requires the Court to consider the convenience of the parties when ruling on a motion to transfer venue. The forum to which Beacon seeks to transfer this action is its own home forum, Massachusetts, making transfer most convenient for Beacon. Beacon asserts that the Accused Products were designed, developed and manufactured in Massachusetts, and that its business records are kept there. Hockney Decl. ¶¶ 8, 19. In opposition, Arete contends that litigating in Massachusetts would be a burden, in that the federal district court in Boston is over 2500 miles from Arete's Reno office, and there are no direct flights between Reno and Boston. Gabrys Decl. ¶¶ 21, 22. The Oakland courthouse in the Northern District of California, by contrast, is "relatively convenient" in that non-stop flights are available between Reno and Oakland and take about 50 minutes. Gabrys Decl. ¶ 18.

**\*6** Arete suggests that Oakland is much more convenient for itself and its witnesses than Boston, which is ten times farther from Reno than is Oakland. Arete appears to say that it is willing to suffer a little inconvenience by appearing in this Court, but not the greater inconvenience of litigating in Massachusetts. Arete offers no authority for its proposition that its choice of forum is entitled to deference when it is "relatively" the most convenient forum, but not its home forum. The law requires us to examine the convenience of all the parties, not just the plaintiff-and to try to identify the forum where the net inconvenience (to all parties) would be least.

In this patent infringement case the parties' convenience will be served by facilitated access to the witnesses and documents that disclose the history of Beacon's relevant products and the design and development of the devices that plaintiff accuses of infringement. *See* B & B Hardware, Inc. v. Hargis Ind., 2006 WL 4568798 at \*4 (C.D.Cal. Nov.30, 2006) (transferring trademark dispute to E.D. Ark.); Neil Bros., 425 F.Supp.2d at 331 (transferring patent infringement action to W.D. Tenn.).

Arete's documents are located in Reno, which is much closer to Oakland than to Boston. But the relevant Arete documents are limited and readily transportable (consisting primarily of the patent file and the patent itself). Moreover, Arete must transfer its documents from its principal place of business whether this action is litigated here or in the District of Massachusetts. Beacon, on the other hand, would be spared the inconvenience of having to ship its much more voluminous documents from Massachusetts to California if the action were transferred to the District Court in Boston.

In addition to documentary evidence about the Accused Products, Beacon points out that testing equipment and the Accused Products themselves are in Massachusetts, making access to the FESS's more convenient for both parties (as well as the witnesses, jurors and judge) if physical inspection is necessary. Mot. at 14-15 and n. 3. Beacon has presented evidence that the FESS units are vacuum-sealed in thick steel containers that appear to be large and bulky and presumably would be difficult to transfer to another location.2d Hockney Decl. ¶ 4 and Fig. 1.

We conclude that transferring this action to the District of Massachusetts would not simply shift an equivalent inconvenience from Beacon to Arete-in part because Arete already bears some inconvenience by appearing in this Court. Arete has no place of business in California; its employees would be required to travel for trial and its records would have to be shipped out of state. Transferring this action to Massachusetts would increase Arete's inconvenience-but not massively, whereas that transfer would reduce dramatically the inconvenience that litigating this case would impose on Beacon.

Thus, on balance, the convenience to the parties favors transfer to the District of Massachusetts.

## C. Convenience of Witnesses

**\*7** The convenience of the witnesses is often the most important factor considered by the Court in ruling on a motion to transfer. *See* Steelcase, Inc. v. Haworth, Inc., 41 U.S.P.Q.2d 1468, 1470 (C.D.Cal.1996) (granting motion to transfer patent action to W.D. Mich.)."To demonstrate inconvenience, the movant should produce information regarding the identity and location of the witnesses, the content of their testimony, and why such testimony is relevant to the action.... The court will consider not only the number of witnesses located in the respective districts, but also the nature and quality of their testimony in relationship to the issues in the case."*Id.* In balancing

the convenience of the witnesses, courts attend with special care to the burdens that would be placed on any non-party witnesses. *Royal Queentex,* 2000 WL 246599 at *6.

Among the most significant witnesses on the infringement and anticipation issues are the inventor(s) and the design and testing engineers. *See Steelcase,* 41 U.S.P.Q.2d at 1470. Important witnesses on the issue of damages include potential and actual customers and expert witnesses. *Id. See also MTS Sys. Corp. v. Hysitron, Inc.,* 2006 WL 2547698 at *2 (N.D.Cal. Sept.1, 2006) (granting motion to transfer venue).

**1. Arete's Witnesses**

Chief among Arete's witnesses is Dr. Christopher Gabrys, President and Chief Executive Officer of Arete. He is the sole named inventor of the patent in suit. Gabrys Decl. ¶ 6. He currently resides in Reno, Nevada, where Arete has its principal place of business. *Id.* ¶ 4. Dr. Gabrys points out that Reno is 222 miles, or 3 1/2 hours by automobile, from the Oakland courthouse, compared to 2500 miles to Boston; furthermore, he notes that relatively short non-stop flights from Reno to Oakland are available, but there are no direct flights between Reno and Boston. *Id.* ¶¶ 16-22.Dr. Gabrys therefore contends that it would be "relatively convenient for me to attend hearings and trial in Oakland."*Id.* ¶ 19.

Another Arete officer, Timothy Rodgers, who is the Secretary-Treasurer and Chief Operating Officer, lives in Santa Barbara, California, which is about 330 miles, or a 5 1/2 -hour drive, from Oakland, compared to 2500 miles from Boston. *See* Gabrys Decl. ¶¶ 25-30. A non-stop flight between Santa Barbara and Oakland takes about one hour and ten minutes, whereas there are no non-stop flights between Santa Barbara and Boston. *Id.* Mr. Rodgers has informed Arete that "it would be relatively convenient for him to attend trial in Oakland."*Id.*

Arete expects to call a third witness, J. Michael Neary, the attorney who prosecuted the patent-in-suit. Mr. Neary resides in LaPine, Oregon, which is about 456 miles from Oakland, or a 7 1/2 hour drive. *See* Gabrys Decl. ¶¶ 31-36. Non-stop flights between Eugene, Oregon, and San Francisco are available, but not between Eugene and Boston. *Id.* Mr. Neary has

informed Arete that "he would likely be available to testify at trial in Oakland but not in Boston."*Id.* ¶ 36.In assessing Mr. Neary's situation, however, we also may take into account the fact that he has a minority ownership interest in Arete, an interest that might increase his motivation to appear voluntarily at a trial in Boston.

**\*8** In sum, while Arete's witnesses would have to travel regardless of where this case is tried, their travel burdens would be less if the case remained here.

**2. Beacon's Witnesses**

Beacon has identified eight potential witnesses who reside in the District of Massachusetts, including former and current engineers and sales and marketing personnel whose testimony might well play important roles in Beacon's invalidity and non-infringement defenses.

Beacon has identified four engineering witnesses who can provide testimony about how the accused products were developed. Among them, Richard Hockney and James Arseneaux are current Beacon employees residing in Massachusetts. Hockney is Beacon's Chief Engineer and is the lead inventor on U.S. Patent No. 6,262,505, which was cited as prior art to the '489 Patent. Hockney Decl. ¶ 13. Arseneaux was the project manager for the installations of the CEC and NYSERDA Arrays and is familiar with the use of the Accused Products in those Arrays. Hockney Decl. ¶ 14.

Beacon also expects testimony from two of its former engineers: Norman Brackett, who resides in Massachusetts, and Omar Kabir, who apparently resides in New York.2d Hockney Decl. ¶ 8. Hockney, Brackett and Kabir are expected to testify about the design, development, function and operation of Beacon's Accused Products. Kabir and Brackett are familiar with the state of the art of dampening systems at the time the application for the patent-in-suit was filed. They also would offer testimony about how the technology in the Accused Products was embodied in the products that Beacon was producing before Arete's patent application was filed. Mot. at 6-7.

Beacon also expects to call Mark Manganelli, a

current Beacon employee who resides in Massachusetts and who is familiar with the accounting for the CEC Array and NYSERDA Array.

In addition, Beacon has identified four former and current employees whose testimony would be offered to describe meetings between Beacon and Dr. Gabrys, Arete's President, during which Dr. Gabrys allegedly acquired information about Beacon's TelCom Units (the alleged prior art) before the '489 Patent application was filed. Hockney Decl. ¶ 15. Of these witnesses, only Ward Spears is a current Beacon employee; he resides in Massachusetts. Michael Favaloro, a former Beacon employee, also resides in Massachusetts. Two other former Beacon employees live outside Massachusetts: Sharad Moghe is believed to reside in Ohio, and David Hezzell is believed to reside in California. *Id.*

Beacon has identified two witnesses, both of whom live in Massachusetts, who would offer testimony about Beacon's marketing. Harvey Wilkinson is a former Beacon employee who is expected to testify about the marketing of Beacon's TelCom Units. Hockney Decl. ¶ 16. Matthew Lazarewicz is a current Beacon employee who is expected to testify about efforts to market the CEC and NYSERDA Arrays. Hockney Decl. ¶ 17.

**\*9** While there likely would be some overlap among the subjects covered by the witnesses Beacon has identified, we have no basis for a finding that Beacon has padded or manipulated its list in order to exaggerate the inconvenience that litigating this case in this forum would impose. Each of the proffered witnesses will offer presumptively relevant information and many would appear to be sources of evidence that is likely to play a significant role in determining the outcome of the two major issues in this litigation (infringement and invalidity). Looking primarily to the convenience of the six non-party witnesses identified by Beacon, three of them (Brackett, Wilkinson, and Favaloro) are Massachusetts residents. Beacon represents that Brackett and Wilkinson have indicated that they would be available for only limited times due to work obligations and travel demands if the action were litigated in California. Hockney Decl. ¶ 18.

The other non-party witnesses identified by Beacon are Kabir, a New York resident, Moghe, a resident of

Ohio, and Hezzell, a resident of California. This district is presumably more convenient for Hezzell, but it is quite likely that Massachusetts is more convenient for Kabir and Moghe.

All five of Beacon's employee witnesses, Hockney, Arseneaux, Manganelli, Spears, and Lazarewicz, reside in Massachusetts. With a total of eight witnesses residing in Massachusetts, the balance tips heavily in favor of transfer.

Arete contends that traveling to Massachusetts would be extremely inconvenient for its witnesses, who would prefer to litigate on the West Coast. But as Arete's witnesses do not reside in this district, they would be inconvenienced by travel regardless of where the case is tried. *See Royal Queentex, 2000 WL 246599 at \*7.* As it now stands, all of Arete's witnesses would be required to travel to the Northern District of California, as none of them reside here. While transferring this action to the District of Massachusetts would increase the travel inconvenience to Arete's witnesses, that transfer would decrease, by much greater margins, the travel inconvenience for the larger number of Beacon witnesses.

We conclude that the substantial net increase in convenience for parties and witnesses that would result from transferring this litigation to Massachusetts clearly outweighs the modest presumption in favor of Arete's choice of venue.

## IV. Interest of Justice

Section 1404(a) also requires us to consider how the "interest of justice" would be affected by transferring this case to Massachusetts or declining to order that transfer. Factors that may be relevant to this inquiry include (1) the relative ability of each of the two courts to compel attendance of witnesses, (2) the relative ability of the two courts to provide direct access by witnesses and jurors to tangible evidence or to pertinent premises, (3) promoting consistency among court rulings that affect the development and trial of this case, (4) reducing the aggregate transaction costs imposed by the litigation on the parties, (5) providing the most expeditious access to judicial resources and a trial date, (6) assessing the relative intensity in the two jurisdictions of any local interests that the litigation might implicate, and (7)

the relative levels of familiarity of the judges in the two courts with the substantive law they would be called upon to construe and apply in this case.

**A. Attendance of Witnesses**

**\*10** The availability of compulsory process to compel the attendance of unwilling witnesses is an important factor.[FN1] *See Cambridge Filter Corp.,* 548 F.Supp. at 1311 (granting motion to transfer to N.D. Cal.).

> FN1. Beacon erroneously assumes that this Court's subpoena power could reach only those non-party witnesses who reside within 100 miles. Mot. at 14. This Court's subpoena power extends throughout the state of California pursuant to Fed.R.Civ.Proc. 45(b)(2)(C), which provides that a subpoena may be served anywhere within the state of the issuing court if a state statute allows state-wide service of a subpoena issued by a state court of general jurisdiction. Section 1989 of the California Code of Civil Procedure authorizes such state-wide service.

If this litigation proceeds in this Court, five of the non-party witnesses that Beacon has identified would be beyond the range of compulsory process, whereas only one of Arete's non-party witnesses could not be subpoenaed. And Arete has suggested that it identified that witness (David Campbell, a former employee who lives in Maryland) only out of an abundance of caution-not because he is expected to be the source of significant evidence.

Viewing the matter from a different perspective, we note that if the litigation proceeds in this court there is only one non-party witness, Mr. Hezell, who would be within range of compulsory process. Moreover, it is not at all clear that Mr. Hezell's testimony is likely to contribute significantly to the just resolution of any important issue in this case. A former Beacon employee, he apparently could provide evidence about meetings between Beacon officials and Dr. Gabrys (the named inventor on plaintiff's patent) that occurred before Arete submitted the application that led to the issuance of the '489 patent. It appears, however, that there are at least two other witnesses who have testimony to offer on that same subject-both of whom reside in Massachusetts and one of

whom, no longer being employed by Beacon, might well decline to testify in California voluntarily.

In contrast, if this litigation proceeds in Massachusetts, several non-party witnesses will be within subpoena range-and several others who are outside that range will be much closer to the site of the trial than they would be if it were proceeding in California, so they might be less resistant to appearing in Massachusetts voluntarily.

In sum, the respective courts' ability to compel witness attendance favors transfer to the District of Massachusetts.

In some cases, it is important, as an additional aspect of the analysis of the "interest of justice," to compare (in the two candidate courts) ease of access to premises or to immovable physical evidence. In the case at bar, there likely would not be a need for jurors or witnesses to inspect or view any particular premises or piece of real property, but being able to examine the Accused Products, or to see the process by which they are made, might advance the interest of justice. As we have pointed out, the specific products that Arete accuses in this lawsuit are encased in large, apparently heavy, sealed metal casings. These casings would be difficult to move to California from Massachusetts. It would be much easier to view them, and the plant at which the accused products were developed and manufactured, if the case were venued in Massachusetts. Because it would be much easier and cheaper to arrange for such inspections and viewing in Massachusetts than it would be here, it is more likely that these sources of potentially useful information and evidence would be made available to witnesses and triers of fact if the case were transferred.

**B. Consistency in Court Rulings**

**\*11** As a general proposition, the interest of justice is advanced to the extent that one court (rather than two or more) is the source of the rulings and judicial guidance that are provided in any one case. Concentrating responsibility for rulings and guidance in one court reduces both inefficiencies (eliminating the need for judges in other courts to become familiar with the case and the pertinent law) and the risk that the parties or witnesses will be subject to inconsistent directives.

In the case at bar, several non-party depositions are likely to be taken, and some non-party subpoenas are likely to be served, in the District of Massachusetts. None are likely to be taken or served in the Northern District of California. If disputes arise during such depositions, or as a result of subpoenas issued to non-party witnesses or entities, the Court to which the parties must turn for rulings is the District of Massachusetts. *See, e.g.,*Fed.R.Civ.P. 45(c)(2)(B). Permitting this case to proceed in the Northern District of California thus creates a substantial risk that two different courts would be called upon to learn the case and to issue rulings that affect the scope and timing of discovery.

If this litigation is venued in Massachusetts there will be appreciably less risk that multiple courts will be required to address discovery disputes. Most of the significant discovery is likely to take place in Massachusetts, where at least eight of the likely witnesses reside. Little discovery of moment, if any, is likely to take place in the Northern District of California. Moreover, if the case is venued in the District of Massachusetts, counsel can elect to take to that court even disputes that arise in depositions being taken in other states if the deponent is a party or is legally aligned with or controlled by a party (e.g., is a current employee at a certain level).Fed.R.Civ.Proc. 30(d)(3). Thus, only if the case is venued in Massachusetts is there a substantial likelihood that all pretrial rulings and guidance would emanate from a unitary judicial source. The significance of this factor grows with the subtlety and complexity of the case and the evidentiary issues it is likely to generate-and this is a patent case at whose center are some extremely sophisticated scientific processes and products.

## C. Aggregate Transaction Costs

While it may not be conventional to do so, we think that an analysis of the "interest of justice" should include some consideration of the transaction costs that are likely to be generated by the litigation. As the expense of litigating has increased in this country (at a pace that far exceeds the rate of inflation), rising litigation transaction costs have posed an ever greater threat to the "interest of justice." Foreseeable transaction costs dissuade some people who have legally cognizable claims or viable defenses from using the court system at all (plaintiffs who never file; defendants who default rather than contest claims). And for those who try to use the court system, transaction costs often become sources of decision-distorting pressures or outright abandonment of rights. Our concern about the health and the accessibility of the system of civil justice compels us to take into account the implications of venue selection for transaction costs. If the total cost (to all parties) of litigating a case is likely to be appreciably less in one venue than in another, we have a duty to consider this factor when trying to identify the venue in which litigating the case would advance most the "interest of justice." [FN2]

> FN2. When we address "total transaction costs" to the litigants in this setting we are not merely re-hashing our assessment of the relative expense burdens that we considered when we reviewed the "convenience of parties." When assessing the parties' convenience, we are primarily interested in determining, for each separately considered venue, whether proceeding there would be appreciably more expensive for one party than for the other. By contrast, when we examine the expense burden in this section we are trying to determine whether the total net cost of the litigation would be appreciably greater in one of the proposed venues than in the other(s). So in this part of our analysis we are trying to aggregate the total economic burden, direct and indirect, that the litigation is likely to impose on all parties-and to determine whether it appears that that aggregate burden would be substantially greater in one of the proposed venues than in the other(s).

**\*12** Arete contends that trying this case in Massachusetts will cost more because of the greater travel distance from Reno. This argument does not account for the fact that Arete will likely be required (by applicable law) to conduct most of the discovery in Massachusetts anyway, in light of the fact that most of the witnesses reside there. As we have noted, none of the parties and none of the witnesses reside in the Northern District of California. Moreover, it appears that most of the significant non-party witnesses reside either in Massachusetts or in states that are much closer to Massachusetts than to

California (New York, Ohio, and Maryland). Thus, if the trial were conducted here in Oakland, many more witnesses would be required to travel much greater distances than if it is tried in Boston.

Furthermore, for many years Beacon has made products in Massachusetts that it contends are central to its "anticipation" and "obviousness" defenses. Exemplars of these products (as well as of those that Arete has directly accused), and the documentary evidence about their design and development, all are located in the Boston area. By contrast, Arete apparently has no products that are available for inspection or demonstration, and it would be required to copy and transport its documentary evidence somewhere (here or Boston) regardless of where the litigation proceeds.

Taking all these circumstances into account, it seems likely that the net (aggregate) cost of fairly litigating this case would be appreciably lower if it were venued in Boston than if it were venued here.

**D. Other Considerations**

The Court may consider relative court congestion on a motion to transfer, but this factor usually is not a major consideration. *Royal Queentex, 2000 WL 246599 at *8.* Moreover, it is not clear that there is any material difference in "congestion" between the two candidate courts. Statistics published by the Administrative Office of the United States Courts for 2006 show that weighted filings (civil and criminal) per judgeship were much higher in the Northern District of California (621) than in the District of Massachusetts (306), but those same statistics also show that the median times from filing to disposition and from filing to trial were longer in the Massachusetts federal court (9 months and 28 months, respectively) than they were in the Northern District of California (7.4 months and 25.0 months, respectively).*2006 Federal Court Management Statistics* 38, 127 (Administrative Office of the United States Courts 2007). While these figures could be interpreted to suggest that cases are processed with greater efficiency in this district than in Massachusetts, they also could support an inference that litigants could have access to more judicial resources and prompter judicial attention (on a per case basis) in Boston than in Northern California.

Arete also contends that the litigation is likely to be more streamlined here than in Boston because this court has adopted specialized local rules that govern the pretrial development of patent cases. It is judicially noticeable, however, that Massachusetts is the locus of considerable high-tech innovation and business activity, as well as of the kind of litigation that accompanies such activity. Thus, it is reasonable to assume that judges in the federal court in Boston are likely to have had considerable exposure to patent litigation. We certainly cannot presume that simply because we have promulgated a set of procedural rules that presumptively apply to patent cases that our judges will manage such cases with greater sophistication or efficiency than the judges of the District of Massachusetts. The fact that judges in the District of Massachusetts appear to have more time per case than we do might increase the likelihood that they would be able to tailor case development plans that are more sensitive to the specific circumstances of each litigated matter.

**\*13** Nor is there any basis for assuming that the judges of this court would be more familiar with the substantive legal norms that will apply in this case than the judges who sit in the District of Massachusetts. The claims and defenses that the parties will litigate are governed exclusively by federal patent law; substantive local law will play no significant role. Federal judges sitting in comparably situated courts are presumed to be comparably familiar with federal law.

This case has not been pending long enough for any judge of this court to have invested significant time in learning about the facts and circumstances out of which it arises. It follows that transfer would not cause a duplication of learning by a judge in Boston.

Nor do the parties have pending here any motions or other pretrial problems whose disposition or resolution would be delayed by the proposed transfer. *Cf. Allen v. Scribner, 812 F.2d 426, 436 (9th Cir.), amended by 828 F.2d 1445 (9th Cir.1987)* (3 1/2 year pendency of litigation counseled against change of venue).

The authorities suggest that when weighing the competing interests in a setting like this we also may ask whether California or Massachusetts has any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

specific interests or applicable public policies that this litigation would implicate and that would elevate either state's concern about the issues presented by this lawsuit or its outcome. *Decker Coal,* 805 F.2d at 843. Arete has neither alleged state law claims nor identified any California public policy for which this case could have significant implications. *Cf. Jones,* 211 F.3d at 498-99. Arete is not a resident of California-so this litigation would not even implicate a generalized interest that California would have in protecting, promoting, or disciplining local businesses. Beacon, on the other hand, is a resident of Massachusetts-so Massachusetts presumably has some interest in how Beacon behaves and its fate as an employer and taxpayer. But this interest is so general and so obliquely implicated by this litigation that this factor deserves little weight in our analysis.

## V. Balance of Factors

When we review all of the pertinent factors, and focus on those that are most analytically significant, we conclude that the balance tips sharply in favor of transferring this case to the District of Massachusetts. As we have indicated, this is not a situation in which moving the case to the other candidate court simply would relocate an equivalent burden from plaintiff to defendant. The burden that would be imposed on Beacon by keeping the case here would be much greater than the burden that would be imposed on Arete by moving it to Boston. The center of evidentiary gravity in this matter clearly is in the Boston area-where there are more witnesses, more documents, more relevant products and the only relevant premises. While Oakland is closer to Arete's headquarters than Boston, neither Arete nor any of its witnesses reside here. None of Arete's documents are here. It has no products to display or premises that might need to be inspected. Moreover, there will be appreciably less risk of skewed or incomplete development or presentation of the evidence if the case is litigated in Massachusetts-because more of the important witnesses reside there and are within the subpoena range of that District Court and because the accused devices and the allegedly 'anticipating' products are readily accessible there. Litigating the case in the District Court of Massachusetts also reduces the risk that this litigation will needlessly consume extra judicial resources or that inconsistent judicial rulings or guidance will compromise the development of the evidence or the management of

the pretrial process.

### CONCLUSION

**\*14** For the reasons detailed above, we HOLD that the convenience of the parties and the witnesses and the interest of justice would be served best by transferring this action to the District of Massachusetts. Therefore, pursuant to 28 U.S.C. § 1404(a), we GRANT Beacon's motion and ORDER THE TRANSFER OF THIS CASE TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. The Clerk shall transfer the file.

**IT IS SO ORDERED.**

N.D.Cal.,2008.
Arete Power, Inc. v. Beacon Power Corp.
Slip Copy, 2008 WL 508477 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit I

*Westlaw.*

Carus Corp. v. Greater Texas Finishing Corp.
N.D.Ill.,1992.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
CARUS CORPORATION, Plaintiff,
v.
GREATER TEXAS FINISHING, CORPORATION,
Defendant.
No. 91 C 2560.

Jan. 31, 1992.

*MEMORANDUM OPINION AND ORDER*

ILANA DIAMOND ROVNER, District Judge.

### I. INTRODUCTION

*1 The plaintiff, Carus Corporation ("Carus"), has
brought this suit seeking a declaratory judgment that
it has not violated the patent of defendant Greater
Texas Finishing Corporation ("Greater Texas").
Greater Texas has filed a motion to dismiss for lack
of personal jurisdiction and, in the alternative, a
motion to transfer this action to the United States
District Court for the Southern District of New York,
where it has three similar cases pending involving
alleged infringement of the same patent. For the
reasons stated below, the Court grants the defendant's
motion to transfer.[FN1] Because the Court transfers this
case, the Court need not decide whether personal
jurisdiction is proper over Greater Texas in Illinois.
*See Goldlawr, Inc. v. Heiman, 369 U.S. 463, 465-66,
82 S.Ct. 913, 915 (1962); Datasouth Computer Corp.
v. Three Dimensional Technologies, Inc., 719
F.Supp. 446, 449 (W.D.N.C.1989); Marder v.
Dembinski, 498 F.Supp. 1323, 1324 (N.D.Ill.1980)*
(Shadur, J.).

### II. FACTS

For purposes of this motion to transfer, the Court has
assumed the allegations contained in Carus'
complaint to be true. This case involves an alleged
infringement of Greater Texas' patent on a process
known as "acid wash," which produces a random

faded effect on clothing such as jeans and denim. An
Italian inventor, Francesco Ricci, obtained patent No.
4,740,213 ('213 patent) on April 26, 1988 and
subsequently assigned his rights to Golden Trade, the
current owner and exclusive licensee.

Carus supplies chemicals to commercial customers. It
also makes products that bleach denim products
under the trademark Denox. Amongst its products,
Carus sells permanganate products such as potassium
permanganate *per se* and cementitious pellets with
embedded permanganate.[FN2] On April 10, 1991,
Greater Texas sent a letter to Carus warning against
"infringement and contributory infringement" of the
'213 patent, by the sale of potassium permanganate
pellets. Carus claims that potassium permanganate is
a staple commodity of commerce and that it has not
sold any material especially made or adapted for the
'213 patent method.

Before Carus filed suit, Greater Texas had brought
three actions involving ten defendants for violation of
the '213 patent in federal court in the Southern
District of New York. Those actions are currently
pending. Greater Texas argues that consolidation of
this action with the suits in New York will avoid the
risk of inconsistent determinations on similar issues,
promote judicial economy, and, through consolidated
discovery, prevent duplicative discovery.

### III. ANALYSIS

Before a court grants a § 1404(a) motion to transfer,
the movant must show that (1) venue is proper in the
transferor district; (2) the transferor court has the
power to transfer the case; and (3) the transfer is for
the convenience of the parties and witnesses, and is
in the interests of justice. *Zurich Ins. Co. v. Raymark
Industries, Inc., 672 F.Supp. 1102, 1103
(N.D.Ill.1987).* The parties do not dispute the
existence of the first two elements necessary for
transfer of this case. Carus, however, asserts that
transfer would be inconvenient to the parties and
witnesses and would not be in the interests of justice.

### A. Convenience of Witnesses and Location of
### Documentary Evidence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1992 WL 22691 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 22691)**

**\*2** Carus argues that convenience of the witnesses and location of the documentary evidence favor Illinois, and not New York. The Court recognizes that all of Carus' witnesses and documents regarding this suit are located in Ottawa, Illinois, and transfer to New York would be an added expense for it. Greater Texas' witnesses and documents are located at its principal place of business in El Paso, Texas, and not New York. The problem is that the three pending lawsuits in New York will require the testimony of the same Greater Texas witnesses that would be required to travel to Chicago if the Court were to deny the motion to transfer. Consolidating the cases will be much more economical and timesaving for Greater Texas, albeit at the expense of Carus. But as noted below, the interests of justice far outweigh the interest of Carus in a more convenient forum.

*B. Interests of Justice*

The final and dispositive issue in this case involves whether the interests of justice favor transfer to New York. The most compelling factor in determining the appropriateness of transfer is the interest of society in the efficient administration of justice. *Magnavox Co. v. APF Electronics, Inc.* 496 F.Supp. 29 (N.D.Ill.1980). As a general proposition, cases should be transferred to the district where related actions are pending. *A.P.T. Inc. v. Quad Environmental Technologies,* 698 F.Supp. 718, 723 (N.D.Ill.1988) (Bua, J.) (transferring patent case); *SEC v. First National Finance Corp.,* 392 F.Supp. 239, 241 (N.D.Ill.1975) (Hoffman, S.J.). The presence of three related cases involving the same patent and the same type of infringement actions in the transferor district weighs heavily in favor of transfer. *See Zurich,* 672 F.Supp. at 1104. In addition, these cases all involve complex technical and legal issues. *Magnavox,* 496 F.Supp. at 34. Failure to transfer this case would result in duplicative judicial effort requiring two courts to resolve a number of the same issues. *See Id.* Therefore, transfer of this action to a district which is already familiar and experienced with the facts and law relevant to this action will promote judicial economy. *Zurich,* 672 F.Supp. at 1104.

Apart from conserving judicial resources, transfer will provide for the efficient adjudication of complex litigation due to the possibility of consolidating both discovery and trial. *A.P.T.,* 698 F.Supp. at 724. In addition, transferring this case to New York will avoid inconsistent determinations regarding the same patent. Transfer is even more appropriate where the suit in the other district was the first one filed, as in this case. *Id.*

Carus argues that no common issue of infringement exists between this case and the New York cases because its products are different than the allegedly infringing products at issue in New York. This argument ignores the fact that the testimony relating to Greater Texas' product will be the same in all four cases. Carus also makes an argument that, unlike the New York cases, the validity of the '213 patent is not at issue in this case. Greater Texas has stated that validity will be a disputed issue when it answers and counter-claims for Carus' alleged infringement. For this reason, the Court concludes that the validity of the '213 patent will be at issue in both this case and the New York cases.

*IV. CONCLUSION*

**\*3** Three similar lawsuits involving the alleged infringement of the same patent at issue in this case are currently pending in the federal court in New York. Because of this, the interests of justice dictate that this case be transferred there. The Court grants the defendant's motion to transfer this case to the United States District Court for the Southern District of New York.

> FN1. The Court also denies the parties' requests for oral argument on these questions finding it to be unnecessary.

> FN2. Webster's Ninth New Collegiate Dictionary, 876 (1985) defines "permanganate" as a "dark purple crystalline compound that is a salt of permanganic acid." "Permanganic acid" is defined as "an unstable strong acid known chiefly in purple colored strongly oxidizing aqueous solutions."

N.D.Ill.,1992.
Carus Corp. v. Greater Texas Finishing Corp.
Not Reported in F.Supp., 1992 WL 22691 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit J



Slip Copy                                                                                                Page 1
Slip Copy, 2007 WL 2500982 (N.D.Cal.)
(Cite as: Slip Copy, 2007 WL 2500982)

**H**CoxCom, Inc. v. Hybrid Patents Inc.
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
COXCOM, INC., Plaintiff,
v.
HYBRID PATENTS INCORPORATED, Defendant.
**No. C-06-7918 MMC.**

Aug. 30, 2007.

Adam R. Alper, Eric R. Lamison, Kirkland & Ellis
L.L.P., San Francisco, CA, for Plaintiff.
David A. Degroot, Neil Arthur Smith, Sheppard,
Mullin, Richter & Hampton L.L.P., San Francisco,
CA, Michael E. Wilson, Slusser Wilson & Partridge
L.L.P., Houston, TX, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION
TO TRANSFER**

MAXINE M. CHESNEY, United States District
Judge.
**\*1** Before the Court is defendant Hybrid Patents
Incorporated's ("Hybrid") motion, filed June 8, 2007,
to transfer the above-titled action to the Eastern
District of Texas. Plaintiff CoxCom, Inc.
("CoxCom") has filed opposition, to which Hybrid
has replied. Pursuant to the Court's July 3, 2007
order, the parties filed supplemental briefing. Having
reviewed the parties' submissions in support of and in
opposition to the motion, the Court rules as follows.

**BACKGROUND**

On July 14, 2006, Hybrid filed a complaint in the
Eastern District of Texas against four defendants,
including Cox Communications Inc. ("Cox
Communications"), alleging infringement of four
patents owned by Hybrid. (*See* Wilson Decl., filed
June 8, 2007, Ex. 2.) Specifically, with respect to
Cox Communications, Hybrid alleged said defendant
infringes by providing "High Speed Internet services
to subscribers."(*See id.*Ex. 2 ¶¶ 21-22.) On March 29,
2007, during the course of discovery in the Texas
action, Cox Communication's Rule 30(b)(6) designee
testified that its subsidiary CoxCom had provided

"Internet services" in Texas. (*See* Alper Decl., filed
June 22, 2007, Ex. E at 26). Subsequently, on May 4,
2007, Hybrid, in light of the testimony of Cox
Communications, filed a motion for leave to amend
to add CoxCom as a defendant in the Texas action,
(*see* Wilson Decl. Ex. 6); on June 25, 2007, the Texas
court granted Hybrid's motion and, that same day,
Hybrid filed its First Amended Complaint, adding
infringement claims against CoxCom and five other
newly-added defendants, (*see* Jaasma Decl., filed
June 29, 2007, Ex. 1.)

Meanwhile, on December 27, 2006, CoxCom filed
the instant action, in which CoxCom seeks
declaratory relief pertaining to the same four patents
as are at issue in the Texas action; specifically,
CoxCom seeks a declaration that CoxCom does not
infringe, that the subject patents are invalid, that the
subject patents are unenforceable, and that Hybrid
does not own any of the subject patents. Additionally,
CoxCom seeks relief under § 17200 of the California
Business & Professions Code, based on the same set
of facts that underlie CoxCom's allegation that
Hybrid's patents are unenforceable and that CoxCom
does not own the patents. CoxCom served Hybrid
with the instant complaint on March 26, 2007.

**DISCUSSION**

By the instant motion, Hybrid seeks a transfer to the
Eastern District of Texas. "For the convenience of
parties and witnesses, in the interest of justice, a
district court may transfer any civil action to any
other district or division where it might have been
brought."28 U.S.C. § 1404(a).

Here, the action "might have been brought" in the
Eastern District of Texas, specifically, because
Hybrid is subject to personal jurisdiction therein.
*See*28 U.S.C. § 1391(c) (holding, as to action against
defendant corporation, venue proper in any district in
which defendant is subject to personal jurisdiction);
(*see also* Compl. ¶ 3 (alleging Hybrid's principal
place of business is in Texas).)

**\*2** With respect to the issue of convenience, the
Court, weighing the applicable factors relevant to

Slip Copy                                                                                                                    Page 2
Slip Copy, 2007 WL 2500982 (N.D.Cal.)
**(Cite as: Slip Copy, 2007 WL 2500982)**

such issue, *see Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986), finds the Eastern District of Texas is a more convenient forum, for the reasons set forth below.

At the outset, the Court finds that although plaintiffs' choice of forum is a factor weighing against transfer, such factor is not entitled to significant weight. First, CoxCom is not a citizen of California. (*See* Compl. ¶ 2 (alleging CoxCom is a Delaware corporation with its principal place of business in Georgia).) Second, CoxCom appears to have engaged in forum shopping, given the absence of any showing that, at the time CoxCom filed the instant action, Hybrid was even aware CoxCom was engaging in potentially infringing conduct.[FN1] *See Williams v. Bowman,* 157 F.Supp.2d 1103, 1106 (N.D.Cal.2001) (holding "degree to which courts defer to the plaintiff's chosen venue is substantially reduced where the plaintiff does not reside in the venue" or where "there is any indication that the plaintiff's choice of forum is the result of forum shopping"; citing cases).

> FN1. CoxCom does not allege or otherwise assert, for example, that CoxCom filed the instant action as a reaction to Hybrid's sending CoxCom a cease-and-desist letter or similar communication indicating Hybrid's intent to sue CoxCom for infringement if CoxCom did not stop selling the accused products.

With respect to the "feasibility of consolidation," the Court finds such factor weighs heavily in favor of transfer and, given the circumstances present herein, outweighs the deference due plaintiffs' choice of forum. *See A.J. Industries v. United States District Court,* 503 F.2d 384, 389 (9th Cir.1974) (holding "feasibility of consolidation" with action in transferee court is "significant factor in a transfer decision"; noting "even the pendency of an action in another district is important because of the positive effects it might have in possible consolidation of discovery and convenience to witnesses and parties"). Each of the claims asserted herein is in the nature of a claim of infringement, and each has been raised as a defense in the Texas action by three of the four original defendants.[FN2] (*See* Wilson Decl. Ex. 3 at 10-38, Ex. 4 at 9-37, Ex. 5 at 10-38.) In short, as a result of the Texas court's order of June 25, 2007, Hybrid's claim of infringement against CoxCom is pending in

the Eastern District of Texas, where infringement claims brought by Hybrid against nine other defendants are pending, and the same defenses raised herein are asserted as defenses therein. Under such circumstances, it is more than simply "feasible" that the Texas action and the instant action could be consolidated if they were pending in the same district; rather, such consolidation is highly likely.[FN3]

> FN2. The fourth original defendant filed a motion to dismiss, in lieu of an answer; CoxCom represents that it has not yet filed a response; and no party has advised this Court as to the status of the responsive pleadings with respect to the other newly-added defendants.

> FN3. CoxCom argues consolidation is unlikely because CoxCom believes the Texas court is likely to grant a motion CoxCom plans to file, seeking dismissal for lack of personal jurisdiction. Given that CoxCom's parent has testified that CoxCom has sold, in Texas, products alleged by Hybrid to be infringing in nature, the basis for such motion is unclear.

With respect to the convenience of the parties, CoxCom, as noted, is not a citizen of California, nor has CoxCom asserted that any CoxCom employee who is expected to be a witness resides in California. Hybrid likewise is not a citizen of California, (*see* Compl. ¶ 3), and has not asserted that any Hybrid employee who is expected to be a witness resides in California. With respect to the convenience of third-party witnesses, often the most significant factor, the Court finds transfer would be substantially more convenient for each such witness, even those who reside in California, because such witnesses would not be required to engage in duplicative litigation or travel to two different forums to attend court proceedings.[FN4] *See, e.g., Gundle Lining Constr. Corp. v. Fireman's Fund Ins. Co.,* 844 F.Supp. 1163, 1166 (S.D.Texas 1994) ("It is the convenience of non-party witnesses ... that is the more important factor and is accorded greater weight [than the convenience of party witnesses].") Consequently, this factor weighs in favor of transfer.

> FN4. CoxCom asserts that the inventors of the patents and certain of Hybrid's licensees

reside in California. Assuming, as CoxCom asserts, such witnesses could provide testimony helpful to defend against a claim of infringement by Hybrid, such witnesses likely would be called to testify as witnesses in the Texas action, irrespective of whether the instant action were to go forward in California.

**\*3** In sum, the relevant factors weigh in favor of the request for transfer pursuant to § 1404(a).[FN5] Moreover, such transfer would serve the multiple objectives of "eliminat[ing] duplication in discovery, avoid[ing] conflicting rulings and schedules, reduc[ing] litigation cost, and sav[ing] time and effort of the parties, the attorneys, the witnesses, and the courts."*Cf.*Manual for Complex Litigation (Fourth) § 20.131 (2004) (discussing objectives of transfer in context of multidistrict litigation).

> FN5. In light of this finding, the Court does not address Hybrid's alternative request to transfer under the "first to file rule."

Accordingly, the instant action will be transferred to the Eastern District of Texas.

### CONCLUSION

For the reasons stated, defendant's motion to transfer is hereby GRANTED, and the instant action is hereby TRANSFERRED to the Eastern District of Texas, pursuant to 28 U.S.C. § 1404(a).

**IT IS SO ORDERED.**

N.D.Cal.,2007.
CoxCom, Inc. v. Hybrid Patents Inc.
Slip Copy, 2007 WL 2500982 (N.D.Cal.)

END OF DOCUMENT

Exhibit K



Not Reported in F.Supp.                                                                                  Page 1
Not Reported in F.Supp., 1991 WL 273800 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1991 WL 273800)**

CPattishall, McAuliffe, Newbury, Hilliard &
Geraldson v. Gibson Guitar Corp.
N.D.Ill.,1991.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
PATTISHALL, MCAULIFFE, NEWBURY,
HILLIARD & GERALDSON, a partnership,
Plaintiff,
v.
GIBSON GUITAR CORPORATION, a corporation,
Defendant.
**No. 91 C 6718.**

Dec. 12, 1991.

*MEMORANDUM OPINION*

KOCORAS, District Judge:
**\*1** This matter comes before the court on defendant's
motion to dismiss or stay, or alternative motion to
transfer. For the reasons stated below, we grant
defendant's motion to transfer this action to the
Middle District of Tennessee pursuant to 28 U.S.C. §
1404(a).

BACKGROUND

Defendant Gibson Guitar Corp. ("Gibson") retained
the Chicago law firm Pattishall, McAuliffe,
Newbury, Hilliard & Geraldson ("Pattishall") to
represent them in a trademark infringement suit
against Heritage Guitar and Lasar Music. The
trademark infringement suit was filed in early 1990
in the Middle District of Tennessee, where it was
litigated until the case settled on the eve of trial on
August 27, 1991. The current dispute concerns the
legal fees which Gibson owes Pattishall for its work
on the Tennessee infringement case. Gibson claims
that the bills which Pattishall submitted were grossly
excessive and exceeded written estimates which the
firm had periodically provided, and has refused to
pay the outstanding balance.

Attempts to negotiate the fee dispute through H. Naill
Falls Jr., an attorney who served as Gibson's local
counsel in the infringement case, were unsuccessful.

On the morning of October 22, 1991, Gibson filed a
complaint in the Middle District of Tennessee asking
that the court declare that Pattishall's fees were
excessive and unfair, and to rule that Gibson be
relieved from paying any outstanding fees. On the
afternoon of October 22, 1991, Pattishall filed a
complaint in this Court seeking a judgment against
Gibson for the outstanding fees balance. Gibson has
now moved for the dismissal or staying of the action
pending in this court in deference to the action
pending in the Middle District of Tennessee, or in the
alternative, for a transfer of this case to be
consolidated with the Tennessee action.

DISCUSSION

Both lawsuits involve the same underlying facts and
issues, and therefore, judicial economy and the threat
of inconsistent results dictate that the cases should be
consolidated into one proceeding. *J.V.B. Industries,
Inc. v. Federated Dept. Stores, Inc,* 684 F.Supp. 22,
24 (E.D.N.Y.1988). The general rule is that a court
which has before it a claim which is duplicative of a
previously filed action should stay its action or
dismiss the case in deference to the court where the
first-filed action is pending. *See Colorado River
Water Conservation District v. United States,* 424
U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483
(1976). Gibson forcefully argues that since it filed its
action first (albeit only six hours earlier), it is entitled
to litigate the fee dispute in Tennessee.

However, this "first to file" rule is not necessarily
dispositive. Where the previously filed action is an
anticipatory declaratory judgment proceeding, the
affirmative action should be allowed to proceed even
though it was subsequently filed. *See e.g., Tempco
Electric Heater Corp. v. Omega Engineering, Inc.,*
819 F.2d 746, 749 (7th Cir.1987); *Associated Mills v.
Regina,* 675 F.Supp. 446, 448 (N.D.Ill.1987); *CNA
Financial Corp. v. Home Indemnity Co.,* 703 F.Supp.
759, 761 (N.D.Ill.1989). Although Gibson argues that
it has not filed a declaratory judgment action, the
nature of the relief being sought indicates that the
action is declaratory in nature. Moreover, since
Pattishall had discussed initiating a collection
proceeding if the parties could not resolve the
dispute, it is apparent that Gibson's claim in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 2
Not Reported in F.Supp., 1991 WL 273800 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1991 WL 273800)**

Tennessee was filed in anticipation of an affirmative action initiated by Pattishall in its choice of forum. Therefore, we do not think it appropriate for us to stay or dismiss Pattishall's action merely because Gibson filed their action in Tennessee first.

*2 28 U.S.C. § 1404(a) provides for a change of venue for the convenience of the parties, witnesses, and in the interests of justice to any other district where the action could have been brought. A district court has great discretion in determining whether to transfer a case pursuant to 28 U.S.C. § 1404(a), and a decision to transfer will only be overturned upon a showing of abuse of discretion. *Cote v. Wadel, 796 F.2d 981, 985 (7th Cir.1986); Brown v. Connecticut General Life Insurance Co., 934 F.2d 1193, 1197 (11th Cir.1991).* Although there are factors which militate in favor of both forums, after considering all relevant arguments, we believe that Tennessee is the more appropriate venue.

Obviously each party and their witnesses would be more convenienced by their own choice of forum, and likewise, it is apparent that each would be equally inconvenienced if the case would proceed in their adversary's choice of forum. However, there are several factors which make the Middle District of Tennessee the more appropriate venue.

First, the Tennessee case has been assigned to Judge John Nixon, who presided over the underlying trademark infringement case. Although the case settled, the parties still appeared before Judge Nixon on several occasions, and his familiarity with the infringement case will undoubtedly give him a greater understanding of the situation than if the case were to proceed in an entirely new forum. Familiarity of the judge with the underlying action has been held to be a valid consideration justifying a change of venue. *See e.g., Fossett Corp. v. Gearhart, 694 F.Supp. 1325, 1327 (N.D.Ill.1988); Boston and Maine Corp. v. United Transportation Union, 110 F.R.D. 322, 329 (D.Mass.1986).*

Second, choice of law principles indicate that Tennessee law would apply based on the "most significant relationship" approach. *See Palmer v. Beverly Enterprises, 823 F.2d 1105, 1107 (7th Cir.1987).* Generally, considerations of judicial economy tip in favor of allowing the court that is most familiar with state law to apply it. *Espino v. Top*

*Draw Freight System, Inc., 713 F.Supp. 1243, 1245 (N.D.Ill.1989); Heller Financial, Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1293 (7th Cir.1989).* Certainly the Tennessee court is more familiar with Tennessee law.

Finally, notions of equity and fairness dictate that this action should be transferred. Pattishall and Gibson entered into a contract for the performance of legal services in Tennessee. Although Pattishall argues that it did much of its research and preparation in Chicago, if the case would have proceeded to trial, Pattishall would have spent a significant time in Tennessee litigating the case. It seems that if Pattishall was willing to earn money in Tennessee, it can argue the propriety of their legal fees there. *See Lesser & Kaplin, P.C. v. American Insurance Co., 723 F.Supp. 1099, 1103 (E.D.Pa.1989)* ("It is not unreasonable to require attorneys who were prepared to spend substantial time litigating in Virginia to spend one day there to testify in support of their claim for fees.").

*3 We therefore find that interests of judicial economy require us to transfer this action to be consolidated with the previously filed action before Judge Nixon in the Middle District of Tennessee.

N.D.Ill.,1991.
Pattishall, McAuliffe, Newbury, Hilliard & Geraldson v. Gibson Guitar Corp.
Not Reported in F.Supp., 1991 WL 273800 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit L

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2000 WL 246599 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 246599)

▶Royal Queentex Enterprises v. Sara-Lee Corp.
N.D.Cal.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
ROYAL QUEENTEX ENTERPRISES INC.,
Plaintiff,
v.
SARA LEE CORPORATION, Defendant.
No. C-99-4787 MJJ.

March 1, 2000.

ORDERED DENYING MOTION TO TRANSFER
VENUE

JENKINS, J.

INTRODUCTION

**\*1** Before this Court is the motion of defendant Sara
Lee Inc. ("Sara Lee") to transfer venue pursuant to 28
U.S.C. 1404(a). For the reasons outlined in this
memorandum and order, the motion is DENIED.

FACTUAL BACKGROUND

This factual dispute between Royal Queentex
Enterprises, Inc. ("Royal Queentex") and Sara Lee
concerns the latter's allegation that Royal Queentex's
"Leg Avenue" product mark infringes and dilutes
Sara Lee's successful "L'EGGS" trademark. On
October 29, 1999, Royal Queentex filed a declaratory
relief action in this Court (hereinafter "the California
action") to establish its right to use the "Leg Avenue"
mark. On November 24, 1999, Sara Lee filed a
complaint against Royal Queentex and two additional
parties in the Middle District of North Carolina,
alleging that Royal

Queentex engaged in trademark infringement and
false designation of origin, federal and state
trademark dilution, and unfair competition
(hereinafter "the North Carolina action").

Sara Lee is a multinational corporation with
operations in more than 40 countries. According to
public information, Sara Lee generates more than $20

billion in annual revenue from five lines of
businesses. One of them is branded apparel, among
them the L'EGGS hosiery brand. Sara Lee's branded
apparel products has annual sales of $2.5 billion. Sara
Lee has sold $10 billion in L'EGGS brand product
since 1969. Sara Lee Hosiery is based in Winston-
Salem, North Carolina.[FN1]

> **FN1.** Sara Lee is a Maryland corporation
> with its principal place of business in
> Chicago, Illinois.

Royal Queentex is a California corporation with its
place of business in Los Angeles, California. Royal
Queentex imports exotic lingerie from Taiwan and
distributes it to wholesalers throughout the U.S.
under the label "Leg Avenue." Royal Queentex has
eight employees including Michael Tsai, who
manages the business. Royal Queentex's sales in
1999 were approximately $6.6 million, with more
than 30 percent occurring in California. North
Carolina accounted for 3.6% percent of its 1999
sales.

On November 12, 1996 Royal Queentex filed an
application with the United States Patent and
Trademark Office ("PTO") to register the mark LEG
AVENUE for use with its hosiery. The mark LEG
AVENUE was published for opposition by the PTO
on June 17, 1997. In October 1997, Sara Lee filed an
opposition to registration of the LEG AVENUE
mark. Royal Queentex did not respond to Sara Lee's
opposition.[FN2] After waiting five months, the
Trademark Trial and Appeals Board ("PTTB")
entered default judgment in favor of Sara Lee and
denied registration of Royal Queentex's LEG
AVENUE mark based on Royal Queentex's apparent
abandonment of the application.

> **FN2.** Royal Queentex says it missed its
> filing deadline due to a procedural mix-up.
> However, according to PTTB
> correspondence, it appears Royal Queentex
> experienced difficulty with counsel. On June
> 10, 1998, the PTTB issued an order
> suspending proceedings in view of the
> withdrawal of Royal Queentex's counsel.
> The PTTB gave Royal Queentex time to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2000 WL 246599 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 246599)**

either appoint new counsel or continue pro se. Additionally, The PTTB gave Royal Queentex thirty days to show why default judgment should not be entered due to their apparent loss of interest in the case. Royal Queentex never responded and default judgment was entered on August 19, 1998.

On October 21, 1999, Sara Lee's outside counsel mailed a cease and desist letter to Queentex which read:

We are directing this correspondence in the hope that this matter may be resolved amicably. L'EGGS Products is willing to forego legal action to enforce its rights only if we receive prompt written assurances that Royal Queentex will immediately discontinue all us of any name containing the words "LEG" or "LEGS," or any colorable imitation thereof, including but not limited to use of the designation "LEG AVENUE," in connection with the sale of hosiery products of any type, including pantyhose, knee-highs, socks, tights, trouser socks, or other forms of legwear.

**\*2** If we do not receive a response with these assurances within fourteen (14) days of the date of this letter, L'EGGS Products has authorized this firm to take further legal action necessary and appropriate to enforce its valuable trademark rights.

This letter was delivered to Royal Queentex on October 26, 1999.

Three days later, Royal Queentex filed the California action for declaratory relief without responding to Sara Lee's letter. Nearly four weeks after the California action was filed, Sara Lee filed the North Carolina action for infringement and dilution. On December 8, 1999, Sara Lee answered here and concurrently filed this motion to transfer venue of the California action to the Middle District of North Carolina pursuant to 28 U.S.C. § 1404(a).

DISCUSSION

I. Legal Standard

Motions to transfer venue are governed by 28 U.S.C. § 1404(a).Section 1404(a) provides that for the

convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where the action might have been brought. 28 U.S.C. § 1404(a) (1998). The purpose of section 1404(a) is to prevent the waste of 'time energy and money' and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense. *Van Dusen v. Barrack,* 376 U.S. 612, 616 (1964) (quoting *Continental Grain Co. v. Barge FBL-585,* 364 U.S. 19, 26-27 (1960)). Under section 1404(a), the moving party has the burden of showing that the balance of conveniences weighs heavily in favor of the transfer in order to overcome the strong presumption in favor of the plaintiff's choice of forum. *See Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986); *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255-56 (1981).

In order to support a motion to transfer venue, the moving party must show that the forum to which they seek transfer is a forum in which the action originally might have been brought. *See Hoffman v.. Blaski,* 363 U.S. 335, 344 (1960). In addition, the transfer must be for the convenience of the parties and witnesses and in the interests of justice. *See Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.,* 179 F.R.D. 264, 269 (C.D.Cal.1998) (citing *Arley v. United Pac. Ins. Co.,* 379 F.2d 183, 185 (9th Cir.1969)). This Circuit set forth several considerations that can be used in weighing these factors. These include: 1) plaintiff's choice of forum, 2) convenience of the parties, 3) convenience of the witnesses, 4) ease of access to the evidence, 5) familiarity of each forum with the applicable law, 6) feasibility of consolidation of other claims, 7) any local interest in the controversy, and 8) the relative court congestion and time of trial in each forum. *See Decker Coal,* 805 F.2d at 843;*Linear Technology Corp. v. Analog Devices, Inc.,* 1995 WL 225672,[*]1 (N.D.Cal.1995); *Teknekron Software Systems, Inc. v. Cornell University,* 1993 WL 215024,[*]7 (N.D.Cal.1993); *University of California v. Eli Lilly & Co.,* 21 U.S. P.Q.2d 1201, 1207 (N.D.Cal.1991).

II. Might Have Been Brought

**\*3** Transfer under section 1404(a) is limited to courts where the action might have been brought. *See Hoffman,* 363 U.S. at 344;*A.J. Indus., Inc. v. United States Dist. Ct. for the Cent. Dist. of Cal.,* 503 F.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

384, 386 (9th Cir.1974). The transferee court must have had complete personal jurisdiction over defendants, subject matter jurisdiction over the claim, and proper venue had the claim originally been brought in that court. *See Hoffman*, 363 U.S. at 343-44. Here, it is undisputed that Royal Queentex's California action could have been brought in the Middle District of North Carolina.

The Middle District of North Carolina has proper personal jurisdiction over Sara Lee because the L'EGGS Products division of Sara Lee is headquartered in Winston-Salem, North Carolina, and because Sara Lee conducts substantial business from that location. Venue is proper pursuant to 28 U.S.C. § 1391(c) for corporations in any district in which a court has proper personal jurisdiction over that corporation. Finally, this Court has proper subject matter jurisdiction over the claim based on diversity and because the claim exceeds $75,000. Therefore, since the action might have been brought in the Middle District of North Carolina, the Court now turns to a consideration of the convenience and justice factors at issue in this case.

III. Convenience Factors

A. Plaintiff's Choice of Forum

In motions to transfer venue, there is a strong presumption in favor of plaintiff's choice of forum. *Jarvis v. Marietta Corp.*, 1999 WL 638231 (N.D.Cal.1999)(citing *Piper Aircraft*, 454 U.S. at 255). Therefore, on this Rule 1404(a) motion to transfer, Sara Lee bears the burden of overcoming this presumption to demonstrate that the balance of inconveniences substantially weighs in favor of transfer. *See Decker Coal v. Continental Edison*, 805 F.2d 834, 843 (9th Cir.1986). While plaintiff's choice of forum is to be given great weight, that choice is not the final word. *Pacific Car and Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir.1968). Circumstances in which a plaintiff's chosen forum will be accorded little deference include cases of anticipatory suits and forum shopping. *See Mission Ins. Co. v. Purina Fashions Corp.*, 706 F.2d 599, 602 n. 3 (5th Cir.1983). The principle disfavoring anticipatory lawsuits is especially strong where, as here, the first-filed suit is one for a declaratory judgment. "[A] proper factor to consider in dismissing a declaratory judgment is whether the suit

was filed in anticipation of another and therefore was being used for the purpose of forum-shopping." *Patton Electric Co. v. Rampart Air, Inc.*, 777 F.Supp. 704, 708 (N.D.Ind.1991).

Sara Lee claims Royal Queentex engaged in forum shopping, and filed the California action in anticipation of the North Carolina action. For the reasons stated herein, the Court disagrees. Sara Lee argues that (1) either the letter to Royal Queentex did not raise a justiciable controversy, in which Royal Queentex would have no grounds for declaratory judgment action, or (2) the letter contained a specific threat of imminent suit by Sara Lee thereby making this action anticipatory.

**\*4** Sara Lee's first argument misapplies and misinterprets the Declaratory Judgment Act. 28 U.S.C.A. § 2201. Declaratory judgment actions are justiciable if "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *see also National Basketball Association v. SDC Basketball Club*, 815 F.2d 562, 565. "In a trademark case, the 'actual case or controversy' test requires the plaintiff to establish: (1) that the defendant's conduct created 'a real and reasonable apprehension of liability on the part of the plaintiff,' and (2) that the plaintiff engaged in a course of conduct which has brought it into adversarial conflict with the defendant."*See Windsurfing Intern. Inc. v. AMF Inc.*, 828 F.2d 755, 757-58 (Fed.Cir.1989).

While this determination often requires some *ad hoc* factual navigation, this outcome appears to be quite clear in this case. "The question is whether the District Court would have jurisdiction to hear a coercive action brought by the declaratory judgment defendant."*Seattle Audubon Society v. Moseley*, 80 F.3d 1401, 1406 (9th Cir.1996). Here, the answer is clearly that it would. This Court would have jurisdiction to hear a claim for infringement and dilution initiated by Sara Lee against Royal Queentex; thus, this Court also has jurisdiction to hear Royal Queentex's claim for a declaratory judgment that it is not infringing or diluting Sara Lee's trademark. Royal Queentex clearly had the right both to reject Sara Lee's offer to discuss

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2000 WL 246599 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 246599)**

settlement and to take an aggressive stance by immediately filing a declaratory judgment action upon receiving the cease and desist letter. *Hanson PLC v. Metro-Goldwyn-Mayer Inc.,* 932 F.Supp. 104, 108 (S.D.N.Y.1996).

Sara Lee next offers the proposition that where a party mails a cease and desist letter, the opposing party may not steal away the choice of forum by immediately filing a declaratory judgment action. Prevailing law, including the cases cited by Sara Lee, do not support such a neat conclusion. In *Charles Schwab & Co., Inc. v. Duffy,* 49 U.S.P.Q.2d 1862, 1864 (N.D.Cal.1998) (Chesney, J.), cited by Sara Lee, the court dismissed a declaratory judgment action because it could not exercise personal jurisdiction over defendant. In other words, *Schwab* is in full accord with the "mirror image" rule set forth in *Seattle Audubon.* However, the court noted that even if it had personal jurisdiction over the defendant, it would not permit the case to continue and reward the winner of the "race to the courthouse." *Id.* However, in *Schwab,* the court was not penalizing plaintiff for winning the race to the courthouse; rather, the court penalized plaintiff for the tactics used to win the race. "The race to the courthouse appears to have been 'won' by Schwab, at least in large part, due to a letter sent to Duffy's attorney that may have misled Duffy as to Schwab's intentions." *Id.* It is thus distinguishable on that point, as Queentex did not make any communication designed to mislead before filing suit.

**\*5** In similar vein, Sara Lee cites *Mission Ins.* for that court's declination to exercise jurisdiction in the first-filed action because it was filed in anticipation of an expected action. 706 F.2d at 602. In *Mission Ins,* however, the court dismissed plaintiff's claim because plaintiff caused defendant to delay filing suit by representing that plaintiff was considering the merits of the claim. 49 U.S.P.Q.2d at 1864. Again, here the record is bereft of any such assurances by Queentex.

In two additional cases cited by Sara Lee, *One World Botanicals Ltd. v. Gulf Coast Nutritionals, Inc.,* 987 F.Supp. 317 (D.N.J.1997) and *Heatron, Inc. v. Shackelford,* 898 F.Supp. 1491 (D.Kan.1995), both courts repudiated plaintiff's choice, but only after finding an admission of anticipatory filing. *See One World,* 987 F.Supp. at 329 (finding "Gulf Coast admits in its brief, as it must, that it filed its

declaratory judgment action in anticipation of One World's infringement action in New Jersey"); *see also Heatron,* 898 F.Supp. at 1495 (finding "Shackelford as much as admits that the suit in Oklahoma was filed in anticipation of Heatrons suit.")

While Sara Lee's letter is one factor this Court takes into consideration in determining whether the California action was filed in anticipation of the North Carolina action, a cease and desist letter itself is not dispositive unless it provides "specific, concrete indications that a suit by [D]efendant was imminent." *See Ward v. Follet Corp.,* 158 F.R.D. 645, 648 (N.D.Cal.1994) (Whyte, J.); *see also Amerada Petroleum Corp. v. Marshall,* 381 F .2d 661, 663 (5th Cir.1967). In *Guthy-Renker,* for example, defendant alleged that plaintiff's declaratory judgment action was brought pursuant to defendant's "notice of suit" letter. 179 F.R.D. at 271. There, the letter expressly stated that it was giving notice of the potential patent infringements in an attempt to avoid litigation. The court found that "[defendant's] letter neither provided nor intended to provide plaintiff with a specific, concrete indication of imminent suit." *Id. at 272.*

The letter at issue here commands a different result. Sara Lee's letter of October 21, 1999 provides, "We are directing this correspondence in the hope that this matter may be resolved amicably. L'EGGS products is willing to forego legal action to enforce its rights only if we receive prompt written assurances that Royal Queentex will immediately discontinue all use of any name containing the word 'LEG' or 'LEGS'." Sara Lee's letter was an invitation to settle the matter amicably, yet clearly intimated legal action if this effort was not quickly fruitful. In Sara Lee's motion, it admits that Royal Queentex spurned Sara Lee's offer to negotiate an amicable settlement by filing this action. (Motion, 11: 22-23). Sara Lee represented to the Court at oral argument that Michael Tsai admitted in his declaration that he understood the letter to constitute a threat of imminient suit. This allegation, however, is mistaken. It appears Sara Lee's counsel mistakenly credited Michael Tsai for statements contained in the declaration of Nolan Williams. This Court finds that Sara Lee's letter constituted specific, concrete indications of a legal dispute, but not specific, concrete indications that suit was imminent, and thus, under *Seattle Audubon* properly provided a basis for a declaratory judgment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 246599 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 246599)**

**\*6** Therefore, Royal Queentex's choice of forum will be accorded proper deference as this Court turns to the analysis of whether the balance of inconveniences substantially weighs in favor of transfer.

**B. Convenience of Parties**

It is clear that it will be inconvenient for Sara Lee to litigate this matter in this judicial district. By the same token, it would be at least equally inconvenient for Royal Queentex to litigate this matter in the Middle District of North Carolina. For the reasons stated herein, Sara Lee has not met its burden of establishing the balance of inconveniences weighs highly in favor of transfer.

Sara Lee has pointed out that its corporate hosiery headquarters are over 2500 miles away in North Carolina. Its senior officers are in North Carolina; all relevant documents and records are located there as well. Additionally, Sara Lee has claimed that it would be more convenient for Night Dreams and Priscilla's, the other two parties to the North Carolina action, were this case was transferred to North Carolina for consolidated proceedings.

On the other end of the scale, Royal Queentex would surely be inconvenienced if it had to try this case in the Middle District of North Carolina. If forced to travel to North Carolina, Tsai asserts that he would have to shut down the business during the trial. Royal Queentex, a company with eight employees, would suffer a much greater financial burden than Sara Lee if forced to litigate on the other side of the country. To the extent Sara Lee would be better able to bear the travel costs, this factor weighs against transfer.*Kingsepp v. Kmart Corp., 1997 WL 269582* at ${}^*$2 (E.D.N.Y.1997); *see also Dwyer v. General Motors Corp., 853 F.Supp. 690, 693* (finding a court may also consider the relative means of the parties in deciding a transfer motion.)

**C. Convenience of the Witnesses**

One of the most important factors in determining whether to grant a motion to transfer venue is the convenience of the witnesses. *See Jarvis v. Marietta Corp.,* No. C 98-4951 MJJ, 1999 U.S. Dist. LEXIS 12659 at ${}^*$6 (N.D.Cal.1999). To demonstrate

inconvenience, the moving party "should produce information regarding the identity and location of the witnesses, the content of their testimony, and why such testimony is relevant to the action ... The Court will consider not only the number of witnesses located in the respective districts, but also the nature and quality of their testimony."*Steelcase, Inc. v. Haworth,* 41 U.S.P.Q.2d 1468, 1470 (C.D.Cal.1996). In balancing the convenience of the witnesses, primary consideration is given to third party, as opposed to employee witnesses. *Jarvis* at ${}^*$5. In sum, Sara Lee must provide information as to the identity and location of its third party witnesses, the content of their testimony, and indicate why their testimony is relevant to this case.*Id. citing Steelcase,* 41 U.S.P.Q.2d at 1470.

This Court finds Sara Lee has made an inadequate record under *Steelcase* in failing to specify its third party witnesses by identity, location, and testimonial content. Sara Lee has additionally failed in many other respects to provide the necessary showing of inconvenience to warrant transfer of this case. First, while Sara Lee has generally identified twelve third-party witnesses,[FN3] the companies or firms they work for, and the general subject matter of their testimony; Sara Lee has not explained specifically who the inconvenienced witnesses will be, what their specific testimony will be, and how that testimony will be relevant to this case. *Steelcase,* 41 U.S.P.Q.2d at 1470. Therefore, it is difficult to evaluate the role of these witnesses and realize the impact of a venue change on their function. *See E & J Gallo Winery v. F & P S.p.A.,* 899 F.Supp. 465, 466 (E.D.Cal.1994).

> FN3. Many of them are described only generally as corporate representatives who will testify on some general subject matter.

**\*7** Second, five of the witnesses identified are not even located in North Carolina. For example, Millward Brown is located in Connecticut; NPD and Ink are both located in New York; QLM is located in Georgia; and DDB is located in Chicago, and beyond the compulsory process of either relevant forum. Sara Lee asserts that because these witnesses are located on the east coast, they would be inconvenienced if forced to travel to the west coast. This argument is unpersuasive. Traveling to another state for any of these parties for the purpose of attending trial is inconvenient and burdensome. These witnesses will

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 6
Not Reported in F.Supp.2d, 2000 WL 246599 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 246599)**

be inconvenienced whether they must travel to North Carolina or California. Third, Sara Lee does not even assert that their witnesses would be unable to travel to California to defend suit here. *See Cochran v. NYP Holdings, Inc., 58 F.Supp.2d 1113, 1119 (C.D.Cal.1998).* In sum, either Royal Queentex and its witnesses will have to travel to North Carolina or Sara Lee and its witnesses will have to travel to California. Where transfer would merely "shift" the inconvenience from one party to another, it should not be granted. *Id.; see also Arrow Electronics, Inc. v. Ducommun Inc., 724 F.Supp. 264, 266 (S.D.N.Y.1989).*

D. Ease of Access to Evidence

Absent any other grounds for transfer, the fact that records are located in a particular district is not itself sufficient to support a motion for transfer. *See STX, Inc. v. Trik Stik, Inc., 708 F.Supp. 1551, 1556 (N.D.Cal.1988).* If this case remains in the Northern District of California, Sara Lee will likely have to ship documents; however, if this case is transferred to the Middle District of North Carolina, Royal Queentex will have to do the same. This factor, thus, does not weigh heavily for or against transfer.

IV. Interests of Justice

A. Familiarity of Each Forum with the Applicable Law

This factor does not weigh heavily in favor of transfer. While the Middle District of North Carolina has a greater familiarity with North Carolina law, Sara Lee's counter-complaint is not limited to infringement and dilution of the L'EGGS mark in the state of North Carolina. Sara Lee's claims include a cause of action for Royal Queentex's activities in "other states" where Royal Queentex sells LEGS AVENUE products. More than thirty percent of Royal Queentex's sales are in California, while six percent of its sales are in Texas. The California judiciary is equally as capable of handling claims governed by Texas and North Carolina law as North Carolina's judiciary would be in handling claims governed by Texas and California law. Thus, this factor does not weigh heavily in favor of transfer.

B. Feasibility of Consolidation of Other Claims

Transfer is favored where it will allow consolidation with another pending action and conserve judicial resources. *See Chrysler Capital Corp. v. Woeling, 663 F.Supp. 478, 483 (D.Del.1987).* Sara Lee correctly points out that there are two pending actions which could be consolidated. However, in the North Carolina action, the two additional defendants are Night Dreams of North Carolina, Inc. and Priscilla's of Greensboro, Inc. The status of these two additional parties to the North Carolina action has been the subject of dispute among the parties. Prior to filing suit against Night Dreams and Priscilla's, Sara Lee was informed that both would discontinue sales of Leg Avenue products until the dispute between Sara Lee and Royal Queentex was resolved. Nonetheless, Sara Lee filed suit against both parties in North Carolina. Royal Queentex argues that the timing of the second suit, in any event, is suggestive of the conclusion that it was instituted with an eye towards supporting this motion to transfer venue and in thwarting transfer of the North Carolina action to this forum. Notwithstanding Royal Queentex' assertion, the principal parties in both actions are Sara Lee and Royal Queentex. If transfer were warranted, it should occur in conformity with the first-to-file rule. *See Alltrade, Inc. v. Uniweld Prods. Inc., 946 F.2d 622, 623 (9th Cir.1991).*

C. Local Interest in the Controversy

**\*8** The Court finds that both California and North Carolina have significant interests in this controversy. Sara Lee conducts significant business in North Carolina. Its hosiery division is based there. However, Royal Queentex's sales in this state were approximately $1.98 million dollars in 1999. As the state with the most allegedly infringing sales, California also has a significant interest in the resolution of this dispute. *See SRAM Corp. v. Sunrace Roots Enterprise Co., Ltd., 953 F.Supp. 257, 259 (N.D.Ill.1997).* Therefore, this factor does not tip in Sara Lee's favor.

D. Relative Court Congestion

Relative court congestion is at best, a minor factor in the section 1404 calculus. "Docket congestion is not given much weight in a § (1404)(a) consideration."*IMS Health, Inc. v. Vality Technology, Inc., 59 F.Supp.2d 454, 471 (E.D.Pa.1999).*

Not Reported in F.Supp.2d                                                                                                Page 7
Not Reported in F.Supp.2d, 2000 WL 246599 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 246599)**

Nonetheless, Sara Lee correctly points out that the caseload in this District is heavy. In the Middle District of North Carolina, according to the Judicial Caseload Profiles, published by the Statistical Office of the Administrative Office of the United States Courts, the median time from filing to trial is sixteen months. Here, the median time from filing to trial is twenty-two months. Thus, in this one respect, the Middle District of North Carolina would be a slightly more convenient forum. However, this factor alone cannot control the overall balance of this Court's decision on Sara Lee's motion to transfer. *Id.*

CONCLUSION

The Court finds that Sara Lee has failed to meet its burden under section 1404 of establishing that the balance of inconveniences weighs heavily in favor of transfer to the Middle District of North Carolina. The motion to transfer venue is accordingly DENIED.

IT IS SO ORDERED.

N.D.Cal.,2000.
Royal Queentex Enterprises v. Sara Lee Corp.
Not Reported in F.Supp.2d, 2000 WL 246599 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit M

*Westlaw.*

Slip Copy                                                                                                    Page 1
Slip Copy, 2006 WL 2634768 (E.D.Tex.)
**(Cite as: Slip Copy, 2006 WL 2634768)**

**H**Singleton v. Volkswagen of America, Inc.
E.D.Tex.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Texas,Marshall
Division.
Richard SINGLETON, Ruth Singleton, Amy
Singleton, Individually and as Representative of The
Estate of Mariana Singleton, Deceased Minor,
Plaintiffs,
v.
VOLKSWAGEN OF AMERICA, INC., a New
Jersey Corporation; and Volkswagen, A.G., a foreign
Corporation organized under the laws of Germany,
Defendants.
**Civil Action No. 2-06-CV-222 (TJW).**

Sept. 12, 2006.

Jeffrey Todd Embry, Hossley & Embry, Tyler, TX,
for Plaintiffs.
Burgain Garfield Hayes, Burgain G. Hayes, Attorney
at Law, Austin, TX, for Defendants.

*MEMORANDUM OPINION AND ORDER*

T. JOHN WARD, District Judge.
**\*1** Before the Court is Defendant Volkswagen of
America, Inc.'s Motion to Transfer Venue (Doc. No.
3). After considering the filings of the parties and the
applicable law, the Court ORDERS that the
defendant's motion be DENIED for the reasons
expressed below.

**I. Factual Background**

This products liability action arises out of alleged
injuries sustained by the plaintiffs as the result of an
automobile accident. On May 21, 2005, the plaintiffs,
residents of Collin County, Texas, were in a 1999
Volkswagen Golf being driven by Ruth Singleton
when it was struck in the rear by a 1999 Chrysler 300
driven by Colin R. Little. As a result of the impact,
the 1999 Volkswagen Golf spun around and struck
the rear of a flat-bed trailer, owned by Skinner
Nurseries of Denton County, Texas, parked on the
shoulder. The two passengers in the Volkswagen,
Richard and Mariana Singleton, received serious

injuries. Mariana Singleton died after being
transported to a hospital. The plaintiffs contend that
Defendant Volkswagen of America, Inc. ("VWOA")
is responsible for their injuries as a result of the
alleged defective design of the passenger seat and
seat assembly of the 1999 Volkswagen Golf.

On May 30, 2006, the plaintiffs filed suit in this
court, asserting claims of strict liability, breach of
warranty, and negligence against VWOA and
Volkswagen, A.G. VWOA is a subsidiary of
Volkswagen, A.G., and a corporation organized
under New Jersey law. Volkwagen, A.G. is a German
corporation. VWOA seeks to have this action
transferred to the Dallas Division of the Northern
District of Texas pursuant to 28 U.S.C. § 1404(a) for
the convenience of the parties and witnesses.

**II. Discussion**

Section 1404(a) provides that "[f]or the convenience
of parties and witnesses, in the interest of justice, a
district court may transfer any civil action to any
district or division where it might have been
brought."28 U.S.C. § 1404(a) (2004). It is within the
district court's sound discretion whether to transfer
venue under section 1404(a).*Mohamed v. Mazda
Corp.*, 90 F.Supp.2d 757, 768 (E.D.Tex.2000). When
considering whether to transfer venue, the district
court "must exercise its discretion in light of the
particular circumstances of the case."*Hanby v. Shell
Oil Co.*, 144 F.Supp.2d 673, 676 (E.D.Tex.2001); *In
re Triton Ltd. Sec. Litig.*, 70 F.Supp.2d 678, 688
(E.D.Tex.1999) (stating that district courts have the
discretion to decide whether to transfer venue
according to "individualized, case-by-case
consideration of convenience and fairness").

Under Section 1404(a), the analysis remains the same
regardless of whether the party moves for *inter* or
*intra* district transfer. *Mohamed*, 90 F.Supp.2d at
768. When deciding whether to transfer venue, the
court balances the following two categories of
interests: "(1) the convenience of the litigants, and (2)
the public interests in the fair and efficient
administration of justice."*Hanby*, 144 F.Supp.2d at
676. The convenience factors weighed by the district
court are the following: (1) the plaintiff's choice of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

forum; (2) the convenience of the parties and material witnesses; (3) the place of the alleged wrong; (4) the cost of obtaining the attendance of witnesses and the availability of the compulsory process; (5) the accessibility and location of sources of proof; and (6) the possibility of delay and prejudice if transfer is granted. *Mohamed, 90 F.Supp.2d at 771.* The court also balances the following public interest factors: (1) the administrative difficulties caused by court congestion; (2) the local interest in adjudicating local disputes; (3) the unfairness of burdening citizens in an unrelated forum with jury duty; and (4) the avoidance of unnecessary problems in conflict of laws. *Id.* The moving party bears the burden of demonstrating that venue should be transferred to another forum. *Hanby, 144 F.Supp.2d at 676.* To meet this burden, the moving party must show that "the balance of convenience and justice *substantially* weighs in favor of transfer."*Mohamed, 90 F.Supp.2d at 768.*

*A. Convenience Factors*

*1. The plaintiff's choice of forum*

**\*2** The plaintiff's choice of forum is "a paramount consideration in any determination of [a] transfer request, and that choice should not be lightly disturbed."*In re Triton Ltd. Sec. Litig., 70 F.Supp.2d 678, 688 (E.D.Tex.1999)* (quoting *Young v. Armstrong World Indus., 601 F.Supp. 399, 401 (N.D.Tex.1984)*). The plaintiff's choice of forum will not be disturbed unless it is clearly outweighed by other factors. *Shoemake v. Union Pac. R.R. Co., 233 F.Supp.2d 828, 830 (E.D.Tex.2002).* In a diversity action, such as this, venue is proper in a judicial district in which the defendant resides." *28 U.S.C. § 1391(a)(1) (2005).* When the defendant is a corporation, the corporation is "deemed to reside in any district in that State within which its contacts would be sufficient to be subject it to personal jurisdiction...."*28 U.S.C. § 1391(c) (2005).* In this case, the Plaintiffs' choice of forum is the Marshall Division of the Eastern District of Texas. Venue is proper in the Eastern District of Texas because there is no question that VWOA, a corporation licensed to do business in the State of Texas, is subject to the personal jurisdiction of this District. Furthermore, venue is proper in any division in this District.

*2. The convenience of parties and material witnesses*

The Court will first assess the convenience of the parties. In assessing the convenience of parties, third-party defendants are parties whose convenience must also be considered. *In re Volkswagen, 371 F.3d 201, 204 (5th Cir.2004)* (stating that "nothing in *§ 1404(a)*... limits the application of the terms 'parties' and 'witnesses' to those involved in an original complaint ."). The convenience of the parties is accorded less weight in a transfer analysis than the convenience of nonparty witnesses. *Shoemake, 233 F.Supp.2d at 832.* In this case, the Defendants include a foreign corporation based in Germany and its subsidiary organized under the laws of New Jersey. The Defendants will be inconvenienced regardless of whether the case is transferred. On the other hand, at the time of the accident, the Plaintiffs resided in Plano, Collin County, Texas, and Mr. Little, the third-party defendant, resided in Garland, Dallas County, Texas. The distance between Plano and Marshall is approximately 153 miles, and the distance from Garland to Marshall is approximately 150 miles. Neither distance is far enough to weigh substantially in favor of a transfer. In the Court's view, the convenience of the parties does not weigh in favor of transfer.

The Court now considers the convenience of the witnesses. Generally, in a venue transfer analysis, the most important factor considered is whether "key fact witnesses" will be substantially inconvenienced if the court should deny transfer. *Mohamed, 90 F.Supp.2d at 774.* Further, the convenience of non-party witnesses weighs more heavily in favor of transfer than the convenience of party witnesses. *Shoemake, 233 F.Supp.2d at 832.* The moving party must "specifically identify key witnesses and outline the substance of their testimony."*Mohamed, 90 F.Supp.2d at 775* (quoting *Hupp v. Siroflex of America, Inc., 848 F.Supp. 744, 749 (S.D.Tex.1994)*).

**\*3** In its moving papers, the Defendant has submitted a list of potential witnesses who all live and work in Dallas County or the Dallas area. *Defendant's Motion to Transfer Venue ("Defendant's Motion")* at 7. These witnesses include the third-party defendant, accident witnesses, accident investigators, treating medical personnel, and the medical examiner. Further, the Defendant has submitted two affidavits, one from an accident witness and the other from the

accident investigator, stating their inconvenience of traveling to Marshall. *See Exhibits 4 and 5 attached to Defendant's Motion.*However, the Defendant did not explain why all of these witnesses are actually material to its case. Further, the Defendant did not outline the substance of these witnesses' testimony. With such scant information about these individuals, the Court cannot determine that they are indeed key fact witnesses whose convenience should be assessed in this analysis. Nevertheless, after considering the convenience of the witnesses, the Court finds that the convenience of non-party witnesses does not weigh in favor of transfer. The Defendant has not shown that its material, nonparty witnesses will be *substantially* inconvenienced if the Court denies transfer. The Defendant submits to the Court that Dallas is approximately 155 miles from Marshall. *See Exhibit 3 attached to Defendant's Motion.*This distance, however, is not substantial. *Mohamed, 90 F.Supp.2d at 776* (stating that "[g]iven the advances in transportation and communication, the [150 mile] distance between Marshall and Dallas is negligible.") This case is not analogous to *In re Volkswagen* where the non-party witnesses would have had to drive or fly a distance of approximately 400 miles to Marshall. *In re Volkswagen, 371 F.3d at 204.*

### 3. The place of the alleged wrong

It is undisputed that the alleged accident occurred in Dallas County, Texas, which is within the Dallas Division of the Northern District of Texas. However, the location of the product design and manufacture are also relevant, and occurred outside the Northern District of Texas. This factor weighs only slightly in favor of transfer.

### 4. The cost of obtaining the attendance of witnesses and the availability of compulsory process

In its moving papers, the Defendant states that the cost of bringing non-party and non-expert witnesses to Marshall would include time and money. *Defendant's Motion* at 8. Given the proximity of Dallas to Marshall, the cost of having these witnesses attend a trial in Marshall would be minimal. *Mohamed, 90 F.Supp.2d at 776* (stating that this Court will not "transfer a federal lawsuit for the sole reason of preventing a two-and-a-half hour drive by a few witnesses.") Thus, the cost of obtaining the attendance of witnesses does not weigh in favor of

transfer.

The Defendant also states that all of the witnesses are outside of this Court's subpoena power because they reside more than one hundred miles from Marshall. *Defendant's Motion* at 8. The Defendant misconstrues the subpoena power of this Court. A court may compel any witness residing in the state in which the court sits to attend trial, subject to reasonable compensation if the witness incurs substantial expense. *See*Fed.R.Civ.P. 45(c)(3). Under this rule, this Court's subpoena power extends to all of the witnesses listed by the Defendant because they all reside in the State of Texas. Therefore, this factor does not weigh in favor of transfer.

### 5. The accessibility and location of sources of proof

**\*4** The Court notes that this factor has become less significant in a transfer analysis because of the advances in copying technology and information storage. *Mohamed, 90 F.Supp.2d at 778.* The Defendant argues that the evidence is more easily accessible from the Dallas Division of the Northern District of Texas because all of the documents and physical evidence relating to the accident, and other documents are in or near Dallas County. *Defendant's Motion* at 8. Any documents or evidence can be easily transported to Marshall. In the Court's view, this factor does not weigh in favor of transfer.

### 6. The possibility of delay and prejudice if transfer is granted

The Fifth Circuit has suggested that this factor may be relevant in a transfer analysis "only in rare and special circumstances and when such circumstances are established by clear and convincing evidence."*Shoemake, 233 F.Supp.2d at 834* (citing *In re Horseshoe Entm't, 305 F.3d 354, 358 (5th Cir.2002)*). Because it is early in the litigation, the Plaintiffs would not be prejudiced by a transfer. *Ledoux v. Isle of Capri Casinos, Inc., 218 F.Supp.2d 835, 838 (E.D.Tex.2002).* Therefore, this factor is neutral. *Id.*

### B. Public Interest Factors

### 1. The administrative difficulties caused by court congestion

Slip Copy                                                                    Page 4
Slip Copy, 2006 WL 2634768 (E.D.Tex.)
**(Cite as: Slip Copy, 2006 WL 2634768)**

The Court should consider any administrative difficulties caused by court congestion in its transfer analysis. In its moving papers, Defendant states that both the Dallas Division of the Northern District and the Marshall Division of the Eastern District "move cases along with relative promptness."*Defendant's Motion* at 10. After considering this factor, the Court is not persuaded that it weighs in favor of transfer.

### 2. The local interest in adjudicating local disputes

There is a local interest in resolving this litigation among the residents of the Dallas Division of the Northern District of Texas because the automobile accident occurred there. Furthermore, because the Defendant has brought a third-party claim against Colin Little, residents of the Dallas Division of the Northern District of Texas have an interest in a case involving one of their fellow residents that arose out of an accident within the Division. As the Plaintiffs point out, however, the citizens of Marshall also have an interest in this product liability case because the product is available in Marshall. *Plaintiffs' Response to Defendant's Motion to Transfer Venue* at 10-11. Therefore, this factor is neutral.

### 3. The unfairness of burdening citizens in an unrelated forum with jury duty

Defendant contends that the residents of the Marshall Division should not be burdened with the jury duty and resolution of this dispute. *Defendant's Motion* at 10-11. Although the accident occurred in the Dallas Division of the Northern District of Texas, the Plaintiff's product liability claims against the Defendant are related to the Marshall Division. The citizens of Marshall would be interested to know whether there are defective products offered for sale in close proximity to the Marshall Division and whether they are being exposed to these products. *See Mohamed v. Mazda Motor Corp., 90 F.Supp.2d 757, 780 (E.D.Tex.2000)*. Therefore, this factor weighs against transfer.

### 4. The avoidance of unnecessary problems in conflict of laws

**\*5** The plaintiffs assert products liability, breach of warranty, and negligence claims that arise under

Texas law, and the defendant seeks a transfer between two federal district courts within the State of Texas. Consequently, the Court finds that this factor is inapplicable in this transfer analysis.

### III. Conclusion

The Court has considered the applicable factors under 28 U.S.C. § 1404(a). Although some factors weigh in favor of a transfer, others do not. The Defendant has not satisfied its burden of showing that the balance of convenience and justice substantially weighs in favor of transfer in this case. Upon application of the section 1404(a) factors to this case, the Court has exercised its discretion and has concluded that transfer to the Dallas Division of the Northern District of Texas is not warranted. Accordingly, the Court **DENIES** the Defendant's Motion to Transfer Venue.

E.D.Tex.,2006.
Singleton v. Volkswagen of America, Inc.
Slip Copy, 2006 WL 2634768 (E.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit N

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 1908244 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1908244)**

C Vishay Dale Electronics, Inc. v. KOA Corp.
N.D.Tex.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Texas, Fort Worth
Division.
VISHAY DALE ELECTRONICS, INC., Plaintiff,
v.
KOA CORPORATION, et al., Defendants.
**No. 4:04-CV-247-A.**

Aug. 24, 2004.

Richard L. Schwartz, Whitaker Chalk Swindle &
Sawyer, Fort Worth, TX, for Plaintiff.
Richard H. Gateley, Brackett & Ellis, Fort Worth,
TX, Marshall M. Searcy, Kelly Hart & Hallman,
Forth Worth, TX, for Defendants.

*MEMORANDUM OPINION* and *ORDER*

MCBRYDE, J.
**\*1** Came on for consideration the motion of plaintiff,
Vishay Dale Electronics, Inc., to enjoin and the
motion of defendants KOA Corporation and KOA
Speer Electronics, Inc. (collectively "KOA") to
dismiss the claims against KOA Corporation and to
transfer the remaining claims to the Western District
of Pennsylvania. The court, having considered the
motions, the responses, the record, and applicable
authorities, finds that plaintiff's motion should be
granted as set forth herein and that KOA's motion
should be denied.

I.

*Procedural History*

On April 1, 2004, plaintiff filed its complaint in this
action alleging that defendants, KOA and TTI, Inc.,
had been, and were, infringing one or more claims of
United States Patent No. 5,287,083 (the " '083
patent"), United States Patent No. 6,401,329 (the "
'329 patent"), United States Patent No. 6,441,718 (the
" '718 patent"), and United States Patent No.
6,510,605 (the " '605 patent"). On April 29, 2004,
KOA filed in the United States District Court for the
Western District of Pennsylvania a complaint for

declaratory relief (the "Pennsylvania action") seeking
a judgment of invalidity, noninfringement, and
unenforceability of the '083 patent, the '718 patent,
the '329 patent, the '605 patent, and United States
Patent No. 5,604,477 (the " '477 patent"). KOA
additionally asserted a claim for patent misuse,
alleging that plaintiff had attempted to illegally
obtain damages and royalties from KOA by
improperly seeking to extend the geographical and
temporal scope of the patents in issue. On May 24,
2004, KOA amended its complaint in the
Pennsylvania action to add a request for declaratory
judgment of noninfringement and unenforceability of
United States Patent No. 6,675,529 (the " '529
patent").

On May 6, 2004, plaintiff filed its amended
complaint in this action, omitting the claims as to the
'329 and '605 patents, continuing to urge patent
infringement as to the '083 and '718 patents only.

II.

*Grounds of the Motions*

In support of its motion to enjoin, plaintiff urges that,
because its suit was first filed in this court, this court
has primary jurisdiction and may enjoin pursuit of the
Pennsylvania action.

In support of their motion, the KOA defendants urge
that the court lacks personal jurisdiction over KOA
Corporation and that plaintiff's claims against it
should be dismissed. They further urge that the
remaining claims should be transferred to the
Western District of Pennsylvania to be considered
along with the Pennsylvania action.

III.

*The Motion to Enjoin*

Federal courts have long recognized the principle of
comity that requires them to exercise care to avoid
interference with each other's affairs. *West Gulf
Maritime Ass'n v. ILA Deep Sea Local 24, 751 F.2d
721, 728 (5th Cir.1971).* The concern is to avoid the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 1908244 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1908244)**

waste of duplication, to avoid rulings that may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result. *Id.* at 729. "The Fifth Circuit adheres to the general rule that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed."*Save Power Ltd. v. Syntek Fin. Corp.,* 121 F.3d 947, 950 (5th Cir.1997). Without doubt, this case is the first-filed case. The court is not persuaded that plaintiff's failure to immediately serve defendants changes anything, especially since plaintiff notified defendants that the suit had been filed.

**\*2** KOA urges that the first-to-file rule should not be applied since KOA Corporation is not subject to personal jurisdiction in Texas. For the reasons discussed *infra,* the argument lacks merit. KOA further urges that the first-to-file rule should not apply, because this is a customer action. The customer action doctrine, however, does not apply since plaintiff has also sued KOA and not merely its customer in this action. See*Katz v. Lear Siegler, Inc.,* 909 F.2d 1459, 1464 (Fed.Cir.1990); *In re Laughlin Prods., Inc.,* 265 F.Supp.2d 525, 537 (E.D.Pa.2003).

Also, KOA urges that the actions are not substantially similar, because the Pennsylvania action involves other patents that are not at issue here. The court is satisfied that the actions overlap on the substantive issues and that they would be properly consolidated in the same forum. There is no reason that KOA's claims in the Pennsylvania action could not be brought as counterclaims in this action. Nevertheless, the court has determined that it will stay the Pennsylvania action only as to those claims pertaining to the '083 and '718 patents. There is no reason why KOA should not be able to pursue claims that would not be compulsory counterclaims here in its chosen forum.

IV.

*Personal Jurisdiction*

When considering a motion to dismiss for lack of personal jurisdiction in a patent infringement case, the court applies the law of the Federal Circuit. *3D Sys., Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 1378 (Fed.Cir.1998); *Beverly Hills Fan Co. v. Royal*

*Sovereign Corp.,* 21 F.3d 1558, 1564-65 (Fed.Cir.1994); *Nutrition Physiology Corp. v. Enviros, Ltd.,* 87 F.Supp.2d 648, 650 (N.D.Tex.2000). The burden is on the plaintiff to make a *prima facie* case for the exercise of jurisdiction over the nonresident defendant.*Electronics for Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1349 (Fed.Cir.2003); *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.,* 297 F.3d 1343, 1347 (Fed.Cir.2002). The court accepts the uncontroverted allegations in the plaintiff's complaint as true and resolves any factual conflicts in the parties' affidavits in plaintiff's favor. *Electronics for Imaging, Inc.,* 340 F.3d at 1349;*Deprenyl,* 297 F.3d at 1347.

Personal jurisdiction over a nonresident may be exercised if (1) the nonresident defendant is amenable to service of process under the law of the forum state, and (2) the exercise of jurisdiction under state law comports with the due process clause of the Fifth Amendment. *Electronics for Imaging, Inc.,* 340 F.3d at 1349. Since the Texas long-arm statute has been interpreted as extending to the limits of due process,[FN1] the only inquiry is whether the exercise of jurisdiction over the nonresident defendant would be constitutionally permissible. See*HollyAnne Corp. v. TFT, Inc.,* 199 F.3d 1304, 1307 (Fed.Cir.1999); *Viam Corp. v. Iowa Export-Import Trading Co.,* 84 F.3d 424, 427 (Fed.Cir.1996).

> FN1.*See, e.g.,Guardian Royal Exchange Assurance Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991); *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990); *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 200 (Tex.1985).

**\*3** For due process to be satisfied, (1) the nonresident defendant must have "minimum contacts" with the forum state resulting from an affirmative act on the defendant's part, and (2) the contacts must be such that the exercise of jurisdiction over the person of the defendant does not offend "traditional notions of fair play and substantial justice."*International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

The minimum contacts prong of the due process

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1908244 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1908244)**

requirement can be satisfied by a finding of either "specific" or "general" jurisdiction over the nonresident defendant. *Bullion v. Gillespie, 895 F.2d 213, 216 (5th Cir.1990); Nutrition Physiology, 87 F.Supp.2d at 652.* For specific jurisdiction to exist, the foreign defendant must purposefully do some act or consummate some transaction in the forum state and the cause of action must arise from or be connected with such act or transaction. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); Akro Corp. v. Luker, 45 F.3d 1541, 1545-46 (Fed.Cir.1995).* Even if the controversy does not arise out of or relate to the nonresident defendant's purposeful contacts with the forum, general jurisdiction may be exercised when the nonresident defendant's contacts with the forum are sufficiently continuous and systematic as to support the reasonable exercise of jurisdiction. *See, e.g.,Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 779, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).* When general jurisdiction is asserted, the minimum contacts analysis is more demanding and requires a showing of substantial activities within the forum state. *Jones,* 954 F.2d at 1068.

The court is concerned only with specific jurisdiction in the instant case, as the claims asserted by plaintiff arise out of or are related to alleged contacts by defendants with Texas. Plaintiff alleges that KOA Corporation, through its distribution network, sells and offers to sell in Texas products that infringe its patents.[FN2] No more is usually required to establish specific jurisdiction in a patent infringement case arising out of a stream of commerce theory than that the product was sold in the forum. *Beverly Hills Fan Co., 21 F.3d at 1565. See American Philips Corp. v. Am. Vending Sales, Inc., 35 F.3d 1576, 1578-79 (Fed.Cir.1994)* (patent infringement occurs where allegedly infringing sales are made). Here, plaintiff has made a *prima facie* showing that KOA has an "established distribution channel" in Texas. *Beverly Hills, 21 F.3d at 1565-66.* Thus, the specific jurisdiction requirement is satisfied.

> FN2. KOA admits that TTI, Inc., is one of many customers that distributes products for KOA Speer Electronics, Inc. ("KOA

Speer"). KOA's Br. at 6. KOA Speer is KOA Corporation's sole sales representative of the products of KOA Corporation in the United States. Pl.'s App. at 36.

The second prong of the due process analysis is whether exercise of jurisdiction over the nonresident defendant would comport with traditional notions of fair play and substantial justice. *International Shoe, 326 U.S. at 316.* In determining whether the exercise of jurisdiction would be reasonable such that it does not offend traditional notions of fair play and substantial justice, the Supreme Court has instructed that courts look to the following factors: (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) shared interest of the several states in furthering fundamental substantive social policies. *Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)* (citing *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)*). And, the burden is on KOA to present a "compelling case" that the exercise of jurisdiction over KOA Corporation would be unreasonable. *Electronics for Imaging, Inc., 340 F.3d at 1352* (quoting *Burger King, 471 U.S. at 477*). Applying these factors, the court concludes that exercise of jurisdiction over KOA Corporation would be constitutionally permissible.

V.

*Motion to Transfer*

**\*4** Under *28 U.S.C. § 1404(a)*, the court may transfer a civil action to another district or division where the action might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice." The party making the motion bears the burden of proof. *Time, Inc. v. Manning, 366 F.2d 690, 698 (5th Cir.1966).* Among the factors to be considered are the convenience of the parties and witnesses, the availability of process to compel the presence of unwilling witnesses, the cost of obtaining the presence of witnesses, the relative ease of access to sources of proof, calendar congestion, where the events in issue took place, and the interests of justice in general. *Burlington N. & Santa Fe Ry. Co. v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2004 WL 1908244 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1908244)**

*Hertzog Servs., Inc.,* 990 F.Supp. 503, 504 (N.D.Tex.1998). Having considered these factors, the court is not persuaded that the proposed transfer would be to a more convenient forum, as opposed to a forum likely to prove equally convenient or inconvenient to the parties. *SeeVanDusen v. Barrack,* 376 U.S. 612, 645-46, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).

### VI.

### *Order*

For the reasons discussed herein,

The court ORDERS that:

(1) plaintiff's motion to enjoin be, and is hereby, granted in part, and KOA be, and is hereby, enjoined from prosecuting its claims and urging its contentions as to the '083 and '718 patents in the Pennsylvania action except to seek a dismissal of those claims or transfer of those claims to this court, if it so desires;

(2) KOA's motion to dismiss the claims against KOA Corporation be, and is hereby, denied; and

(3) KOA's motion to transfer be, and is hereby, denied.

N.D.Tex.,2004.
Vishay Dale Electronics, Inc. v. KOA Corp.
Not Reported in F.Supp.2d, 2004 WL 1908244 (N.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C Vitria Technology, Inc. v. Cincinnati Ins. Co.
N.D.Cal.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
VITRIA TECHNOLOGY, INC., Plaintiff,
v.
CINCINNATI INSURANCE COMPANY,
Defendant.
**No. C 05-01951 JW.**

Sept. 30, 2005.

Christopher J. Sundermeier, Daniel Kaleba, Cooley
Godward LLP, Palo Alto, CA, for Plaintiff.
Jeffrey L. Fillerup, Luce Forward Hamilton &
Scripps LLP, San Francisco, CA, Peter J. Frazza,
Budd Larner, P.C., Short Hills, NJ, for Defendant.

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS FOR IMPROPER VENUE AND
GRANTING DEFENDANT'S MOTION TO
CHANGE VENUE TO THE SOUTHERN
DISTRICT OF OHIO

WARE, J.

*I. INTRODUCTION*

**\*1** Vitria Technology, Inc. ("Plaintiff" or "Vitria")
brings this action against Cincinnati Insurance
Company ("Defendant" or "CIC"), alleging breach of
contract of Plaintiff's software license.

Currently before this Court is Defendant's Motion to
Dismiss for Improper Venue pursuant to
Fed.R.Civ.P. 12(b)(3), or in the Alternative, Motion
to Change Venue under 28 U.S.C. §§ 1406(a) and
1404(a). The Court considered the parties' pleadings
and finds the matter to be suitable for disposition
without oral argument. *See* Civ. L.R. 7-1(b). For the
reasons set forth below, this Court DENIES
Defendant's Motion to Dismiss for Improper Venue,
but GRANTS Defendant's Motion to Transfer Venue
to the Southern District of Ohio.

*II. BACKGROUND*

Plaintiff is a Delaware corporation with its principal
place of business in Sunnyvale, California. Plaintiff
has a permanent license to operate in Ohio. Plaintiff's
principal office per the filing of its permanent license
is at 650 W. Lake Center, 4555 Lake Forest Drive,
6th Floor, Cincinnati, Ohio. Defendant is a
corporation organized and existing under the laws of
Ohio, with its principal place of business in Fairfield,
Ohio.

Plaintiff alleges that it entered into a software license
and services agreement with Defendant in which
Defendant has breached by impermissibly using their
software. Plaintiff brings suit in the Northern District
of California based solely on diversity jurisdiction
pursuant to 28 U.S.C. § 1332. Plaintiff asserts venue
in the Northern District of California based on the
fact that a substantial part of the events giving rise to
the claim occurred in this district. Defendant
contends that Plaintiff fails to support such an
assertion with any facts to substantiate its claim.
(Motion at 2:2-6.)

It is undisputed that the relationship between Plaintiff
and Defendant began when Defendant solicited
Plaintiff's business at its headquarters in Sunnyvale,
California. It is also undisputed that portions of the
contract were negotiated via telephone and other
means from California by Plaintiff. Plaintiff also sent
agents to negotiate the contract in Ohio. Upon the
execution of a licensing agreement, Plaintiff's
employees were sent to Ohio to set-up their work
system and for other support issues.

Defendant contends that the complaint should be
dismissed for improper venue because: (1) the
substantial part of the events leading up to the
consummation of the contract did not occur in the
Northern District of California; (2) the alleged breach
did not occur in the Northern District of California;
and (3) the alleged creation of an obligation or
liability in the Northern District of California is not
sufficient to establish venue pursuant to § 1391(a)(2).

In the alternative, Defendant contends that the
complaint should be transferred to the Southern
District of Ohio because: (1) the Southern District of
Ohio is a district where a civil action might have

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2431192 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2431192)**

been brought; and (2) the factors weigh in favor of transfer to the Southern District of Ohio.

**\*2** Plaintiff contends that venue is proper in the Northern District of California because Defendant, as a corporation doing business in California, is subject to personal jurisdiction in the Northern District of California. Ultimately, Plaintiff contends that it would be inconvenient for Plaintiff to litigate in Ohio.

### III. STANDARDS

A. *Venue*

Under 28 U.S.C. § 1391(a), where federal subject matter jurisdiction is based solely on diversity of citizenship, venue is proper in the following judicial districts and no others; 1) if all defendants reside in the same state, a district where any defendant resides; or, 2) a district in which a "substantial part of the events or omissions on which the claim is based occurred, or where is located a substantial part of the property that is the subject of the action"; or, 3) if there is no district in which the action may otherwise be brought, a district in which any defendant is subject to personal jurisdiction at the time the action is commenced. 28 U.S.C. §§ 1391(a)(1)-(a)(3).

B. *Transfer of Venue*

Title 28 U.S.C. § 1404(a) provides that the Court may transfer any civil action to any other district where it might have been brought for the "convenience of the parties and witnesses, in the interest of justice."Section 1404(a) transfers are vested in the sound discretion of the Court.*Decker Coal v. Commonwealth Edison Co.,* 805 F.2d 834, 842-43 (9th Cir.1986). Normally, however, the plaintiff's choice of forum is to be given great weight. *Florens Container v. Cho Yang Shipping,* 245 F.Supp.2d 1086, 1092 (N.D.Cal.2002). Under section 1404(a), the moving party has the burden of showing that the balance of conveniences weighs heavily in favor of the transfer in order to overcome the strong presumption in favor of the plaintiff's choice of forum. *SeeDecker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986); *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255-56, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

### IV. DISCUSSION

A. *The Northern District of California is the proper venue for this action.*

Pursuant to Fed.R.Civ.P. 12(b)(3), a defendant may move to dismiss a case for improper venue. Venue is proper in a district where a defendant resides. 28 U.S.C. § 1391. For purposes of venue under 28 U.S.C. § 1391, "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."28 U.S.C. § 1391(c). Since this is not a motion to dismiss for lack of personal jurisdiction, the Court need not explicate its analysis of whether CIC has sufficient minimum contact with California. CIC is a corporation. It purposefully availed itself to California when it solicited the software license and service agreements with Vitria in California. Thus, CIC is subject to specific personal jurisdiction in the state of California. *SeeMcGee v. International Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (upholding jurisdiction over claim arising out of a single contract solicited in the state).

**\*3** Continuous but limited activity in the forum state, such as the ongoing business relationship in will also support specific jurisdiction, that is, jurisdiction over claims arising out of that continuous activity. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). It is undisputed that there was an ongoing business relationship between CIC and Vitria, giving rise to the breach of contract claim. Since Defendant is subject to specific personal jurisdiction in the state of California, venue is proper under § 1391(c). Therefore, Defendant's Motion to Dismiss for Improper Venue is DENIED.

B. *For the convenience of the parties and witnesses, and in the interest of justice, the Southern District of Ohio is the more suitable venue.*

Factors supporting transfer under 28 U.S.C. § 1404(a) include when venue is proper because a "substantial part" of the events or omissions occurred locally. Other factors may support a discretionary transfer based on the convenience of parties and witnesses, the interests of justice, and the risks or burdens of defending in the chosen forum. 28 U.S.C.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                            Page 3
Not Reported in F.Supp.2d, 2005 WL 2431192 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2431192)**

§ 1404(a).

1. *A Substantial Part of the Events Giving Rise to the Action Occurred in the Southern District of Ohio*

In determining whether venue is proper under 28 U.S.C. § 1391(a)(2), only those events and omissions that directly give rise to the claim are relevant.*Jenkins Brick Co. v. Bremer,* 321 F.3d 1366, 1372 (11th Cir.2003). Relevant factors to be considered in a contract action are where the negotiations took place, where the contract was signed, where performance or breach occurred, or the place where parties acted or were engaged in business. *Bates v. C & S Adjusters, Inc.,* 980 F.2d 865, 867 (2d Cir.1992); *Myers v. Bennett Law Offices,* 238 F.3d 1068, 1076 (9th Cir.2001).

In this case, the in-person contract negotiations between Plaintiff and Defendant took place in Ohio. More importantly, the performance, and the breach occurred in Ohio. While the Court agrees with Plaintiff's contention that California is the proper venue for this action since negotiations and execution of the contract were conducted in California, in-person negotiations occurred in Ohio, as well as on-site demonstrations. Mere execution of a contract does not weigh heavily in determining which forum state is more convenient or proper.

The improper use of the software license is the alleged breach of contract which is the subject of the dispute here. The location of this breach would be where instruments facilitating this breach, such as servers are located. As all computer systems and alleged improper use of the software license occurred in Ohio, Ohio would be a location of the substantial part of the events which are the subject of this suit.

2. *The Convenience of the Parties and the Witnesses*

Plaintiff has its main office in Ohio. Plaintiff has had employees providing on-site services such as set up and support for Defendant in Ohio. In sending agents and support staff to Ohio to foster the contract currently in dispute, it does not appear to this Court that it would be burdensome for Plaintiff to resend the same people involved in the dispute to Ohio for the purpose of litigation. Plaintiff contends that since all of its corporate documents are located in California, Plaintiff would be inconvenienced if the

action is litigated in Ohio. The Court is not convinced that Plaintiff will be inconvenienced since Plaintiff also has offices in Ohio. Additionally, with today's technological advances, the Court does not believe that Plaintiff would have any difficulty transporting those corporate documents to Ohio for the purpose of litigation.

**\*4** In contrast, the Northern District of California would be inconvenience for the Defendant. Defendant's main business is in Ohio. Material evidence, such as Defendant's servers and equipment, are all located in Ohio. There is likely to be significant examination of such bulky equipment which is difficult to transport. Additionally, it will be burdensome for Defendant to terminate use of those equipments because it is likely that the equipments are being used for current business activities. These factors clearly weighs in favor of a transfer of venue to Ohio.

In weighing the convenience of the witnesses, the Court considers not only the number of witnesses involved, but also the materiality of the expected testimony. *E. & J. Gallo Winery v. F. & P. S.p.A.,* 899 F.Supp. 465, 466 (E.D.Cal.1994) (suggesting materiality is a factor by requiring disclosure of anticipated testimonies). The convenience of expert witnesses is given little weight. *Williams v. Bowman,* 157 F.Supp.2d 1103, 1108 (N.D.Cal.2001). Plaintiff does not dispute Defendant's contention that witnesses and parties who are: (1) responsible for the negotiation and execution of the Agreement, and the implementation of the software; and (2) knowledgeable about whether the alleged breach is a breach, all live in Ohio. Plaintiff merely contends that of the 33 individuals that Plaintiff has identified as having "involvement" *on Plaintiff's behalf* in the negotiation and performance of the License Agreement, 17 live within the Northern District of California. On balance, it appears that the materiality of the expected testimony weighs in favor of the Defendant because most of the key witnesses live in Ohio. Thus, venue is more proper in the Southern District of Ohio for the conveniences of the majority of the anticipated witnesses in this litigation.

3. *The Interest of Justice*

The "interest of justice" prong of § 1404(a) covers more than just the quest for a fair trial. Plaintiff's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2431192 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2431192)**

argument that as Defendant insures California residents, Defendant's alleged breach of contract is of substantial local interest is flawed. While Defendant's businesses with California residents may subject Defendant to personal jurisdiction in the state, Defendant's alleged breach of contract of a licensing agreement with Plaintiff has little to do with Defendant's insured. In engaging in contract negotiations and indeed ongoing businesses with Defendant, Plaintiff has had sufficient minimum contacts with the state of Ohio to facilitate a transfer that does not offend traditional notions of fair play and substantial justice.

### *V. CONCLUSION*

For the reasons set forth above, this Court DENIES Defendant's Motion to Dismiss for Improper Venue and GRANTS Defendant's Motion to Transfer Venue to the Southern District of Ohio.

N.D.Cal.,2005.
Vitria Technology, Inc. v. Cincinnati Ins. Co.
Not Reported in F.Supp.2d, 2005 WL 2431192 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.